[No. S045982. May 15, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY AVILA, JR., Defendant and Appellant.

## COUNSEL

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Eric L. Christopherson and Louis M. Vasquez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—During the late night and early morning hours of July 31 and August 1, 1991, two young women, Dorothy Medina and Arlene Sanchez, attended a gathering in rural Fresno, where Medina was brutally gang raped. She and Sanchez were then driven to a canal bank and killed.

In 1994, a Fresno County jury convicted defendant Johnny Avila, Jr., codefendant Richard Avila, who is also defendant's cousin, and codefendant Jeffrey Spradlin, of two counts of first degree murder. (Pen. Code, §§ 187, 189.)[1] It acquitted defendant and Richard Avila of one count of rape while acting in concert but convicted Spradlin of that charge. (§§ 261, subd. (a)(2), 264.1.) The jury further found that defendant and Spradlin personally used a firearm (§ 12022.5, subd. (a)), and that Richard Avila was armed with a firearm (§ 12022, subd. (a)(1)). For defendant and both codefendants, the jury further found true multiple-murder (§ 190.2, subd. (a)(3)), rape-murder (§ 190.2, subd. (a)(17)), and witness-killing (§ 190.2, subd. (a)(10)) special-circumstance allegations as to each victim.

For defendant, the trial court subsequently struck the rape-murder special circumstance as to both murder counts and the multiple-murder special circumstance as to the Sanchez murder count.[2] The penalty phase trials of the

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Likewise, for Richard Avila, the trial court struck the rape-murder special circumstance as to both murder counts and the multiple-murder special circumstance as to the Sanchez murder

three individuals were severed from each other, and defendant's trial commenced first. The jury sentenced defendant to death.[3] Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

# I. FACTS

## A. *Guilt Phase Evidence*

### 1. *Prosecution's Case-in-chief*

#### a. *Background*

In July and August 1991, Richard Avila and his wife Tricina lived at 1604 North Hayes (the North Hayes property) in Fresno. There were three trailers on the property: Tricina's mother Rachael Diaz, 15-year-old brother Zeek, and sister Veronica lived in the main trailer; Richard and Tricina lived in a smaller Wilderness trailer; and the smallest trailer was abandoned.

Late at night on July 31, or in the early morning hours of August 1, 1991, Dorothy Medina picked up Arlene Sanchez to attend a party. Corinna Sanchez, who lived with her sister Arlene and briefly spoke to Medina at the door, saw Michael "Blanco" Rojas get out of the passenger side of a 1963 or 1964 dark-colored Chevrolet with an orange "76" ball on the antenna. Corinna never saw her sister alive again.

#### b. *Discovery of the Bodies and Investigation*

Around 6:00 a.m. on August 1, 1991, a ranch foreman with Quist Farms saw two cars drive past him at the intersection of Cornelia and Church Streets in Fresno. One was a fairly new Pontiac Bonneville, which was wet and had all its windows down. The other was an old light-colored Datsun or Toyota.

Thirty minutes later, an irrigation worker discovered Medina's body on the south bank of the Houghton Canal (bounded by Chateau Fresno, Grantland Avenue, Belmont Avenue, and Highway 180), which borders a vineyard, in rural Fresno. She was on her back with her arms bent near her head and her legs extended outward. Her blouse was pulled down around her waist, and her bra was pulled up over her breasts. Otherwise she wore only socks and shoes. Nearby, authorities recovered a pair of pink underpants belonging to Medina and a .25-caliber shell casing.

---

count. For Spradlin, the court struck the witness-killing special circumstance as to both murder counts and the multiple-murder special circumstance as to the Sanchez murder count.

[3] Richard Avila and Spradlin were sentenced to life in prison without the possibility of parole.

Medina, whose face and upper body were splattered with blood, died of two gunshot wounds to her head. One was a small contact wound on her right temple made by a .25-caliber copper-jacketed bullet. The other was a large contact wound made by a bullet that entered her forehead and exited the back of her skull. Based on the crime scene evidence, including blood splatter evidence, and the position of Medina's body, authorities concluded that when she was shot Medina was lying in the position in which she was found, and that she probably was shot in the temple first and in the forehead second. Medina had abrasions and lacerations in her genital region that most likely were inflicted shortly before her death, and a vaginal swab indicated the presence of semen. She also had multiple bruises on her neck, forearms, and inner thigh. She had a substantial level of phencyclidine (PCP) and a .07 percent blood-alcohol level in her system, as well as some cocaine metabolite.

Ten feet from Medina, between two rows of grapevines, detectives discovered Sanchez's fully-clothed body. Sanchez similarly died of gunshot wounds to the head. One was a contact wound made by a nine-millimeter copper-jacketed bullet that entered her forehead and lodged in the base of her neck. The other was a smaller wound made by a .25-caliber copper-jacketed bullet that entered her left temple and lodged in her brain. Nearby, police found a .25-caliber shell casing and a nine-millimeter shell casing. The .25-caliber slug recovered from Medina's head and two pieces of the .25-caliber slug recovered from Sanchez's head were similar, but could not be conclusively shown to have been fired from the same gun.

There was a large amount of blood on Sanchez's body, indicating that her heart was still functioning when both wounds were inflicted. A vaginal swab was taken but did not detect any semen. Sanchez had a .14 percent blood-alcohol level and substantial levels of PCP and cocaine metabolite in her system. Evidence at the scene indicated Sanchez attempted to flee up the embankment before she was shot and killed. Two types of shoe prints in addition to the victims' shoe prints were found at the scene.

About the time Medina's body was discovered, a Pontiac Bonneville was engulfed in flames at the canal bank, on the north side of Annadale Avenue, near Blythe and Cornelia, in Fresno. Authorities concluded the fire was deliberately set. In the car were three nine-millimeter shell casings—two that had been expended and one that had not been expended but had detonated in the fire—and one expended .32-caliber shell casing.

Detective Melinda Ybarra of the Fresno County Sheriff's Department investigated the murders of Medina and Sanchez. During the course of her investigation, she became aware of a concurrent investigation of an incident

involving a minor, Spring J., that allegedly occurred at the North Hayes property mere hours before the murders.

On August 2, 1991, Detective Ybarra and sheriff's deputies executed a search warrant at the North Hayes property. On the property was a purple 1964 Chevrolet Impala, which belonged to Richard and had Sanchez's fingerprints on it. Also on the property was a blue 1978 Chevrolet belonging to David Gomez. Sheriff's deputies also found numerous firearms and various calibers of ammunition. Although .25-caliber ammunition was found on the property, no weapon capable of firing such ammunition was found. One unexpended .25-caliber bullet found on the property and two expended .25-caliber shell casings found at the murder scene had been cycled through the same gun. Two of the expended nine-millimeter shell casings recovered from the burnt car found on Annadale Avenue had been cycled through an Uzi that was seized from the property. No firearms used in the murders were recovered.

On August 30, 1991, sheriff's deputies executed a search warrant at a home owned by Richard Avila's mother-in-law, located at 355 North Fruit Street in Fresno, and seized several identical pairs of Nike shoes. These items were compared to photographs of footprints found at the crime scene and found to have similar class characteristics as to shoe length, width, sole design, and wear pattern.

### c. *Events Surrounding the Double Murder*

The testimony of Michael Rojas, Ray Juarez, and Frank Rodriguez formed the heart of the prosecution's case-in-chief. They testified consistently with each other regarding the identity of the key individuals present and certain events occurring that night. Thus, Rojas, Juarez and Rodriguez testified that, on the night of July 31 to August 1, about 30 people gathered on the North Hayes property in the expectation of a drive-by shooting. Many firearms were on the property, and some individuals were armed. People were drinking beer and smoking marijuana and PCP. Two young women, Spring J. and Kim F., were brought to the gathering, where they remained for a couple of hours and then left. At the end of their stay or shortly thereafter, two different young women, Dorothy Medina and Arlene Sanchez, were brought to the property. After several hours, defendant, Spradlin, and Rodriguez drove them away in a late-model gray Pontiac Bonneville, returning without them.

Rojas, Juarez, and Rodriguez testified inconsistently, at times wildly so, regarding their individual roles and their observations during the night in question. We summarize the relevant portions of their testimony below because the bulk of defendant's claims assert errors stemming from their testimony.

### (1) *Michael Rojas*[4]

Michael Rojas went to the North Hayes property on July 31, 1991, to back up Richard in case a fight erupted. He arrived about midnight and did not leave until dawn. That night, Rojas drank beer and smoked marijuana cigarettes.

Zeek Diaz and some other youngsters brought Spring J. and Kim F. to the property. Spring smoked PCP, commonly known as "KJ," with a group of men that included Richard. The group then went inside the main trailer. During this time, Rojas was outside near some trees where others were hanging out. Rojas did not see Spring go into the Wilderness trailer. At some point, Kim left the property with Richard, and Spring left with Mike De Anda and Juarez.

When Spring and Kim were still at the North Hayes property, defendant said he was leaving to pick up girls to "party." He and David Gomez left in Richard's car and returned with Medina and Sanchez. A group of six to eight men, including Juarez and Robert Chavez, approached the car carrying the two girls. Medina began smoking KJ.

Forty-five minutes after Medina and Sanchez arrived, Juarez was talking to Sanchez in the backyard when defendant approached and accused him of trying to act as if Sanchez were his "old lady." The two argued. Defendant had a nine-millimeter gun in his hand, but Rojas told him not to use a gun on any of the homeboys.

Rojas later saw a group of men take Medina to the abandoned trailer near the fence. Richard and De Anda also took her to the Wilderness trailer. At some point, Rojas heard muffled crying and noises coming from the Wilderness trailer. There were many men standing in front of the trailer door and going in and out. Rojas opened the door to the trailer and saw Medina lying on the bed naked. She appeared unconscious, and six or eight men stood over her with their pants down, grabbing at her. Richard, who was wearing a bulletproof vest but no pants, pulled the door closed. Rojas walked back to the tree.

Later, Rojas saw some men, including defendant, Richard, Spradlin, and De Anda, help Medina out of the trailer and toward a late-model gray car. Medina, still naked, was "loaded" and crying. Rojas heard the men tell her

---

[4] On September 12, 1991, the People entered into a contract with Rojas not to prosecute him for the rape of Spring J. in exchange for his truthful testimony in this case. Shortly after the preliminary hearing on this matter, which took place on December 8 and 9, 1991, Rojas was released from custody.

they were going to give her a ride home and saw them put her in the backseat of the car. Defendant placed Medina's head facedown on the seat cushion. Someone also placed Sanchez in the back seat with her head facedown on the cushion. Gomez wanted to take the girls home, but defendant told Richard that he did not want them to leave because he was scared they would "snitch" on them and identify him. Defendant told Richard he was "going to handle his business," meaning he was going to kill the girls. Defendant had a .25-caliber gun in his hand.

Everyone believed Rodriguez would "snitch" on them, and defendant told Rodriguez to get in the car with the girls. Rodriguez did not want to go, but people pushed him into the car. Defendant also got into the car, and Spradlin drove away. Chavez followed in his blue car.

About 40 minutes later, the four men returned together in Chavez's car without the girls. Defendant immediately started yelling at Richard. Defendant was angry because the gun he was given jammed when he tried to shoot one of the women in the head. He also complained that when he shot the women, blood splashed on his clothes. He told Richard, "I took care of your fucking business," and that Richard better take care of "stuff" if anyone said anything. Defendant also yelled at Rodriguez because he tried to run when defendant shot one of the women. Richard told defendant not to worry and to "be cool," because they would "take care of it." Richard then told the group that if anyone said anything, then their heads would be blown off. Defendant was also angry because he got blood on his clothes and on his new shoes. Richard arranged for defendant to get a new set of clothing and shoes. De Anda took the old clothes and said he was going to burn them in a barrel in his backyard. Rojas left at daylight.

When detectives initially interviewed Rojas, he denied ever being at the North Hayes property, and denied any and all involvement in Spring J.'s rape and the murders. Rojas was eventually arrested for the Spring J. incident and thereafter admitted to being present at the North Hayes property.

Rojas had prior convictions for assault with a deadly weapon (§ 245) and armed robbery (§ 211). He was on parole when this incident occurred.

### (2) *Ray Juarez*[5]

Ray Juarez first went to the North Hayes property about 9:00 p.m. on July 31 to help his friend Richard. He left and returned several times that night.

---

[5] In 1993, the People entered into a contract with Juarez to dismiss the murder charges against him in exchange for his guilty plea to the rape of Spring J. and his truthful testimony in this case. Juarez received a six-year prison term for rape, for which he was incarcerated when he testified.

During one trip to a nearby store with Gomez, Spring, and Kim in Richard's car, a car approached from behind with bright lights, and Juarez shot his .25-caliber gun in the air several times in warning.

Back at the North Hayes property, Juarez smoked KJ in the backyard with Spring and Zeek. Later, he saw Spring in the main trailer, and they started "making out."

At some point, Juarez saw Rojas in the Wilderness trailer with Spring. Rojas had a belt around Spring's neck and a gun pointed at her head, and told her to "shut up or I'll kill you." Spring tried to get up, but Rojas pushed her back down. Juarez had consensual sex with Spring; he did not rape her. He and De Anda later took Spring home. Kim left with Richard.

During the night, Juarez, Rojas, and two other men got in a blue or gray car that Juarez and Spradlin had stolen earlier and followed a Blazer that drove by the property. When the occupants of the Blazer started shooting at them, Rojas shot back at them with a .357-caliber gun and Juarez shot back with an AK-47 or a nine-millimeter gun. They then drove back to the property.

After Spring and Kim left, Medina and Sanchez arrived with Gomez and defendant in Richard's car. Juarez walked up to the car, looked inside, and recognized Medina, his ex-girlfriend, but not Sanchez.

Defendant gave Medina some KJ. Juarez talked to Medina and smoked KJ. Then defendant started screaming at him for talking to Medina. Defendant pulled out a nine-millimeter Uzi, but Rojas, who had been talking to Sanchez, yanked the gun away. Richard also came to see what was going on and told Juarez and defendant to stop arguing.

A short time later, Juarez joined Rojas, Medina, and Sanchez near Richard's car. Medina and Sanchez were "loaded" and leaning against the car. By this point, Juarez had drunk about six cups of beer and was a "little bit drunk." He also had smoked marijuana all day but was feeling fine. Juarez told Medina not to smoke too much, and Medina told him to leave her alone and that she could smoke as much as she wanted.

Juarez went into the main trailer for about 20 minutes and then sat on the porch drinking beer and talking to Zeek. He went to the Wilderness trailer to get some more marijuana and saw "a whole bunch of guys." Juarez smoked marijuana and then moved closer to the group to see what was going on.

Medina was lying on the bed naked and Rodriguez was having sex with her.[6] Rojas was lying next to her with a belt around her neck and a .357-caliber gun pointed at her head. Every time Medina cried, Rojas would tighten the belt around her neck and tell her to shut up. Medina was crying and asking them to stop. She grabbed Juarez and asked him repeatedly to help her. Juarez just told her to relax and "kick back." He also told her to give him a "blow job." She complied, but Juarez threw her back on the bed because he did not feel right about it. Spradlin, Chavez, and Robert Ballesteros also had sex with Medina. Richard then came into the trailer and said, "I want you to take the girls off my property."

Spradlin and Chavez, the last ones to leave the Wilderness trailer, placed a blanket around Medina and carried her to the abandoned trailer. Medina screamed and broke a window in the abandoned trailer with her hand. Juarez then heard a "pop," turned around, and saw Sanchez on the ground with Rojas standing over her "cussing her out." He did not actually see Rojas hit Sanchez.[7] Juarez followed Spradlin and Chavez into the abandoned trailer, where Spradlin had sex with Medina. Medina was trying to break loose, but Chavez was holding her down, and someone continued hitting her. When Juarez told the men to stop, they told him to get out. He left the trailer and joined defendant, Richard, Rojas, and Rodriguez at the front of the property. Sanchez, who was standing by Richard's car, appeared to be crying.

Juarez implored Richard to let him take the women home, but Rojas said no, reasoning: "If we let 'em go, they're gonna tell on us, what we did to them. And they gonna [sic] raid the house." Richard replied: "I don't care what you do, just get 'em off my property. I don't want 'em on my property." Around this time, Spradlin and Chavez came out of the abandoned trailer, followed by Medina, who ran toward Sanchez, holding a blanket over herself. Rojas grabbed Medina, pushed her facedown on a chair under a tree, placed a belt around her neck and a gun to her head, and asked her, "Do you know who we are?" She cried, "No, no," but Rojas said, "You're lying." Rojas then let Medina go, and she ran to Sanchez. Rojas said: "We can't let these girls go home. They know too much. We got to take 'em out." Defendant agreed. Juarez again implored Richard to let him take the women home, and Richard said he did not care what they did as long as the women were off his property.

Spradlin brought around the car they had stolen earlier. Defendant and Rojas grabbed Medina and placed her in the backseat of the car with her face on the seat cushion. Defendant, who had a nine-millimeter Uzi in his hand,

---

[6] Juarez previously told detectives that Spradlin was having sex with Medina when he walked into the Wilderness trailer.

[7] In one interview, Juarez told detectives that defendant hit Sanchez.

also placed Sanchez in the car.[8] Defendant also had a .25-caliber gun with two or three bullets in it that Juarez had given him earlier.[9] Spradlin had a .380-caliber gun in the waistband of his pants. Rojas pressed Rodriguez, who had a nine-millimeter Uzi, to get in the car. Defendant got in the front passenger seat, and Spradlin drove away.

Twenty to twenty-five minutes later, the men returned without the women. Rojas asked what happened, and defendant said he shot the women in the back of their heads twice. Someone asked where they shot the women, and defendant said he shot one woman on the canal bank and the other in the grapevines. Defendant commented, "You should have seen how [the women's heads] cracked." Holding a nine-millimeter Uzi in his hand, defendant told Richard: "Next time you give me a gun, make sure it works. This one got jammed on me." He told Richard that one of the women tried to run. Defendant also complained to Richard that Rodriguez had dropped the gun and tried to run. Richard asked if they threw the women in the canal. When defendant said no, Richard was angry and said: "It would have been harder for them to find. It would have been a couple more days." Defendant offered to go back and throw the bodies into the canal, but Richard said they should "[j]ust let it be." Richard told defendant to change his clothes because they had bloodstains on them. Defendant gave Juarez back the .25-caliber gun, which contained no bullets.

Defendant handed the nine-millimeter gun to Richard, who gave it to Juarez. Juarez cleaned the gun, which had blood on it, and placed it in a bag along with a pair of shorts belonging to Medina. He then gave the bag to De Anda, who said he would burn it at his house. But De Anda returned with the gun later in the day, and Richard told Juarez to bury it elsewhere. Juarez did so near Lake Avocado.

Richard also ordered the stolen car that had carried the women away be washed, taken somewhere far away, and burned. Juarez, Spradlin, Chavez, and Rodriguez washed the car. Spradlin drove off in it, and Chavez followed in his small blue Toyota. Spradlin and Chavez returned together. Spradlin did not say where they burned the car.

Juarez went to the Wilderness trailer, where he heard on a police scanner that two female bodies were found on a canal bank. Juarez then fell asleep

---

[8] At another point in his testimony, Juarez said that Chavez and Rodriguez placed Medina and Sanchez in the car. At yet another point, he said that defendant and Rodriguez carried the girls to the car.

[9] Juarez testified inconsistently about when he gave the gun to defendant. At one point, he said he gave defendant the gun earlier in the day; at another, he said he gave it to him in the evening; and at yet another time he said he gave it to defendant just before the men left with the girls.

and awoke at noon. When he woke up, Rojas pulled out a black leather pouch containing some jewelry. Juarez asked Rojas where he got it, and Rojas said he got it "off one of the girls." Rojas offered a piece of jewelry to Juarez, but Juarez declined.

When Juarez was arrested for the rape of Spring J., he denied any involvement in Spring's rape and in the murders, and further denied that Rojas was involved. But during an interview sometime after his arrest, Juarez acknowledged having had sex with Spring.

Juarez testified that he had spoken to Rojas on a couple of occasions while he was in jail following this incident. The two concocted a plan to blame defendant, Richard, and Spradlin for the murders. Rojas told Juarez that he had heard Richard was looking out for himself and did not care about anyone else. Rojas said he was going to make a deal with the detectives and encouraged Juarez to do the same. Rojas assured Juarez that if they stuck together they would both get out of jail. Juarez initially went along with Rojas's plan, but backed out when he found out that Rojas got out of jail while he remained. Sometime in 1992, Juarez told detectives that it was Rojas's decision to kill the women and that Rojas had ordered Rodriguez to get in the car.

### (3) *Frank Rodriguez*[10]

Shortly after 10:00 p.m. on July 31, 1991, Frank Rodriguez ran into Chavez, Zeek, Spring, Kim, and Juarez. There was a discussion about a possible drive-by shooting at the North Hayes property, and everyone drove there.

On the North Hayes property, Rodriguez drank beer throughout the night and spent most of the evening in the main trailer and in the Wilderness trailer.

Spring went into the main trailer and remained there for some time. Later, Rodriguez saw her go into the Wilderness trailer with Zeek. When Rodriguez walked into that trailer, Rojas asked him for help in holding Spring down. Rodriguez refused and left when Rojas told him to get out.

A couple of hours later, Spring walked out of the Wilderness trailer and left with De Anda. Thereafter, Kim left with Richard. Before Spring and Kim left, two different women arrived on the property with Gomez and defendant.

---

[10] On October 31, 1991, the People entered into a contract with Rodriguez not to prosecute him in exchange for his testimony in this case. He was released from custody in December 1991.

Rodriguez saw one of the women coming around the abandoned trailer with defendant, Richard, Spradlin, and Robert Chavez. The group walked toward a 1990 or 1991 gray Pontiac Bonneville. Chavez put one of the women in the backseat. The woman was on her knees on the floor of the car, with her hands on the seat and her head down. She was crying and repeatedly said, "Help me." The other woman was in the front passenger seat, also crying. Rodriguez did not see who put the woman in the front seat.[11]

Defendant said, "We got to get rid of these bitches." Richard said, "Take care of 'em," and "Got to take care of business. You got to do what you got to do." Defendant, Richard, and Spradlin told Rodriguez to get in the car, and Rodriguez complied because he was fearful of defendant. Rodriguez was unarmed, and he did not intend to assist in murdering the women. Defendant also got in the car, and Spradlin drove them to the canal bank.

At the canal bank, Spradlin took the woman sitting in the backseat and led her away from the car. The woman was on her knees, and Spradlin was holding her by the back of her neck. Rodriguez turned around and heard a pop. When he turned back, the woman was lying on the ground. Defendant led the other woman toward the grapevines. Rodriguez heard defendant say she was trying to get away and heard him yell for Spradlin's help. Rodriguez saw the woman attempting to crawl away from defendant. Spradlin then walked down the canal bank toward the grapevines. Rodriguez heard three gunshots, though he did not actually see defendant or Spradlin with a gun. Rodriguez next remembered getting back into the car and defendant yelling at him.

When the men returned to the North Hayes property, defendant continued to yell, telling everyone present that Rodriguez was a "rookie" who should not have gone, and that defendant should have taken him out, too. Rodriguez defended himself, stating that he had not wanted to go in the first place. Richard told Rodriguez to be quiet or he would be next.

When Rodriguez first spoke to detectives after his arrest on September 6, 1991, he told them he had been out of town the night of the murders and did not know who was responsible for them. Rodriguez was placed in a jail cell with Rojas for about five days, during which time Rojas suggested several times to Rodriguez that it would be better if Rodriguez turned state's evidence.

Rodriguez testified he suffered alcoholic blackouts in the past. He could not remember portions of the night of July 31 and August 1 because he had been drinking excessively and blacked out.

---

[11] In an interview with Detective Ybarra, Rodriguez said Chavez brought one girl to the car and Spradlin brought the other girl to the car.

#### d. *Other Evidence*

Detectives arrested defendant and interviewed him. Defendant initially denied knowing anyone who lived on North Hayes and said that, although he had a cousin named Richard Avila, it had been 10 to 15 years since they had seen each other. He also denied going to a party on North Hayes or taking any women to a party. When shown photos of Medina and Sanchez, he said he had seen Sanchez around town. Midway through the interview, defendant acknowledged he had been at a party but claimed he did not know what happened because he had left.

Defendant eventually told detectives he had met Medina several days before July 31. On July 31, he and Gomez picked up Medina and Sanchez in Richard's 1964 Chevrolet Impala and took them to a party on the North Hayes property, where about eight people were present.

Defendant told detectives that he drank a six-pack of beer at the party and had a "good buzz." He first denied there was any KJ on the property but later acknowledged that the women were smoking it. Defendant also said Chavez was going in and out of the Wilderness trailer, and there were a couple of men inside it. He said there were a few guns inside the trailer but denied seeing any handguns on the property.

When detectives intentionally misrepresented to defendant that they had abundant evidence against him, he told them they would probably find his saliva on Sanchez because he kissed her. Defendant admitted having touched the radio inside the car that had been burned. He denied having sex with the women, denied seeing either one raped, and denied shooting them.

Portions of a prior statement made by Richard were read to the jury and admitted at trial against Richard only.[12]

#### 2. *Jeffrey Spradlin's Defense Case*

Michael De Anda was married to Spradlin's sister. On July 31, 1991, De Anda lived with his mother on Ashland and Vineland. Two weeks before that, he lived in a home owned by Richard's mother-in-law on North Fruit Street.

De Anda went to the North Hayes property about 6:00 p.m. on July 31, 1991. He was armed with a .380-caliber gun.

About midnight, De Anda went into the Wilderness trailer and saw Spring crying on the bed, with her dress bunched around her midsection. Rojas was

---

[12] Because this evidence was not admitted against defendant, we need not recite it here.

holding her down with one hand and holding a large-caliber pistol in her mouth with the other. De Anda told Rojas this was not right, and the two argued. De Anda then told Spring to get out of the trailer.

De Anda guided Spring to the front passenger seat of his car. Juarez then approached, asked to come along, and then sat in the front seat with Spring. On the way to Spring's house, Juarez asked Spring if he could call her the next day, and she said no. To no one in particular, Spring said that night she had stripped for money and willingly engaged in group sex.

De Anda returned to the North Hayes property and joined some people who were standing beside a tree, drinking beer. He heard an argument and moved toward the commotion. Rojas, who had a gun in his waistband, told Rodriguez to "kick back" and not "worry about it." Several people gathered around, including defendant, and Richard told Rodriguez and Juarez to stop arguing.

About dawn on August 1, 1991, De Anda gave Juarez a ride home. In the car, Juarez offered to trade a gold chain with a medallion for some marijuana.

De Anda did not see any girls other than Spring on the North Hayes property.

De Anda was eventually arrested. At trial, De Anda admitted that he did not immediately tell detectives the truth, and that he did not mention Rojas in any of his police interviews until a couple of weeks before the multi-defendant rape trial involving Spring.

De Anda testified he was currently in custody and had been convicted of five felonies, including auto theft, receiving stolen property, and armed robbery.

### 3. *Richard Avila's Defense Case*

Richard Avila denied any involvement in Medina's rape or the murders, and presented evidence of Rojas's involvement in the offenses.

Robert Ballesteros[13] testified he was 15 years old when he went to the North Hayes property on July 31, 1991. Ballesteros saw guns on the property and people armed with guns. He spent most of the night in the main trailer playing Nintendo and listening to the radio. During that time, he saw four

---

[13] Ballesteros was initially charged with rape and murder, but the charges were later dismissed.

women. He saw Spring sitting in a car and Kim leaving with Richard on his motorcycle. Rojas, whom Ballesteros met that night, came into the main trailer and told Ballesteros he had something to show him. Grabbing Ballesteros from behind, Rojas carried him outside and into the Wilderness trailer, where Rojas told the men inside to "get off and let the little guy get his." Ballesteros saw a girl (not Spring J.) lying down, moaning in pleasure, and a man on top of her get up. Rojas pulled Ballesteros's pants down and pushed him on top of the girl. Ballesteros did not have sex with the girl because he knew it was wrong and because he did not have an erection. Everyone around him was making fun of him, and he felt foolish. He ran outside and into the main trailer. He went home shortly thereafter.

Michael Ramirez testified that he went to the North Hayes property around 5:00 or 6:00 p.m. on July 31, 1991, because Richard called him about a threat of a drive-by shooting. Ramirez, who was armed with a .380-caliber automatic handgun, saw a lot of other firearms on the property. He spent most of the evening in the main trailer with Zeek, Kim, and Ballesteros.

Ramirez testified he had sex with Spring in the Wilderness trailer.[14] As Spring was getting up and Ramirez was getting ready to leave, Rojas and Juarez came in. Rojas pushed Spring down and placed a gun against her temple. Holding her by the neck, he said, "You're going to suck my home boy's dick." Ramirez left the trailer and did not know when Spring eventually left the property. He saw Kim leave with Richard.

At some point, Ramirez saw Medina and Sanchez arrive in a purple 1964 Chevrolet with defendant and Gomez. Rojas, Juarez, and a few others approached the women. Later, Ramirez saw Rojas half-carry Medina, who appeared to be intoxicated, into the Wilderness trailer, followed by Juarez. Ramirez went to the porch of the main trailer and drank beer.

Ramirez heard Medina screaming, "Stop, please," and "Please, someone call the police. I'm being raped." He walked to the Wilderness trailer and peered inside. Medina was on her back on the bed, Rojas held her by her ankles, and Juarez held her arms down with his hands and knees. While Medina was being raped, Sanchez was sitting on the hood of a car drinking beer, laughing, and talking with defendant. Ramirez spoke to Chavez and, 15 minutes later, returned to the main trailer.

Ramirez heard an argument and walked outside to hear Rojas tell Richard that he had to do something about these girls because they had seen his face

---

[14] As a result of his conduct with Spring J., Ramirez pleaded guilty to having sex with a minor.

and they knew him downtown. Rojas said, "We've got to take these girls out," which Ramirez understood to mean they had to be killed. Angry and upset, Richard replied: "You fucked up. I don't care what you do with these girls, just get 'em off my property." Richard wanted them off the property because his wife and mother-in-law might show up. Rodriguez told Richard, "This is crazy. This is your home girls. You can't do this to your home girls."[15] Richard did not reply. Rojas asked Rodriguez, "What are you going to do? Snitch?" Rodriguez did not reply. Rojas went back into the Wilderness trailer and emerged with Medina. Rojas held Medina around the upper half of her body, someone else held her by her feet, and they carried her to the abandoned trailer. Medina was crying and said, "Please leave me alone." Rojas replied: "Shut up, bitch." Ramirez thereafter heard glass breaking and thumping noises. He went into the main trailer and did not go outside until sunrise.

In October 1992 Rodriguez told Ramirez he was housed in a jail cell with Rojas, and Rojas had warned Rodriguez not to say anything against Rojas. Rodriguez was scared about being charged with rape and murder. Within six weeks before Ramirez testified, Rodriguez told him he was going to tell the truth and testify on Richard's behalf because Richard was innocent.[16]

Richard Avila[17] testified in his own defense as follows:

In July 1991, Richard lived in the Wilderness trailer, which was owned by his mother-in-law. On July 31, in anticipation of a drive-by shooting, Richard and his father-in-law placed various weapons around the property. All of the weapons belonged to his father-in-law; Richard did not provide the weapons for the purpose of killing anyone. Richard invited David Cordova, Chavez, and De Anda to help him protect the property. Rojas came, uninvited, with Cordova. Many others came uninvited after dusk.

Spring J. was on the North Hayes property in the evening, left, and returned after midnight.

Sometime during the night, Zeek's brother arrived and argued with Juarez about a shooting. Richard broke up the argument. He did not break up a fight between defendant and Juarez.

---

[15] Ramirez testified that Rodriguez was armed throughout the night with a shotgun or some kind of a rifle.

[16] Ray Lopez, a high school friend of Rodriguez's and the godfather of Rodriguez's daughter, testified that Rodriguez told him he would testify falsely against Richard because he was worried about what would happen if he changed his statement.

[17] Richard admitted having twice been convicted of possession of illegal weapons and once of another felony involving moral turpitude.

On August 1, a white Blazer drove by the property about 1:00 or 1:30 a.m. and again 15 minutes later. Juarez and Rojas jumped into a late-model four-door car with two others and followed the Blazer.

About 4:00 a.m., Richard took Kim home. When they left, his 1964 purple Chevrolet Impala was not there, as Gomez was out driving it. After Richard dropped off Kim at her house, he drove to a motel on Ashlan and Highway 99 where his wife was staying. He went into the motel room, undressed, and started to go to sleep, but he got up and went back to the North Hayes property because he had a "funny feeling." When he returned, his car was there. He had been away for less than two hours.

Richard heard mumbling noises coming from the direction of the Wilderness trailer. He walked to that trailer, opened the door, and made eye contact with Rodriguez, who was on his knees on the sofa bed holding a girl's ankles. Another man standing with his back to Richard was picking up his pants. When Richard stepped inside to find out what was going on, he saw Rojas kneeling next to a girl who was lying on a sofa bed. Rojas was holding her down with one hand and had a gun in the other hand. Richard asked Rojas what he was doing. Rojas pointed a .357-caliber chrome magnum at him and told him to mind his own business. Richard told Rojas that he did not want this happening in the trailer and to get them out. Rojas continued to tell him to mind his own business and cocked back the hammer of his gun. Richard backed out of the trailer. At trial, Richard testified that he did not give anyone permission to use his trailer to rape Medina.

As Richard left the trailer, he asked who had brought the girl, and someone said that defendant[18] and Cordova brought "these girls." He went into the main trailer, opened the back door, and saw defendant and another girl talking. He called to defendant and asked who the girls were. Defendant replied they were a couple of his "home girls." Richard told defendant that Rojas was beating a girl in the Wilderness trailer. Defendant told Richard he would go up there shortly.

Richard then walked back toward the Wilderness trailer and heard sounds of glass breaking coming from the area of the abandoned trailer. He then walked to the abandoned trailer and found the door locked. He pounded on the door and told the occupants in the trailer to get out. Someone inside said, "Hold on a minute." Richard was angry because the people inside would not unlock the door.

Richard left, spoke to defendant again about the situation, and returned to the abandoned trailer. He looked inside through the broken window but did

---

[18] Richard testified he did not know defendant well, as they had only met a couple of times before August 1.

not see anyone. As he walked toward the Wilderness trailer, he saw Rojas crouching over a girl under a tree and repeatedly asking her, "Do you know who I am?" Rojas was holding her neck with one hand and a gun with the other. Rojas struck the girl twice with the butt of his gun. Richard approached Rojas and demanded that he let the girl go. Rojas pointed his gun at Richard and told him to mind his own business.

Richard saw defendant walking around the corner of the main trailer with the other girl. He approached defendant and told him that Rojas was beating the girl again, that he did not appreciate what was going on, and that he wanted Rojas out of there immediately. Defendant followed Richard. Richard then saw Chavez and Spradlin walking around the abandoned trailer with the girl Rojas had beaten. Richard walked alongside them. Someone, possibly Juarez, asked Richard for permission to use his car. Richard said no. He also said "take them out of the property," not "take them out." Someone said he was going to give the girls a ride home. Richard did not hear Rojas talking about what should be done with the girls or have a conversation with anyone on that subject. He never said the girls should be taken out and killed. He thought they would be taken home.

Richard continued walking toward the porch of the main trailer. When he looked back, Chavez was leaning inside the left passenger side of a gray or gold-colored late-model Bonneville.[19] Rojas was facing backwards in the front passenger seat. Angry, Richard went inside the main trailer for a beer. A few minutes later, he heard a car leaving and walked outside to see the Bonneville pulling out onto North Hayes. A girl in the car looked back at him with a sad expression. Frustrated, Richard walked to the backyard and then into the main trailer.

Fifteen minutes later, Richard heard an argument outside. Walking toward the participants, Richard heard defendant yelling at Rodriguez and threatening to kill him. Richard heard defendant say he shot the girls and complain that he was given a gun that jammed. Defendant said that Rodriguez was in the grapevines holding one of the girls and that he (defendant) shot her, but that when his gun jammed he took the gun from Rodriguez, who ran. Richard denied telling defendant it would have been better if he had thrown the girls into the canal. Defendant told Richard, "I took care of your business, now you take care of mine." Richard did not respond because he did not want defendant to "turn on him." During this time, defendant was waving his arms, holding a .25-caliber gun in one hand and a nine-millimeter Tec-9 in the

---

[19] In an interview with detectives after his arrest, Chavez said he placed Medina in the backseat of the car, hoping she and Sanchez would be taken home. He then asked Rodriguez to get in the car.

other.[20] Richard tried to calm defendant. Juarez grabbed the .25-caliber gun from defendant, and Richard grabbed the nine-millimeter gun.

When defendant calmed down somewhat, Richard approached Rodriguez, who was preparing to leave, and warned him not to say anything to the police because "Johnny's crazy. He'll kill you."

When Richard returned to defendant, Juarez, Rojas, and Cordova, defendant was angry again because he had blood on the shoes his mother had recently bought him. Richard told defendant to calm down and they would take care of it. Someone brought defendant shoes and clothing.

Richard got some marijuana from the Wilderness trailer and beer from the main trailer. When he walked back outside, he saw some people, possibly Chavez and Spradlin, washing the Bonneville. Richard overheard Chavez discussing burning the car; he did not direct anyone to burn it.

Richard went into the Wilderness trailer with defendant, Rojas, Juarez, Cordova, and De Anda. Listening to a police scanner, they heard about the murders and turned on the news. Between 8:00 and 9:00 a.m., Richard drove defendant home, telling him, "I don't want to hear about [the murders]." Richard returned to the North Hayes property at 1:00 p.m. At that point, only his parents-in-law were there.

About a week later, Richard found a bag containing a nine-millimeter Tec-9 and a .25-caliber semiautomatic pistol in the back of a woodpile behind the shed in the backyard. They appeared to be the guns defendant was holding on August 1. Richard dismantled the guns and destroyed them using a blowtorch because he knew the police were looking for them.

Prior testimony of Frank Mendez was read into the record.[21] Mendez had known Rojas since Rojas was a child, and had known him to smoke marijuana. During August and September 1991, the two were housed in the same jail, and Rojas spoke to Mendez about the murders in this case. Rojas said he knew who had raped the girl, and that he was present when the girls were taken away to be killed. Rojas also said something about getting rid of the girls because they knew too much, and that Richard was driving some girl

---

[20] Richard had last seen the nine-millimeter gun on the kitchen table of the Wilderness trailer 20 minutes before he took Kim home.

[21] Mendez was subpoenaed but failed to appear, and thus was unavailable at trial. At the time he testified, Mendez had a 1971 conviction for illegal transportation of narcotics, a 1984 conviction for possession for sale of narcotics, and 1985 and 1989 convictions for possession of narcotics, and was in custody in Wasco State Prison for a conviction of petty theft with a prior.

home while this was occurring. Rojas also mentioned pulling a chain necklace off one of the girls and calling his wife to tell her to get rid of some of his clothing in the trunk of a car. Rojas did not mention defendant.

Thomas Richardson, counsel for Rojas, testified that the prosecution entered into a contract with Rojas for his cooperation in this matter, and that one term of the contract was that Rojas take and pass a polygraph examination. When Richardson learned the result of the polygraph examination was inconclusive, he informed the prosecutor. The prosecutor replied that Rojas had fulfilled that term of the contract by taking the examination, and that the inconclusiveness of the result indicated the unreliability of the examination rather than Rojas's failure.

Ruben Arrechiga, Jr., testified he had suffered felony convictions in 1977, 1981, 1991, and 1993. In 1986 or 1987, Arrechiga lived with Rojas. During that time, Rojas used PCP three or four times a week. Based on his experience with Rojas, Arrechiga did not believe him to be an honest person.

Arrechiga also spoke to Richard's defense investigator about a convenience store robbery Rojas committed in 1988. Rojas told Arrechiga that as he was fleeing the scene of the crime, he fired shots at two young girls from the neighborhood because they could identify him.

In May 1982, Ronald Tate was walking home at night when he saw a group of teenagers fighting. Rojas, who was with a different group, approached him and repeatedly asked what was happening. Rojas then pulled a knife out of his pocket and stabbed him once in the neck and twice in the back.

### 4. *Defendant's Defense Case*

Defendant presented evidence that Sanchez was a family friend, implicitly suggesting he would not have killed someone he knew and liked. Specifically, defendant's three sisters and two cousins and Sanchez's sister testified that for several years in the mid-1980's Sanchez dated Chucky Chacon, defendant's cousin. During that period, Sanchez and defendant, who occasionally met at family gatherings, appeared to get along. After Sanchez and Chacon broke up, she continued to be friendly with defendant. Defendant and Sanchez were last seen together in the late 1980's at a family gathering.

Spring and Kim testified for defendant. On July 31, 1991, Zeek invited Spring to a party. He picked her up in a purple Impala; Gomez was driving. The three then picked up Spring's friend Kim and drove to the North Hayes property, arriving about 10:30 p.m. They saw many men carrying firearms,

and various guns were strewn about the property. Some of the men approached the girls and started talking to them. Spring recognized Juarez, whom she had met three weeks before.

Spring and Kim left the North Hayes property twice with some others to buy alcohol from a nearby store. On one return trip, when they were with Gomez and Juarez, a car behind them flashed its high beams. Gomez reached down from under his driver's seat, pulled out a 16- to 18-inch gun, and started firing at the car behind them. Juarez leaned out the window and also began shooting at the car. When they returned to the property, they learned that Zeek's brother and his family were in the car behind them.

In the early morning hours of August 1, 1991, Spring, Kim, Zeek, and Juarez smoked KJ outside the back of the main trailer. At one point, Spring and Kim met in Zeek's bedroom, in the main trailer. Juarez was there, and Rojas, whom neither girl knew, was in the kitchen with a 17- to 18-inch gun strapped over one shoulder.

Richard drove Kim home, arriving there between 3:00 and 4:00 a.m. Meanwhile, Spring found herself in the Wilderness trailer, where, over the course of two and a half hours, she was raped 12 times by six or seven individuals, including Juarez and Rojas. Rojas held her legs open while other men raped her. Rojas also pulled her hair and hit her, placed a belt around her neck and choked her with it, put a revolver to her head, cocked back the hammer several times, and threatened to kill her if she told anyone what happened that night. During the assault, Spring lost a necklace and a pair of earrings. Eventually De Anda came into the trailer and told Rojas to leave her alone. He helped Spring find her shoes and clothes, and they walked to De Anda's car. Just as they were leaving the property, Juarez jumped into the car, sandwiching her between De Anda and himself. Spring was scared because Juarez had a gun. In the car, Spring did not say that she was paid to strip or willingly engaged in sex. It was past 4:00 a.m. when Spring returned home. Spring did not recall seeing defendant that night.

Spring testified that, when she first arrived at the party, she saw a girl walking toward a trailer. Kim testified that, before midnight, she saw a man escorting a thin young woman from the main trailer.

John Coyle, a correctional sergeant with the California Department of Corrections who became familiar with Rojas while he was assigned to the California Medical Facility in Vacaville for 16 months, opined that Rojas was dishonest.

### 5. *People's Rebuttal Evidence*

Before trial, Rodriguez discussed with Ray Lopez his upcoming obligation to testify as a witness in this case. Lopez asked Rodriguez if he could change his story about Richard and claim immunity so he would not get in trouble. Rodriguez explained his contract with the prosecution did not work that way. He did not tell Lopez that Richard was uninvolved in the murders.

### B. *Penalty Phase Evidence*

#### 1. *Prosecution's Case in Aggravation*

The prosecution presented evidence that defendant previously had been convicted of shooting at an inhabited dwelling (§ 246), intimidation of a witness by force or violence (§ 136.1, subd. (a)(1)), and felony possession of PCP (Health & Saf. Code, § 11377).

Medina's cousin Richard Gonzales testified that Medina's death devastated her mother and that she had not been the same person since. Similarly, Medina's sisters found it difficult to talk about Medina, and the mere mention of Medina's name brought them to tears. Medina's family believed she was too young to die.

The prosecution presented a photograph of Medina and her two sisters taken in January 1991 and a photograph of Sanchez and her son taken within two months of her death.

#### 2. *Defendant's Case in Mitigation*

Defendant presented extensive evidence about his family background and childhood. He was the second of eight children and the oldest boy. Defendant's mother, Ester, and father, John Avila, Sr., married in 1956 and moved to Pinedale, California, in 1960, where the family lived until 1979. Defendant's mother did not work outside the home, and his father typically worked 10- to 12-hour days as a foreman. Defendant's father was a well-liked and respected member of the community who coached baseball for a boys club and organized other sports.

Defendant's father demanded the family eat breakfast and dinner together, expected his children to do household chores before and after school, and taught his children the difference between right and wrong. During the summers, he made the children work in the fields picking figs to teach them responsibility and to make extra money. The siblings, especially defendant, helped each other in the fields.

Defendant was a small, skinny, and quiet child, who was placed in special education classes at school because he was a slow learner. Because of his special placement in school and his small size, other children used to pick on and beat him, though he never went looking for a fight. Defendant was also a "mama's boy," meaning he would often run errands for his mother. He was generally a happy boy who made others laugh.

Defendant was a member of the boys club and played numerous sports. He was a pitcher on a baseball team coached by his father, and went fishing with him. Defendant was a good brother who played games with his siblings, took them to movies, and stopped them from fighting with each other.

When defendant was 15 years old, an older boy named Russell Mestas picked a fight with him and bit off a part of his ear. Defendant's father broke up the fight. Defendant never retaliated against Mestas. About this time, defendant dropped out of school and "took up with" a young woman named Yolanda. The two lived with his family.

Defendant's father helped him with his schoolwork and to get a job with his company. In his late teens and early twenties, defendant was very active, dancing, playing music, working, and raising his own growing family. Defendant was a good listener, and counseled his sisters and cousins, especially about their rocky marriages and relationships.

In February 1978, when defendant was about 20 years old, defendant and some of his family members went to a reception, and Russell Mestas hit his sister Vera in the mouth. At a party later that night, defendant's father learned about the earlier incident with Mestas and went outside to Mestas's car to confront him. Someone from inside the car shot him. He fell back into defendant's arms and died of his wounds.

The Avila family began receiving threats from the Mestas family and the Contreras family (who were related to the Mestases by marriage). Their house was "shot up" several times. Defendant retaliated by shooting at the Contrerases' house and was sent to the California Youth Authority as a result. The entire Avila clan eventually moved to Fresno. Defendant tried to take his father's place in the family but found it difficult to do so and became bitter.

In 1990, defendant stayed with his sister Mary and her family for a few months. Defendant was unemployed and appeared to be frustrated because he could not find a job. Mary's husband helped him fill out an employment application because defendant could not read or write well. During the time defendant stayed with Mary's family, he played with the children and helped with the household chores.

Julie Cruz dated defendant from mid-1989 to early 1991. Defendant was nice and never disrespected her. Defendant was also very good with her baby. She had never seen defendant use drugs.

Family members testified it would be very hard on their family if defendant were to receive the death penalty.

James Park, an expert on California prisons who had worked for the Department of Corrections for more than 30 years, testified that new inmates in California were classified on a point system, and that an inmate sentenced to life without possibility of parole had enough points to place him in a maximum security prison. Inmates in maximum security prisons have limited movement and loss of privacy, though they have the opportunity to work in factories or buy small items in a cantina. If defendant received a sentence of life without the possibility of parole, he would live in a 60- or 80-square-foot cell with another inmate.

Abel Esquivel, a licensed clinical social worker, testified about the impact of John Avila's death on defendant generally and from a cultural standpoint. Esquivel opined that defendant's substance abuse and criminal activity were the result of confusion and isolation stemming from the loss of his father and his inability to successfully take the lead in the family. Defendant also experienced contradictory feelings resulting from his unsuccessful attempt to mesh his Mexican culture with the mainstream one. Esquivel also testified that defendant tended to gravitate toward those half his age and appeared to vacillate between wanting to establish a home and family of his own and wanting to party and meet young women.

Errol Leifer, a clinical psychologist, conducted a neuropsychological evaluation of defendant and found that he consistently performed at a level of intellectual and mental functioning suggesting mild mental retardation. Defendant also showed residual mild diffuse organic brain damage from chronic use of PCP. Given his mental deficiencies and brain damage, if defendant ingested intoxicants such as PCP and alcohol, his ability to engage in an act involving a plan or a scheme would be greatly impaired. Leifer conceded, however, that defendant would be capable of understanding that a witness to a criminal act could be a threat to him and of making a decision to kill.

Another clinical psychologist, Charles Pine, conducted diagnostic tests on defendant on three occasions in 1992, 1994, and 1995, and concluded that he suffers from a cognitive disorder stemming from neuropsychological deficiencies, head trauma, and substance abuse, making it difficult for him to solve abstract problems; posttraumatic stress disorder due to the death of his father

and loss of his way of life; depression stemming from early childhood; and polysubstance dependence disorder involving PCP, alcohol, and marijuana. Pine also testified that defendant functioned at a borderline level of mental retardation, with an IQ of 77.

## II. JURY SELECTION ISSUES

### A. *Procedure Used to Challenge Prospective Jurors for Cause*

Defendant contends that several aspects of the procedure the trial court required the parties to follow in making challenges for cause were arbitrary and unreasonable, and made selecting a fair and impartial jury impossible, in violation of statutory requirements. He also asserts violations of his rights to an impartial jury under the Sixth Amendment, due process and fundamental fairness under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment.[22]

### 1. *For-cause Excusals on Written Answers Alone*

Defendant contends the trial court erroneously excused for cause four prospective jurors based solely on their written answers to a jury questionnaire concerning their views on the death penalty, and without any opportunity for follow up questioning during which the court and counsel might have been able to clarify the responses and determine whether, in fact, the prospective jurors should be disqualified from service. He asserts the excusals violated various provisions of the federal Constitution enumerated above.

---

[22] With respect to virtually every claim raised on appeal, defendant urges that the error or misconduct he is asserting infringed a variety of his constitutional rights to a fair and reliable trial. In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. Unless otherwise indicated with respect to a particular claim, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte, erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as it was wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the federal Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765]; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional "gloss" as well. No separate constitutional discussion is required in such cases, and we therefore provide none.

The trial court, after soliciting comment from all counsel, prepared a 24-page written questionnaire consisting of 108 questions. Several pages of the questionnaire focused on the prospective jurors' views concerning the death penalty.[23]

Based on the questionnaires completed by the first 75 prospective jurors, the trial court proposed to excuse for cause 14 individuals without questioning them orally because their responses to the questionnaire "very clearly" indicated that either they were not death qualified—because they would always impose the death penalty or would never consider imposing the death penalty—or they had read or heard something about the case that created a

---

[23] The questions designed to identify prospective jurors' views about the death penalty read in relevant part as follows:

"81. What are your views on the death penalty?
"___ Strongly Support
"___ Support
"___ Will Consider
"___ Oppose
"___ Strongly Oppose
"82. Please explain your position: [¶] . . . [¶]
"85. Do you feel that the death penalty is used too often, not often enough, or too randomly? Please explain:
"86. How strongly do you hold this view and why? [¶] . . . [¶]
"91. One of the duties of a juror is to follow the law as it is instructed to you. Do you honestly think that you could set aside your personal feelings and follow the law as the Court explains it to you, even if you had strong feelings to the contrary? Yes ___ No ___ Please explain: [¶] . . . [¶]
"97. If the People prove beyond a reasonable doubt that the defendant(s) is guilty of murder in the first degree, would you refuse to vote for such a verdict because of your conscientious opinion concerning the death penalty, knowing that verdict would obligate the jury to get into a second phase of the trial? In other words, regardless of the evidence, and because of your conscientious objections to the death penalty, would you in every case <u>automatically</u> vote for something other than murder in the first degree because you know that such a verdict would end the death penalty questions once and for all? Yes ___ No ___
"98. If the People prove beyond a reasonable doubt that the defendant(s) is guilty of murder in the first degree and prove beyond a reasonable doubt the truthfulness of the special circumstances alleged, would you refuse to vote for a verdict of the truthfulness of the special circumstances because of your conscientious opinion concerning the death penalty and your knowledge that to do so would obligate the jury to get into the penalty phase? In other words, regardless of the evidence that might be produced during the course of this trial, and because of your conscientious objections to the death penalty, would you in every case <u>automatically</u> vote for a verdict of not true as to the special circumstances alleged because you know that such a verdict would end the death penalty question then and there? Yes ___ No ___
"99. Do you entertain such conscientious opinions concerning the death penalty that, regardless of the evidence that might be developed during the penalty phase of the trial, should we get there, that you would automatically and absolutely refuse to vote for such a penalty in any case? In other words, regardless of the evidence and because of your conscientious objections to the death penalty, would you in every case <u>automatically</u> vote for life imprisonment without the possibility of parole and never vote for a verdict of death? Yes ___ No ___"

strong belief in defendant's guilt. Defendant objected unsuccessfully to the excusal of four of the 14 prospective jurors: C.H., R.V., O.D., and R.W.[24]

■ Decisions of the United States Supreme Court establish the circumstances under which a prospective juror's views on the death penalty properly may serve as the basis for a challenge for cause. In *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522 [20 L.Ed.2d 776, 88 S.Ct. 1770], the United States Supreme Court held that a defendant cannot be sentenced to death if the jury that imposed the penalty was chosen by excluding prospective jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." In *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844], the high court clarified its decision in *Witherspoon* and held that a prospective juror may be excluded for cause because of his or her views on capital punishment if those views would " 'prevent or substantially impair' " the performance of his or her duties as a juror in accordance with the trial court's instructions and his or her oath. (Accord, *People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519].) But neither *Witherspoon* nor *Witt* requires that a prospective juror automatically be excused if he or she expresses a personal opposition to the death penalty. Those who firmly oppose the death penalty may nevertheless serve as jurors in a capital case as long as they state clearly that they are willing to temporarily set aside their own beliefs and follow the law. (*Lockhart v. McCree* (1986) 476 U.S. 162, 176 [90 L.Ed.2d 137, 106 S.Ct. 1758]; accord, *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

■ Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for "appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451 [15 Cal.Rptr.3d 656, 93 P.3d 271] (*Stewart*).) But such deference is unwarranted when, as here, the trial court's ruling is based solely on the "cold record" of the prospective jurors' answers on a written questionnaire, the same information that is available on appeal. (*Ibid.*) Accordingly, reviewing the record de novo, we conclude the trial court did not err in excusing for cause four prospective jurors based solely upon their written responses to the jury questionnaire.[25]

---

[24] Defendant also objected to the excusal of Prospective Juror V.K. After discussion with counsel, the trial court decided not to excuse her at this stage.

[25] While we conclude that the trial court did not err, we observe that courts balance a number of competing interests during jury selection. One such important interest is the obligation to give all parties the opportunity to select a fair and impartial jury based on

*Stewart* is distinguishable. There, we held that the trial court erred in excusing for cause five prospective jurors, over the defendant's objections, based solely upon their responses to a three-part question on the written jury questionnaire that focused on views concerning the death penalty. We therefore reversed the defendant's death sentence without an inquiry into prejudice. (*Stewart, supra,* 33 Cal.4th at pp. 445–455.)

Our concerns, however, were centered on the particular circumstances of that case. At the outset, we stressed a material flaw in the *Stewart* questionnaire itself. It asked whether the prospective juror had a conscientious opinion or belief about the death penalty that " 'would prevent *or make it very difficult*' " for the juror to vote for first degree murder, find a special circumstance true, or impose the death penalty. (*Stewart, supra,* 33 Cal.4th at p. 442, italics added.)

As we observed, even one who gave a straightforward "yes" answer to such questions would not necessarily demonstrate disqualification under *Witt,* because mere *difficulty* in imposing the death penalty does not, per se, prevent or substantially impair the performance of a juror's duties. The prospective juror might nonetheless be able to put aside his or her personal views and deliberate fairly under the death penalty law. Yet the *Stewart* questionnaire did not inquire whether the prospective juror could do so. Hence, in many cases, followup questioning was essential to assess whether the juror could overcome personal reservations and properly weigh and consider the aggravating and mitigating factors. (*Stewart, supra,* 33 Cal.4th at p. 447.)

Each of the five prospective jurors whose excusals for cause were challenged in *Stewart* had answered the flawed questionnaire in ways that indicated strong reservations about the death penalty but did not negate the possibility the jurors could set aside their feelings and deliberate fairly. As a result, we held those jurors should have been subject to clarifying follow up examination. (*Stewart, supra,* 33 Cal.4th at pp. 444–449.) The court's failure to conduct such an examination was apparently based on its misunderstanding and misapplication of the standard necessary to excuse a prospective juror for cause based on his or her death penalty views. (*Id.* at pp. 444–445, 447, 451.)

In *Stewart,* we noted: "[W]e need not and do not hold . . . a trial court never may properly grant a motion for excusal for cause over defense objection based solely upon a prospective juror's checked answers and written responses contained in a juror questionnaire. We are, however, unaware of any authority upholding such a practice." (*Stewart, supra,* 33

adequate information. The legitimate pursuit of laudatory efficiency should not be transformed into an arbitrary pursuit of speed for its own sake.

Cal.4th at pp. 449–450, fns. omitted.) Indeed, we did not criticize 17 stipulated excusals for cause, based solely upon written responses to the *Stewart* questionnaire, stating that many of the responses submitted in those 17 cases "revealed unambiguous and entrenched support for or opposition to the death penalty." (*Id.* at p. 444 & fn. 11.) Thus, nothing in *Stewart* indicates that an excusal without oral voir dire is improper where the prospective juror's answers to a jury questionnaire leave no doubt that his or her views on capital punishment would prevent or substantially impair the performance of his or her duties in accordance with the court's instructions and the juror's oath.

■ The question left undecided in *Stewart* is squarely presented here, and we now hold that a prospective juror in a capital case may be discharged for cause based solely on his or her answers to the written questionnaire if it is clear from the answers that he or she is unwilling to temporarily set aside his or her own beliefs and follow the law. (See *Lockhart v. McCree, supra,* 476 U.S. at p. 176.)

The questionnaire at issue here did not suffer from the defect cited in *Stewart.* It asked whether a prospective juror held such conscientious objections to the death penalty that, regardless of the evidence or the strength of proof, he or she "automatically" would refuse to return a first degree murder verdict, find a special circumstance true, or impose the death penalty. Any juror who "automatically" would vote in ways that precluded the death penalty would clearly be disqualified under *Witt.*

■ Thus, this questionnaire format, unlike the one presented in *Stewart,* included more expansive and detailed questions on capital punishment and gave jurors the clear opportunity to disclose views against it so strong as to disqualify them for duty on a death penalty case. Moreover, unlike in *Stewart,* the death-penalty-related answers given by the prospective jurors whose excusals defendant challenges here were sufficiently unambiguous to allow the court to identify disqualifying biases on the basis of their written responses alone. With respect to each of these excusals, we conclude that the trial court's determinations, based solely on the questionnaire responses, were correct.

Prospective Juror R.V. indicated she strongly opposed the death penalty and would in every case automatically vote for life imprisonment without the possibility of parole, regardless of the evidence that might be produced during trial. She indicated she could not set aside her personal feelings and follow the law if the death penalty were involved. Her responses were clear, unequivocal, and internally consistent. The trial court did not err in excusing her for cause based solely on her responses to the jury questionnaire.

Prospective Juror C.H. indicated she strongly opposed the death penalty because her religion taught her that killing was wrong. She indicated she could not set aside her personal feelings and follow the law, explaining: "I would have such difficulty with the death penalty that I don't think I could weigh evidence without my beliefs influencing me." To the question inquiring whether she entertained such conscientious opinions about the death penalty that, regardless of the evidence that might be developed during trial she would in every case automatically vote for life imprisonment without the possibility of parole, she wrote, "I couldn't vote." Although she did not simply check "Yes" or "No" to this question as directed, we understand her written response to mean that she would be unable to carry out her duties as a juror in the case because of her views about the death penalty. Her responses were internally consistent and unambiguous. The trial court did not err in excusing her for cause based solely on her responses to the jury questionnaire.

Although Prospective Juror O.D. indicated he strongly opposed the death penalty, he also acknowledged that one of the duties of a juror was to follow the law and indicated he could set aside his personal feelings and follow it. Given only these two answers, we might not be able to say that O.D.'s opposition to the death penalty was clear and unequivocal. But he also indicated that he entertained such conscientious opinions regarding the death penalty that he would, in every case and regardless of the evidence presented, automatically vote for something other than first degree murder so as not to reach the penalty phase, automatically vote for a verdict of not true as to the special circumstances alleged so as not to reach the penalty phase, and, automatically vote for life imprisonment without the possibility of parole if there were a penalty phase. O.D. also strongly disagreed with the following three statements, based on his religious beliefs: (1) "Any person who intentionally kills another person, unless the killing was in self-defense or the defense of another, deserves the death penalty"; (2) "Convicted murderers should be swiftly executed once they are convicted"; and (3) belief in the adage "An eye for an eye." When asked to explain his answers, O.D. answered, "I was taught that there should be no reason to kill and I will continue to think this way." We find that, taken together, O.D.'s answers to the jury questionnaire professed an opposition to the death penalty that would prevent him from performing his duties as a juror. Accordingly, the trial court did not err in excusing him for cause based solely on his responses to the jury questionnaire.

Lastly, Prospective Juror R.W. indicated he strongly opposed the death penalty based on his religious beliefs and believed the death penalty "should never be used." R.W. also answered "unknown" to questions whether he would in every case automatically vote for something other than murder in the first degree because such a verdict would end the death penalty question

once and for all, and whether he would in every case automatically vote for a verdict of not true as to the special circumstances alleged because such a verdict would end the death penalty question then and there. But he acknowledged he entertained such conscientious objections to the death penalty that, regardless of the evidence that might be developed during trial, he would in every case automatically vote for life imprisonment without the possibility of parole. In other words, he expressed doubt he could put aside his pro-life bias even when voting on guilt and special circumstance issues, and made clear he would not be able to do so if deliberations proceeded to the issue of penalty.

Thus, as with Prospective Juror O.D., we find that R.W.'s responses, taken together, reflected opposition to the death penalty that would prevent him from performing his duties as a juror. Accordingly, the trial court did not err in excusing him for cause based solely on his responses to the jury questionnaire.[26]

### 2. *Time Limitations on Voir Dire*

The trial court explained to all parties that it would conduct voir dire in the following manner: 24 prospective jurors would be called and questioned as a group by the court and then by counsel, with counsel for each defendant and the prosecutor allotted 10 to 15 minutes each to question the group; if all the parties passed the group for cause, then peremptory challenges would be directed to the 12 of the 24 seated in the jury box; each prospective juror dismissed on a peremptory challenge would be replaced, in order, by those seated in seat numbers 13 through 24; when the initial group of 24 was reduced to the 12 seated in the jury box, another group of 13 would be called and questioned as a group by the court and then by counsel, with counsel for each defendant and the prosecutor allotted 10 minutes each to question the subsequent group. Subsequent groups of 13 would be called and the process repeated until a jury was impaneled. Using this system, the court predicted that the jury would be selected in five days.

---

[26] R.W. also answered "unknown" to a question whether he could honestly set aside his personal feelings and follow the law. But this query preceded questions asking directly how his pro-life views would affect his votes on guilt, special circumstances, and penalty, and it immediately *followed* much narrower questions about whether he agreed with, and could follow, the law requiring consideration of defendant's background, including mental defects and upbringing. R.W. had answered that he disagreed with this particular law, because those guilty of crime should be punished "regardless." To the question whether he would follow this law, R.W. responded "?" Insofar as R.W.'s "unknown" answer to the question whether he could set aside personal feelings indicated that he *might* be able to do so, the answer, given the location of this question in the questionnaire, might well have been directed only at the "background and upbringing" question that immediately preceded it. On the other hand, insofar as R.W.'s answer to the "set aside personal feelings" question indicated his doubt that he could overcome personal biases, it supports the inference that his ability to be fair was compromised.

Defendant joined in codefendant Richard Avila's general objection to the method of jury selection imposed by the trial court. Although defendant did not specifically object to the time limit imposed by the court for counsel to question prospective jurors, he did argue that it was impossible to select a fair and impartial jury in five days. The court, however, reiterated that it would adhere to its proposed system of jury selection. Counsel for the defendants then opted to pool their time allotment, such that counsel for defendant would have 45 minutes to question the first group of 24 prospective jurors on behalf of all three defendants, counsel for Richard Avila would have 30 minutes to question the second group on behalf of all three defendants, counsel for Jeffrey Spradlin would have 30 minutes to question the third group on behalf of all three defendants, and so on.

The court informed counsel that, on request and for good cause shown, it would allow additional time to question prospective jurors. Although the court denied defense requests for sequestered voir dire, it contemplated that some individual voir dire might be necessary "because of either publicity that they've heard about concerning the case or because they want to answer some things privately."

On appeal, defendant contends the trial court arbitrarily and unreasonably limited the amount of time defense counsel could spend questioning prospective jurors during voir dire, in violation of his state and federal constitutional rights.

We conclude that defendant's general objection to the method of jury selection imposed by the trial court and argument that he could not select a fair and impartial jury in five days preserved the claim for appeal. The claim, however, is without merit.

At the time of trial in this matter, Code of Civil Procedure section 223, enacted by Proposition 115 (approved by the electorate effective June 6, 1990), provided for court-conducted examination of prospective jurors in a criminal case, including death penalty cases, in the presence of the other jurors. Upon a showing of good cause, the court could permit the parties to supplement the examination or itself submit to the prospective jurors additional questions by the parties as it deemed proper. Code of Civil Procedure section 223 further provided that the court's exercise of discretion in the manner in which it conducted voir dire would not cause any conviction to be reversed absent a miscarriage of justice, as specified in section 13 of article VI of the California Constitution.[27] Because the court was not required to afford defendant any

---

[27] After the trial in this case, Code of Civil Procedure section 223 was amended to provide counsel for each party with the right to some direct voir dire. (*Stewart, supra,* 33 Cal.4th at p. 455, fns. 17 & 18.) As amended effective in 2001, it provides: "Upon completion of the

time at all to question prospective jurors under Code of Civil Procedure section 223 as then in effect, it did not abuse its discretion in setting a time limit on counsel-conducted voir dire, either individually or in the aggregate.

Defendant's reliance on *People v. Hernandez* (1979) 94 Cal.App.3d 715 [156 Cal.Rptr. 572] is inapposite. There, the defendant argued that the trial court violated former section 1078 in setting a time limit for voir dire. Although the court ultimately held that the defendant was precluded from arguing that the trial court improperly curtailed voir dire examination of prospective jurors because he did not exercise all of his peremptory challenges, it noted that the "fixing of an arbitrary time limit for voir dire in advance of trial is dangerous and could lead to a reversal on appeal." (*People v. Hernandez, supra,* 94 Cal.App.3d at p. 719.) But former section 1078, which had required trial courts "to permit *reasonable* examination of prospective jurors by counsel for the People and for the defendant" (94 Cal.App.3d at p. 719), was repealed in 1988 (see Stats. 1988, ch. 1245, § 36, p. 4155) and thus did not govern defendant's trial.

In arguing that the trial court erred in placing time limitations on voir dire, defendant identifies a number of prospective jurors who, he contends, should have been further questioned. Contrary to defendant's view, we do not agree that the court abused its discretion in restricting further voir dire of these prospective jurors. For example, defendant argues that the court abused its discretion in denying his request to further question Prospective Juror T.G. based on her statements during voir dire that she would find it difficult to sit as a juror in a case involving the Bulldog gang, that she did not know if she could be fair to both sides, and that she believed criminal defense attorneys were "slime."[28] But the court and the prosecutor explored these matters after defense counsel concluded his voir dire, and T.G. stated that she would give all parties a fair hearing, and would follow the court's instructions and base her decision solely on the evidence presented. In any event, although the court denied the defense's challenge for cause as to T.G., defendant exercised a peremptory challenge against her.

---

court's initial examination, counsel for each party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors. The court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel. The court may specify the maximum amount of time that counsel for each party may question an individual juror, or may specify an aggregate amount of time for each party, which can then be allocated among the prospective jurors by counsel." (Code Civ. Proc., § 223, as amended by Stats. 2000, ch. 192, § 1.)

[28] After the court questioned T.G., counsel for defendant questioned her on behalf of all defendants. Counsel then represented that he had no further questions. Counsel for Richard Avila requested a moment to confer with counsel for defendant, after which counsel for defendant requested he be allowed to ask "several more questions." The court denied the request.

In another example, defendant argues that the court abused its discretion in denying his request to further question Prospective Juror G.M. based on his statement to the court that his wife was a criminal investigator with the Internal Revenue Service, and that the denial prejudiced him because G.M. was ultimately seated as a juror in this case.[29] The court denied the request as untimely because it was made a day after G.M. had been questioned, and noted that there was no basis for excusing him for cause in any event. Although G.M.'s wife might have been generally aligned with law enforcement, G.M. did not make any responses suggesting he himself might have been so aligned. Accordingly, the court did not abuse its discretion in denying the request for further questioning.

As for other prospective jurors defendant contends were inadequately questioned because of lack of time, defense counsel either did not request additional time or did not make a showing of good cause. Defendant concedes, moreover, that the court did, in some instances, allow counsel to ask additional questions upon request. The court thus did not abuse its discretion in restricting defense counsel's examination of prospective jurors.

We similarly reject defendant's federal constitutional claim. The United States Constitution "does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." (*Morgan v. Illinois* (1992) 504 U.S. 719, 729 [119 L.Ed.2d 492, 112 S.Ct. 2222]; see also *People v. Robinson* (2005) 37 Cal.4th 592, 613 [36 Cal.Rptr.3d 760, 124 P.3d 363]; *People v. Box* (2000) 23 Cal.4th 1153, 1179 [99 Cal.Rptr.2d 69, 5 P.3d 130].) The trial court, moreover, has a duty to restrict voir dire within reasonable bounds to expedite the trial. (*People v. Wright* (1990) 52 Cal.3d 367, 419 [276 Cal. Rptr. 731, 802 P.2d 221].) The court's logistical planning of voir dire and limitation thereof were reasonable, especially considering the multidefendant nature of the trial. Moreover, as stated, the court's willingness to permit additional time for counsel-conducted voir dire upon a showing of good cause ameliorated any potential concern that the limitation would somehow be unfair or violate the right to an impartial jury.

### 3. *Asserted Violation of Code of Civil Procedure Section 226*

Defendant contends the trial court's system of jury selection violated Code of Civil Procedure section 226,[30] as well as the federal Constitution. We disagree.

---

[29] Counsel for Richard Avila, who asked questions during voir dire on behalf of the defendants, did not inquire into this statement.

[30] Code of Civil Procedure section 226, subdivision (c), provides: "All challenges for cause shall be exercised before any peremptory challenges may be exercised." Code of Civil Procedure section 231, subdivision (d), further provides in relevant part: "[E]ach party shall be entitled to have the panel full before exercising any peremptory challenge."

As stated, counsel for Richard Avila objected to the method of jury selection imposed by the court, instead requesting that the parties be allowed to direct all for-cause challenges against the entire jury panel, that is, all of the prospective jurors in the courtroom (see Code Civ. Proc., § 194, subd. (q)), before they were required to use peremptory challenges. He argued that section 226 of the Code of Civil Procedure mandated such a procedure. Defendant joined in the objection. The court reiterated the procedure it would follow: "[W]e are taking challenges for cause before peremptories. The only question is whether it should be to all of the jurors in the courtroom or only 12 or 18, or in this case 24, and I see nothing in the statute or in any cases that say that you have to question and pass for cause all of the jurors in the courtroom before you can begin exercising peremptories. I think that is one alternative way of doing it." The court further noted that to conduct voir dire in the manner requested by counsel was "a terribly inefficient way to proceed."

 Peremptory challenges generally are exercised under either of two methods. Under the "jury box" method, which is the system utilized in California, 12 prospective jurors are questioned, subjected to challenges for cause, and replaced until 12 qualified jurors remain. Both sides then exercise peremptory challenges. A juror removed by peremptory challenge is replaced by another juror, who is then questioned and challenged both for cause and peremptorily. This process continues until peremptory challenges have been exhausted or waived. (*People v. Wright, supra,* 52 Cal.3d at p. 397; *United States v. Thompson* (2d Cir. 1996) 76 F.3d 442, 451; *United States v. Blouin* (2d Cir. 1981) 666 F.2d 796, 796.) Under the "struck jury" method, a large initial panel of prospective jurors is drawn and subjected to challenges for cause before peremptory challenges are exercised. If, after each side exercises its peremptory challenges, there remain more than 12 jurors, the court decides which 12 will constitute the jury. (*People v. Wright, supra,* 52 Cal.3d at p. 397; *United States v. Blouin, supra,* 666 F.2d at pp. 796–797.) The trial court apparently employed a variation of the "jury box" system in this case.

 Defendant argues that Code of Civil Procedure section 226 dictates that *all* challenges for cause must be exercised before *any* peremptory challenges may be exercised, and that a procedure (like the one the trial court here used) whereby challenges are exercised in groups, even if within each group challenges for cause are exercised before peremptory challenges, violates the statutory mandate. That section, however, must be read in light of Code of Civil Procedure section 231, which entitles each party to have a full panel before exercising any peremptory challenge—"panel" here apparently always having been understood by California courts as the subset of the members of the whole venire who are called to fill the jury box during voir dire. In other words, defendant was entitled to have a panel of 12 jurors before he exercised any peremptory challenges, but the governing statutes

have never been interpreted to require that the entire venire be subjected to for-cause challenges before the exercise of any peremptory challenges, a procedure that—in a capital case entailing a large venire—would further add to the time-consuming nature of the process. (See, e.g., *People v. Wright, supra,* 52 Cal.3d at p. 396 [where we assumed, without discussion, that, in former Penal Code section 1088, which stated in pertinent part that " 'each party shall be entitled to have the panel full before exercising any peremptory challenge,' " the phrase "full panel" meant "a full complement of 12 jurors"].) Under the system of jury selection employed by the court here, defendant directed his peremptory challenges against 12 individuals seated in the jury box. No statutory violation occurred.

■ Defendant maintains that, under the variation of the "jury box" system employed here, he was unable to make informed exercise of peremptory challenges because he did not know the composition of the final jury. Although knowledge of the composition of the entire panel can be relevant to the exercise of a peremptory challenge against an individual juror, the fact that a particular procedure used might have made exercising initial peremptory challenges less informed does not in itself require reversal. (*People v. Wright, supra,* 52 Cal.3d at p. 397.)

■ A court commits reversible error if its procedures deny a party's right of peremptory challenge. (*People v. Wright, supra,* 52 Cal.3d at pp. 397–398; see also *Pointer v. United States* (1894) 151 U.S. 396, 408–409 [38 L.Ed. 208, 14 S.Ct. 410]; *United States v. Blouin, supra,* 666 F.2d at p. 797.) But defendant here was not prohibited from exercising all of his allotted peremptory challenges; indeed, he exercised them all. No error occurred.

### 4. *Cumulative Prejudice*

Because we conclude the trial court did not err in any aspect of its jury selection procedures, we reject defendant's claim of cumulative error resulting in prejudice under the federal Constitution.

### B. *Denial of Defendant's Challenges for Cause*

Defendant claims that the trial court improperly denied his challenges for cause to 12 prospective jurors, thereby violating his federal constitutional rights to an impartial jury under the Sixth Amendment, due process and fundamental fairness under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment. Eleven of these 12

prospective jurors did not sit on defendant's jury because each was peremptorily challenged.[31] Although he had one peremptory challenge remaining, defendant did not peremptorily challenge J.S. Defendant eventually exhausted his peremptory challenges and did not express dissatisfaction with the jury, which included J.S.

 "To preserve a claim based on the trial court's overruling a defense challenge for cause, a defendant must show (1) he used an available peremptory challenge to remove the juror in question; (2) he exhausted all of his peremptory challenges or can justify the failure to do so; and (3) he expressed dissatisfaction with the jury ultimately selected." (*People v. Maury* (2003) 30 Cal.4th 342, 379 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Because defendant did not express dissatisfaction with the jury ultimately selected, he did not preserve this claim. Even had the claim been preserved, it would fail on the merits.

As stated, "a juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; accord, *Wainwright v. Witt, supra,* 469 U.S. at p. 424.)

 To prevail on appeal, defendant "must demonstrate that the court's rulings affected his right to a fair and impartial jury." (*People v. Yeoman, supra,* 31 Cal.4th at p. 114.) On appeal, we examine the context in which the trial court denied the challenge in question to determine whether the court's decision that the prospective juror's beliefs would not substantially impair the performance of his duties fairly is supported by the record. (*People v. Crittenden, supra,* 9 Cal.4th at p. 122.) If a prospective juror provides "conflicting answers to questions concerning his or her impartiality, the trial court's determination as to that person's true state of mind is binding upon the appellate court." (*Ibid.*)

When the trial court asked Prospective Juror J.S. how he felt about the death penalty "versus life without parole," he answered that the death penalty should be enforced in cases where the murder had been planned, but acknowledged there may be circumstances where life imprisonment would be a "probable alternative." Later, when counsel for defendant asked basically the same question, J.S. replied that the death penalty should be considered in any murder case, and that, for life without possibility of parole, mental

---

[31] Defendant peremptorily challenged Prospective Jurors T.G., M.T., and K.V. Richard Avila peremptorily challenged Prospective Jurors R.A., P.P., and C.L. Jeffrey Spradlin peremptorily challenged Prospective Jurors D.B., E.M., B.M., B.C., and H.P.

deficiency should be considered. Upon further questioning, he stated he would be willing to listen to evidence of mitigating circumstances before making a decision to vote for death or life without possibility of parole. He believed he could listen to all the evidence and be fair. Richard Avila challenged J.S. for cause, and defendant joined in the motion. The court denied the challenge, explaining, "I don't think he's either an automatic vote or a substantial impairment." The record amply supports the court's retention of J.S.

▮▮▮ As for the 11 other prospective jurors defendant contends should have been dismissed for cause, they could not have possibly affected the jury's fairness because they did not sit on the jury. (See *People v. Yeoman*, *supra*, 31 Cal.4th at p. 114.) The harm to defendant, if any, was in being required to use peremptory challenges to cure what he perceived as the trial court's error, thereby reducing the number available to him later in the trial. (See *ibid.*; see also *People v. Boyette* (2002) 29 Cal.4th 381, 418 [127 Cal.Rptr.2d 544, 58 P.3d 391].) But the loss of a peremptory challenge does not constitute a violation of the constitutional right to an impartial jury. (See *Ross v. Oklahoma* (1988) 487 U.S. 81, 88 [101 L.Ed.2d 80, 108 S.Ct. 2273]; see also *People v. Boyette*, *supra*, 29 Cal.4th at p. 419.)

In short, the trial court's denial of defendant's 12 challenges for cause did not violate his constitutional rights.

### C. *Denial of Batson/Wheeler Motions*

During jury selection, Richard Avila made a series of motions under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*), challenging the prosecutor's use of peremptory challenges against Black and Hispanic prospective jurors, and defendant joined in some but not all of them.[32] Spradlin also made one motion under *Wheeler*, in which defendant joined. The trial court denied each motion.

The jury as seated included two Hispanic males, two Hispanic females, and one Black female. One of the three alternate jurors was a Black male.

On appeal, defendant contends the court erroneously denied the *Wheeler* motions, violating his rights under the state and federal Constitutions.

---

[32] The court and the parties agreed that a party objecting to a use of a peremptory challenge would simply state, "Objection, *Wheeler*," and that they would discuss the issue outside the presence of the prospective jurors. They also agreed that a *Wheeler* objection would incorporate an objection under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).

■ A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler, supra,* 22 Cal.3d at pp. 276–277; see *People v. Griffin* (2004) 33 Cal.4th 536, 553 [15 Cal.Rptr.3d 743, 93 P.3d 344].) Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. (*Batson, supra,* 476 U.S. at p. 88; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

■ The United States Supreme Court has recently reaffirmed that *Batson* states the procedure and standard to be used by trial courts when motions challenging peremptory strikes are made. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416], fn. omitted.)

We review the trial court's ruling on the question of purposeful racial discrimination for substantial evidence. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874].) It is presumed that the prosecutor uses peremptory challenges in a constitutional manner, and we give deference to the court's ability to distinguish "bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) As long as the court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Ibid.*)

### 1. *Relevant Proceedings*

During jury selection, before the start of peremptory challenges, counsel for Richard Avila noted that, after challenges for cause and other hardship excusals were accounted for in the current jury panel, only a few Hispanic and Black individuals remained. On the basis of the small number of individuals representing minority groups, counsel stated she planned to make a *Wheeler* motion in response to any peremptory challenge exercised by the prosecution with which she did not agree.

Counsel for Richard made her first *Wheeler* motion after the prosecutor exercised his third peremptory challenge to excuse Prospective Juror S.A., who was Black. The trial court denied the motion, ruling that no prima facie showing had been made because there had been "no pattern."[33]

Counsel for Richard made her second and third *Wheeler* motions in response to the prosecutor's use of peremptory challenges to two Hispanic prospective jurors, N.L. and C.R., and only counsel for Spradlin joined in the motions. At a hearing on these two motions, the trial court found a prima facie case as to N.L. and C.R., and asked the prosecutor to state his reasons for excusing the two. The prosecutor explained he was using peremptory challenges to excuse some prospective jurors who did not believe strongly in the death penalty, and that his decision was based on a mathematical system of scoring prospective jurors' answers on the questionnaires to certain death-penalty-related questions. The court denied the *Wheeler* motions as to N.L. and C.R.

Later, when the prosecutor peremptorily challenged a second Black prospective juror, V.J., the trial court conferred with counsel, asking them whether or not if it were to grant defendants' anticipated *Wheeler* motion, a possible remedy would be to keep V.J. seated on the jury. Counsel informed the court that decisional law required that the entire panel be discharged. Counsel for Richard argued that there was no legitimate basis for excusing V.J. because her questionnaire indicated she was strongly in favor of the death penalty and her answers during voir dire were "extremely forthcoming" and "informative." Richard's counsel also noted that the prosecutor had earlier used a peremptory challenge to remove a Black prospective juror (S.A.). Defendant and Spradlin joined in counsel's arguments.

The trial court found that, in view of the small number of African-Americans on the panel, two excusals constituted a prima facie showing under *Wheeler*.[34] The prosecutor responded that he challenged Prospective Juror V.J. because she believed that police lie, and because he felt she was not forthcoming about her knowledge of her husband's drug case. The court denied the motion.

Next, during voir dire of the prospective alternate jurors, counsel for Spradlin made a *Wheeler* motion when the prosecutor peremptorily challenged G.B., who was Black, and defendant and Richard joined in the

[33] When Richard correctly argued there need not be more than one excusal for the court to find a violation, the court replied: "Well the cases do say that—that there must be a pattern or a prima facie case, and I just find on this record there is no such showing as of this time."

[34] The court stated: "The court . . . finds that in view of the small number of African-Americans on this panel, that two does meet a prima facie case."

objection. The trial court found no prima facie case of group bias, stating, "There's simply no pattern or circumstances that create that impression to the court that her race had anything to do with her being challenged or that there is any pattern on the part of the prosecutor to challenging people of the black race."

2. *Asserted Pretextual Justification for Excusing Prospective Juror V.J.*

Defendant contends that the trial court erred in accepting the prosecutor's justification for his peremptory challenge to Prospective Juror V.J.

Preliminarily, we note defendant did not object below to the prosecutor's peremptory challenge to Prospective Juror V.J. But he did make arguments objecting to the challenge when codefendant Richard's motion was heard. We thus conclude the claim is preserved for review but that it lacks merit.

Prospective Juror V.J. noted on her jury questionnaire that she served as the jury foreperson in a criminal trial, that her prior jury experience taught her "things [were not] always like they seem," that someone close to her had been arrested and the experience was "strange" because she did not realize that everyone lies, and that her husband had been in prison and recently had been the victim of a carjacking. To the question asking whether she knew anyone whom she believed to be a drug addict, she wrote, "personal." V.J. stated she strongly supported the death penalty. But her views were contradictory: she stated she would automatically vote for life imprisonment without the possibility of parole because she entertained conscientious opinions concerning the death penalty, but also stated she would automatically vote for the death penalty for the same reasons. Additionally, she wrote she had read about this case some time ago, that she would have to check the "scrapbook" her grandmother had made, and that she had no impressions about any of the defendants from what she had read.

During voir dire by the trial court, Prospective Juror V.J. clarified that her prior jury service was not on a criminal case but on a civil case involving a crop duster who accidentally sprayed the wrong crop. When asked about her written comment that things were not always like they seemed, she said that accidents "don't really mean a lot," referring to the fact that the crop duster was found liable even though it was an accident. Nevertheless, V.J. said she was satisfied with the outcome of that case.

The trial court also asked several questions concerning Prospective Juror V.J.'s husband. V.J. explained that it was her husband who had been arrested, and that he was ultimately sentenced to prison. And when the court

asked V.J. to whom she was referring when she wrote that she did not realize that everyone lies, she answered: "Everybody. Policemen. I mean, everybody." But she added: "Can't judge everybody else by what a few people done [sic]." She stated that if she were selected as a juror, she would be able to judge the case on its own merits. She also clarified that, if the defendants in this case were to be found guilty, nothing would cause her to automatically vote for one punishment over another.

Later, counsel for Richard Avila questioned Prospective Juror V.J. The juror acknowledged she indicated on her questionnaire that she strongly supported the death penalty, but stated she had since changed her mind. She no longer had such strong convictions. Nevertheless, she would follow the law even if she personally disagreed with it. And when questioned about her conflicting answers about the death penalty, V.J. said she could keep an open mind and would follow the law.

The court and counsel conducted further voir dire of Prospective Juror V.J. out of the presence of the other prospective jurors. In response to the court's questioning, V.J. said her brother was a drug addict, but that potential evidence about drug usage or alcohol abuse would not prevent her from being a fair and impartial juror in this case. In response to the prosecutor's questioning, V.J. also said that her husband had spent three and one-half years in prison on a "drug case." Although she did not know what type of drug case it had been, her husband told her the police and attorneys treated him with respect during his court appearances. When the prosecutor asked V.J. about her statement in the questionnaire that everyone lies, she explained that in connection with her husband's drug case, the police had raided her house in her presence, and that, when the case went to trial, the police lied on the stand about how many times they had knocked on her door before entering. She stated: "I just figured with them being policemen, they're supposed—they're supposed to uphold the law and they're supposed to always tell the truth. And sometimes—but they're human, they make mistakes just like anybody else. Maybe he didn't intend to tell that lie, but I knew it was a lie because I was there." Notwithstanding her experiences, she stated she could be fair to all the parties in the case.

As stated, a *Wheeler* motion was made, and the trial court found a prima facie case of group bias.

The prosecutor's principal reason for exercising a peremptory challenge to Prospective Juror V.J. was her view that the police lie. He explained that he did not want V.J. to "infect the jury with her personal experience." The prosecutor was also concerned because, although V.J. said she did not know what type of a drug case her husband had been convicted of, he felt she knew

"more than she said" about that case, considering that she had been present at the raid that eventually led to her husband's arrest and conviction.

When counsel for defendant and Spradlin pointed out that M.Y., a White prospective juror who had been arrested and spent 22 days in jail as a result, remained in the jury box, the prosecutor replied that he intended to exercise a peremptory challenge against her for similar reasons.[35]

The trial court ruled that the prosecutor had carried his burden of providing an explanation unrelated to group bias for exercising a peremptory challenge to V.J., noting the significance to all parties of the jurors' views of law enforcement personnel. The court explained that, although V.J. was very "talkative" and "expressive" during voir dire, she was the only prospective juror thus far who had a personal experience with police lying. The court expressly did not base its ruling on V.J.'s stated lack of knowledge about the type of drug case her husband had been involved in, explaining that the prosecutor's question on that point might have been ambiguous.

Defendant argues that the prosecutor's challenge to Prospective Juror V.J. was based on group bias because members of racial minority groups are generally arrested more often and on less evidence than White individuals and thus tend to distrust police officers more than others. He further argues that the prosecutor made no attempt to show that V.J.'s belief "would translate into some type of specific bias that would cause her to acquit an accused double murderer even if the prosecution proved he was guilty." We disagree and conclude the record does not establish that the prosecutor's justification for excusal was pretextual.[36] The prosecutor's challenge to V.J. was based on her *personal experience* that police officers lied, not on a theoretical perception that she, a member of a minority group, might view the police with distrust. It was apparent that the prosecutor was concerned about this circumstance, as he probed V.J. on her husband's criminal history involving drugs and specifically questioned her about her statement that everyone, including the police, lies. The trial court here made a sincere and reasoned effort to evaluate the prosecutor's justifications for excusing V.J., and its ruling is supported by substantial evidence.

Defendant further contends that the assertedly pretextual nature of the prosecutor's excusal of Prospective Juror V.J. is demonstrated by a comparison of her voir dire answers with those of two nonchallenged and seated

---

[35] The prosecutor said of Prospective Juror M.Y.: "She's not going to sit on this jury because of being arrested, spending 22 days in jail, possibly harboring some resentment for that fact, and I would never let her sit on it." The prosecutor later excused M.Y.

[36] Because the trial court did not base its ruling on the prosecutor's secondary reason—that Prospective Juror V.J. might not have been forthcoming about the extent of her knowledge of her husband's drug case, we need not discuss whether that reason for excusal was genuine.

jurors, B.B. and D.W. Defendant did not engage in a comparative juror analysis of these particular jurors in the trial court.

In earlier cases, we have declined to engage in comparative juror analysis for the first time on appeal, stating that such an analysis was unreliable in evaluating the prosecutor's justifications for excusing minority prospective jurors. (*People v. Box, supra,* 23 Cal.4th at p. 1190; *People v. Ervin* (2000) 22 Cal.4th 48, 76 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1220–1221 [255 Cal.Rptr. 569, 767 P.2d 1047].) Defendant urges us to reconsider this position in light of the United States Supreme Court's decision in *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*), in which comparative juror analysis was employed, albeit not on direct appeal.

▮ In *Miller-El,* the United States Supreme Court held that, in the context of a challenge of a Black prospective juror, the defendant had established purposeful discrimination under *Batson* and was entitled to relief on that ground in federal habeas corpus proceedings (28 U.S.C. § 2254). (*Miller-El, supra,* 545 U.S. at p. 266 [125 S.Ct. at p. 2340].) In so holding, the high court observed: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Id.* at p. 241 [125 S.Ct. at p. 2325].)

Preliminarily, defendant argues that comparative juror analysis was employed in the trial court because the prosecutor used a numerical scoring system, in which he compared jurors to each other. We disagree. The prosecutor's system of scoring to which defendant refers produced a numerical score for each prospective juror based on his or her own answers to certain death-penalty-related questions on the questionnaire. Thus the scores attributed to particular prospective jurors were not dependent on the scores of others.[37] Moreover, irrespective of the prosecutor's use of a numerical scoring system, defendant did not argue at trial that White jurors who were scored as less acceptable than Black jurors were nevertheless retained, and he likewise fails to articulate such an argument on appeal.

Assuming without deciding that comparative juror analysis for the first time on appeal must be undertaken under the circumstances presented, we conclude defendant's proffered analysis fails to demonstrate purposeful discrimination.

---

[37] Our discussion of the prosecutor's numerical system used in this case is made solely in the context of rejecting the comparative juror analysis claim. We do not mean to suggest that such a system is inherently race and gender neutral.

Defendant urges that the prosecutor's proffered reason for striking Prospective Juror V.J.—negative experience with law enforcement—applied equally to Prospective Juror B.B., who was White, but that the prosecutor nevertheless permitted B.B. to sit on the jury. Initially, we note that defendant's premise is incorrect: the prosecutor's proffered reason for striking V.J. was not simply because she had a general negative experience with law enforcement but because she had a personal experience with the police that led her to question the veracity of police officers.

In any event, a side-by-side comparison of Prospective Juror V.J. and Juror B.B. reveals that they were not "similarly situated." (*Miller-El, supra*, 545 U.S. at p. 247, fn. 6 [125 S.Ct. at p. 2329, fn. 6].) B.B. revealed that her brother recently had been arrested on a traffic warrant, and that she believed the sheer number of officers involved in that incident—six police officers in three patrol cars—was unwarranted. B.B. did not witness her brother's arrest. B.B. also revealed that her brother-in-law, a convicted felon at the time she married her husband, was arrested for bank robbery a few years thereafter. B.B. was not involved in the prosecution of any of her brother-in-law's cases, and she had no opinion on how he was treated in the criminal court system. According to her brother-in-law, he had been treated well. Thus, B.B. herself did not have any negative experience with the police, much less an experience that caused her to form a negative opinion about their veracity.

Defendant also argues that the prosecutor's justification for excusing Prospective Juror V.J. must have been pretextual because Juror D.W. was similarly situated to V.J. but nevertheless was allowed to serve on the jury. We disagree. Even if the prosecutor's justification for striking V.J. applied to D.W., that is not evidence tending to prove purposeful discrimination, for D.W. was Black. (See *Miller-El, supra*, 545 U.S. at p. 241 [125 S.Ct. at p. 2325].) In fact, review of D.W.'s voir dire provides further evidence that the prosecutor's justification for excusing V.J. was *not* based on racial bias.

At the time of voir dire, Juror D.W. had an aunt who was employed by the sheriff's department, and D.W. herself was awaiting a response from the sheriff's department about her recent interview for an identification technician position. She also knew others who were in law enforcement or worked in the legal system. When D.W. was 15 years old, her uncle was arrested in her presence. Although her uncle was convicted in a Fresno court of an unidentified crime and sent to prison, he was later found to be innocent and released. D.W. believed her uncle had been treated unfairly but did not blame anyone for the situation. When the prosecutor asked D.W. whether she could be fair to the prosecution in this case, given her belief that her uncle had been treated unfairly in a Fresno case, the juror answered in the affirmative. Unlike Prospective Juror V.J., D.W. did not have an experience with police officers

lying. And also unlike V.J., although the prosecutor was concerned about D.W.'s views concerning a relative's arrest and conviction, he was apparently satisfied with her answers.

Accordingly, side-by-side comparisons of Jurors B.B. and D.W. with Prospective Juror V.J. support the trial court's ruling that no purposeful discrimination occurred.

### 3. *Excusal of Prospective Juror S.A.*

#### a. *Failure to Seek Reasons for Excusal*

Defendant contends that, once the trial court ruled he had made a prima facie showing of group bias regarding the prosecutor's use of a peremptory challenge against Prospective Juror V.J., who was Black, it was required to seek the prosecutor's reasons for using a peremptory challenge against S.A., who was also Black, notwithstanding the court's earlier ruling that no prima facie showing of group bias had been made as to S.A.

As stated, defendant did not object to S.A.'s excusal or otherwise join in codefendant Richard's objection to her excusal. We nevertheless reach the merits of the claim because defendant argues that the trial court had a sua sponte duty to reexamine S.A.'s excusal once it found a prima facie case of group bias as to V.J., and defendant effectively preserved the issue of V.J.'s excusal.

This case raises the following question: Once a trial court finds a prima facie case of group bias as to the excusal of one prospective juror, must it require the prosecutor to provide race-neutral explanations for all challenges made thus far to the members of the group in question, including those the court had ruled upon earlier? One Court of Appeal decision, *People v. McGee* (2002) 104 Cal.App.4th 559 [128 Cal.Rptr.2d 309] (*McGee*), addressed this question and answered in the affirmative. As we will explain, we disagree with the Court of Appeal and answer in the negative.

A defendant may make out a prima facie case of group bias in jury selection by showing that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Batson, supra,* 476 U.S. at p. 94.) The high court recently reaffirmed this principle, stating that a defendant makes out a prima facie case of group bias when he produces "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California, supra,* 545 U.S. at p. 170 [125 S.Ct. at p. 2417].) The defendant "ultimately carries the 'burden of persuasion' to ' "prove the existence of purposeful discrimination." ' " (*Id.* at p. 171.)

In *McGee*, the Court of Appeal characterized *Wheeler* motions as challenging "the selection of a jury, not the rejection of an individual juror; *the issue is whether a pattern of systematic exclusion exists.*" (*McGee, supra,* 104 Cal.App.4th at p. 570, italics added.) Accordingly, it held that once the trial court has found a prima facie case of group bias in the excusal of one prospective juror, the burden shifts to the prosecutor to provide race-neutral explanations for all challenges to prospective jurors who are members of the same group. (*Ibid.*)

■ The premise of the Court of Appeal's analysis in *McGee*, however, is incorrect. When a party makes a *Wheeler* motion, the issue is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias. (*Wheeler, supra,* 22 Cal.3d at p. 280.) Although the *McGee* court relied on *People v. Gore* (1993) 18 Cal.App.4th 692 [22 Cal.Rptr.2d 435], another Court of Appeal decision, the *Gore* decision did not frame the issue in this manner. *Gore* merely recognized, correctly, that a "pattern of systematic exclusion" of a particular cognizable group from the venire raises an inference of purposeful discrimination, and that when such systematic exclusion occurs, everyone (the defendant, the excluded jurors, and the community) is harmed "because the public confidence in the fairness of our system of justice is undermined."[38] (*People v. Gore, supra,* 18 Cal.App.4th at pp. 705, 700; see *Batson, supra,* 476 U.S. at p. 94 ["[p]roof of systematic exclusion from the venire raises an inference of purposeful discrimination because the 'result bespeaks discrimination' "].) ■ Of course, a single discriminatory exclusion may also violate a defendant's right to a representative jury. (*People v. Fuentes* (1991) 54 Cal.3d 707, 716, fn. 4 [286 Cal.Rptr. 792, 818 P.2d 75]; see also *Johnson v. California, supra,* 545 U.S. at p. 169, fn. 5 [125 S.Ct. at p. 2417, fn. 5]; *Batson, supra,* at p. 95.)

■ As will be discussed, we hold that, when a trial court determines that the defendant has made a prima facie showing that a particular prospective juror has been challenged because of such bias, it need not ask the prosecutor to justify his or her challenges to other prospective jurors of the same group for which the *Batson/Wheeler* motion has been denied. Accordingly,

---

[38] Although this court, and others, have sometimes used the term "systematic exclusion" to describe a discriminatory use of peremptory challenges, "[t]he term more properly refers to underrepresentation in the venires from which juries are selected . . . ." (*People v. Fuentes, supra,* 54 Cal.3d at p. 716, fn. 4, citing *Duren v. Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 99 S.Ct. 664]; see also, e.g., *Hernandez v. Texas* (1954) 347 U.S. 475, 479–480, 482 [98 L.Ed. 866, 74 S.Ct. 667] [systematic exclusion of persons of Mexican descent from service as jury commissioners, grand jurors, and petit jurors in the county in which the petitioner was indicted and tried for murder deprived him of equal protection of laws under the Fourteenth Amendment].)

we disapprove of *People v. McGee, supra,* 104 Cal.App.4th 559, to the extent it is inconsistent with this holding.

*People v. Gore, supra,* 18 Cal.App.4th 692, provides little guidance on this issue. In *Gore*, during jury selection, the defendant did not make any *Wheeler* objections to the prosecutor's exercise of peremptory challenges to four Hispanic prospective jurors, and the jury was sworn. Later, when the prosecutor used his first three peremptory challenges to the only three Hispanic prospective alternate jurors called to the jury box, the defendant finally made a *Wheeler* objection. The defendant argued that the prosecutor was systematically excluding Hispanic jurors, listing the seven Hispanic jurors who had been excused. The trial court limited the defendant's arguments to the three Hispanic prospective alternate jurors, finding the *Wheeler* objection untimely as to the first four Hispanic prospective jurors because the jury had been sworn. The court then found a prima facie case of group bias as to the three Hispanic prospective alternate jurors, although it ultimately concluded the prosecutor's reasons for their excusals were unrelated to group bias. (*Id.* at pp. 697–699.) The Court of Appeal held that the trial court should not have barred the defendant from objecting to the dismissal of the first four Hispanic jurors on a *procedural* finding of untimeliness, given that "the pattern of challenging Hispanic prospective jurors permeated the selection of the 12 jurors and alternates" and the *Wheeler* objection was brought before jury selection was complete. (*Id.* at p. 705.) *Gore* has little application to *McGee*, where the trial court declined to inquire about the prosecutor's reasons based on a *substantive* finding that there was no prima facie showing. In other words, the issue raised in *McGee*—whether the prosecutor must explain earlier challenges that did not create a prima facie showing of group bias once the court finds a presumption of group bias as to a later challenge—was not before the *Gore* court.

In *People v. Fuentes, supra,* 54 Cal.3d 707, the defendant made several *Wheeler* motions in response to the prosecutor's use of peremptory challenges to Black prospective jurors, the first after the prosecutor excused four Black prospective jurors. The trial court asked the prosecutor for an explanation, but the prosecutor was not prepared to give one. Accordingly, the court reserved its ruling on the motions and indicated it would note which prospective jurors were Black, and that it would have the prosecutor's reasons before trial commenced. After the prosecutor excused three more Black prospective jurors, the defendant objected, and the court stated it "would 'consider [counsel's objection] a continuing motion.' " (*Id.* at p. 712.) In total, the prosecutor excused 14 Black prospective jurors, 10 during the selection of the trial jurors and four during the ensuing selection of alternates. At the conclusion of voir dire, the prosecutor made an attempt to explain his challenges. The court ruled that the defendant had failed to make a prima

facie showing, but it nevertheless examined the prosecutor's purported reasons for excusing a total of 14 Black prospective jurors, ruling on the challenged jurors as a group. (*Id.* at pp. 712–713.) We concluded that the court made an implied finding of a prima facie showing of group bias, and that it violated the defendant's constitutional right to trial by a jury drawn from a representative cross-section of the community (Cal. Const., art. I, § 16) by failing to carefully evaluate the prosecutor's explanations. (*People v. Fuentes, supra,* 54 Cal.3d at p. 710.) In so concluding, we noted that "every questioned peremptory challenge must be justified." (*Id.* at p. 715.)

The *McGee* court cited our language in *Fuentes* that "every questioned peremptory challenge must be justified" (*People v. Fuentes, supra,* 54 Cal.3d at p. 715) in support of its holding. But the *McGee* court read our holding too broadly. Unlike in *McGee*, the *Wheeler* objection in *Fuentes* was a continuing one, and thus the court's implied finding of a prima facie showing of group bias applied to all the identified Black prospective jurors. Also unlike in *McGee*, the trial court in *Fuentes* did not initially deny the defendant's earlier *Wheeler* motions only to revisit its rulings at the end of voir dire. Accordingly, the point in *McGee*, that later excusals can undermine earlier findings of no prima facie showing of group bias, is unsupported.

Admittedly, a prosecutor's use of peremptory challenges to several prospective jurors in a particular racial or ethnic group may appear more suspect than if he or she exercised merely one. Accordingly, even if a defendant's *Batson/Wheeler* motion pertaining to the first prospective juror of a particular cognizable group excused is denied for a lack of a prima facie showing, he is likely to make one or more subsequent *Batson/Wheeler* motions after a prosecutor peremptorily challenges several more prospective jurors of that same group. And if a trial court finds a prima facie showing of group bias at a later point in voir dire, the court need only ask the prosecutor to explain "each suspect excusal." (*People v. Arias* (1996) 13 Cal.4th 92, 135 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Each suspect excusal includes the excusals to which the defendant is objecting and which the court has not yet reviewed.

We addressed the converse situation in *People v. Alvarez* (1996) 14 Cal.4th 155 [58 Cal.Rptr.2d 385, 926 P.2d 365] (*Alvarez*). There, the defendant made a *Batson/Wheeler* motion after the prosecutor challenged seven African-American and Latino prospective jurors. The trial court found a prima facie case of group bias, and the prosecutor satisfactorily explained his reasons. The defendant made a subsequent motion after the prosecutor challenged another African-American prospective juror, and the court denied the motion after determining that he had not made a prima facie showing of group bias. (*Id.* at pp. 194–195.) On appeal, the defendant argued that the court's determination he had made a prima facie showing of group bias as to

his first *Batson/Wheeler* motion extended to his subsequent motion. We disagreed and explained that the presumption that a prosecutor uses his peremptory challenges in a constitutional manner is "suspended when the defendant makes a prima facie showing of the presence of purposeful discrimination" but "reinstated . . . when the prosecutor makes a showing of its absence." (*Id.* at p. 199.) Thus, on a later motion, the defendant must make a prima facie showing anew. (*Id.* at p. 199; see also *People v. Irvin* (1996) 46 Cal.App.4th 1340, 1351 [54 Cal.Rptr.2d 450] ["Although *Wheeler* motions may be made seriatim, each *Wheeler* motion is itself separate and discrete and is resolved definitively and independently of each other"].) *McGee,* which fails to acknowledge our decision in *Alvarez,* is inconsistent with the premise that each *Wheeler* objection is a discrete event and should be resolved independently of each such motion.

Applying these principles to the record before us, we conclude that the trial court was not required to ask the prosecutor to provide race-neutral explanations for excusing Prospective Juror S.A. because the only suspect excusal before the court was that of V.J. It is true that defendant noted V.J. was the second Black prospective juror peremptorily challenged and the court likewise noted that, in view of the small number of African-Americans on the panel, two excusals constituted a prima facie showing, both alluding to the earlier excusal of S.A. But the earlier excusal of S.A. was merely a part of the totality of the relevant facts to be considered in determining a prima facie case of group bias on the *Wheeler* objection, which was made as to V.J. only.

 Although we hold that the court has no sua sponte duty to revisit earlier *Batson/Wheeler* challenges that it had previously denied, upon request it may appropriately do so when the prosecutor's subsequent challenge to a juror of a protected class casts the prosecutor's earlier challenges of the jurors of that same protected class in a new light, such that it gives rise to a prima facie showing of group bias as to those earlier jurors. But the burden is on the party making the later motion to so clarify, for that party ultimately has the burden of proof. (See, e.g., *People v. Panah* (2005) 35 Cal.4th 395, 423 [25 Cal.Rptr.3d 672, 107 P.3d 790] [defendant bears the burden of establishing that denial of a continuance request was an abuse of discretion]; *People v. Navarette* (2003) 30 Cal.4th 458, 484 [133 Cal.Rptr.2d 89, 66 P.3d 1182] [defendant bears the burden of proof on his motion for a change of venue]; *People v. Kraft* (2000) 23 Cal.4th 978, 1030 [99 Cal.Rptr.2d 1, 5 P.3d 68] [the party seeking severance has the burden to clearly establish there is a substantial danger of prejudice requiring that charges be separately tried].) Defendant did not do so here.

### b. *Trial Court's Assessment of Prima Facie Showing of Group Bias*

Alternatively, defendant contends that, when the trial court addressed the *Wheeler* motion as to Prospective Juror S.A., it might have applied the wrong standard in assessing whether a prima facie showing of group bias had been made, and thus might have erred in denying the motion.

As stated, Richard made a *Wheeler* motion when the prosecutor excused Prospective Juror S.A., and defendant did not join the motion. Accordingly, he failed to preserve this issue for appeal. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 48 [17 Cal.Rptr.3d 710, 96 P.3d 30].) The issue is without merit in any event.

 *Wheeler* states that, to make a prima facie case of group bias, the objecting party must show "a strong likelihood" of bias (*Wheeler, supra,* 22 Cal.3d at p. 280), and the trial court must determine "whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone" (*id.* at p. 281). In *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270], we held that "*Wheeler*'s terms 'strong likelihood' and 'reasonable inference' state the same standard" (*id.* at p. 1313), and that *Wheeler*'s standard, which has always been compatible with *Batson*, means that to state a prima facie case the objecting party must show that "it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias" (*id.* at p. 1318). The high court recently held that our " 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case." (*Johnson v. California, supra,* 545 U.S. at p. 168 [125 S.Ct. at p. 2416]). Instead, the objecting party "satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Id.* at p. 170 [125 S.Ct. at p. 2417].) Proof of a pattern or practice is not required because " ' "a single invidiously discriminatory governmental act is not immunized by the absence of such discrimination in the making of other comparable decisions." ' " (*Johnson v. California, supra,* 545 U.S. at p. 169, fn. 5 [125 S.Ct. at p. 2416, fn. 5].)

The trial court here did not articulate the standard it used in ruling that no prima facie case of group bias had been shown as to the excusal of Prospective Juror S.A. The court, however, noted that "no pattern" had been established, and when Richard asserted there need not be more than one excusal for the court to find a violation, it disagreed, stating case law indicated there must be a "pattern or a prima facie case." Although there is no indication that the court applied a standard other than that articulated in

*Batson,* because the court appeared to have been under the impression that only a pattern of discrimination, revealed in multiple excusals, would suffice to make a prima facie showing, we will assume, arguendo, that the court's decision is not entitled to deference. Instead, we are able to apply the high court's standard articulated in *Johnson v. California, supra,* 545 U.S. 162, and "resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73 [33 Cal.Rptr.3d 1, 117 P.3d 622].) As we will explain, the record does not support such an inference.

At trial, Richard Avila relied on the following facts that he claimed raised an inference of group bias: Prospective Juror S.A. was the only individual out of her group of 24 called to the box who was Black; the prosecutor did not ask S.A. any questions; and S.A.'s answers to the questionnaire and the court's questioning were evenhanded.

On her written questionnaire, S.A. wrote that she had served as a juror in a criminal case, and that the experience had left her with "mixed feelings." This experience nevertheless gave S.A. an impression that the judicial system "overall . . . runs well," but when asked whether she had any unpleasant memories of the trial in which she served as a juror, she answered, "I just wonder sometimes if I made a difference." S.A. also wrote that she had a relative who had been arrested for manslaughter, and that the experience for her was "devastating." She indicated she would consider the death penalty, although she had no opinion on whether the death penalty was used too often, not often enough, or too randomly. She had no opinion on life imprisonment without possibility of parole.

During oral voir dire, when the trial court inquired about her "mixed feelings" about her previous jury duty experience, S.A. explained that she had learned that the defense counsel had wanted her as a juror because he believed that, as a member of a minority group, she would "hold out longer than anybody else." Nevertheless, she did not believe her previous jury experience would "carry over" into her consideration of this case. S.A. also explained that it was her brother who had been arrested and convicted for manslaughter. But she also said she believed her brother had been fairly treated by the criminal justice system, and nothing about her brother's experience would affect her ability to be fair and impartial in this case.

In sum, Prospective Juror S.A.'s written answers to the questionnaire and her responses during oral voir dire disclosed a number of "reasons other than racial bias for *any* prosecutor to challenge her" (*People v. Cornwell, supra,* 37 Cal.4th at p. 70), including but not limited to her personal experience as a trial juror and experience with her brother's involvement in the criminal

justice system, notwithstanding S.A's assurances that her prior experiences would not carry over to this case if she were chosen as a juror. (See, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 138 [121 Cal.Rptr.2d 106, 47 P.3d 988] ["close relative's adversary contact with the criminal justice system" is one ground upon which the prosecutor might reasonably have challenged prospective jurors].) Moreover, although S.A. might have been the only Black individual in her group of 24 called to the box, at the time S.A. was challenged, several Black prospective jurors remained on the panel. The record thus does not support an inference that the prosecutor excused S.A. on the basis of race.

### 4. *Excusal of Prospective Juror G.B.*

Defendant contends the trial court either used an incorrect standard or abused its discretion in determining that a prima facie case of group bias had not been established as to the excusal of Prospective Juror G.B. Assuming without deciding that the court's decision is not entitled to deference (see *ante*, pt. II.C.3.b.), we are able to resolve the legal question whether the record supports an inference that the prosecutor excused G.B. on the basis of group bias. We conclude the record does not support such an inference.

Prospective Alternate Juror G.B., who identified herself as Black, indicated in the written questionnaire that she was a psychiatric nurse, had a degree in psychology, and valued the opinions of psychologists or psychiatrists most of the time, as she worked closely with them in her job as a nurse in a psychiatric ward. She had had an unpleasant experience with a law enforcement officer. G.B. also did not strongly support the death penalty. On her written questionnaire, G.B. indicated she would consider the death penalty and wrote: "[E]ach circumstance is individual to me." She had no opinion on whether the death penalty was used too often, not often enough, or too randomly. She "[s]omewhat" agreed with the statement that any person who intentionally kills another person, except in cases of self-defense or defense of another, deserved the death penalty, and she was neutral on whether convicted murders should be swiftly executed once they were convicted. She did not believe in the adage "An eye for an eye."

Although G.B. had given the issue of the death penalty "much thought prior to being called as a prospective juror on this case," she did not answer the question on the questionnaire asking whether, regardless of the evidence and because of her conscientious objections to the death penalty, she would in every case automatically vote for life imprisonment without the possibility of parole.[39] Some of G.B.'s answers on the questionnaire also were not fully

---

[39] Later, during oral voir dire, G.B. clarified that she would consider both penalties.

and directly responsive to the questions. For example, although G.B. indicated that her opinion on the death penalty had changed over the years, when asked to explain how and why it changed, she answered in general terms, "Its [*sic*] a moral issue and depends on where you are in your own life at the time you are thinking about it." Similarly, on the question asking about her general feelings regarding life imprisonment without parole, G.B. wrote, "Is there rehabilitation would be my question." Thus, based on the questionnaire as a whole, there were many reasons other than racial bias for any prosecutor to challenge her, including but not limited to her negative experience with a law enforcement officer, her background as a nurse in a psychiatric ward where she worked closely with and valued the opinions of psychologists and psychiatrists, and her nonresponsive answers to some questions about penalty in this case.

G.B.'s responses to oral voir dire further support this view. At one point, the prosecutor asked G.B. whether she could apply the beyond-a-reasonable-doubt standard in the guilt phase of trial, regardless of her thoughts on penalty, and G.B. answered yes. When the prosecutor further asked, "[I]s there a subjective side to that answer," G.B. answered, "You're asking me to follow the law, and I said yes, I can follow the law. My—my answer would be yes." G.B. further stated that she did not have any "subjective" feelings as of that point but that, as human beings, everyone had a subjective side. The suggestion of tension between counsel and the juror is one good reason for any prosecutor to challenge her.

Moreover, when G.B. was excused, W.H., who was Black, remained as a prospective alternate juror and eventually served as a juror for the guilt and penalty phases. (See *People v. Cornwell, supra,* 37 Cal.4th at pp. 69–70 [evidence that the prosecutor challenged one of two African-American prospective jurors is insufficient to establish a prima facie showing, particularly in view of the circumstance that the other African-American prospective juror ultimately sat on the jury].) After examining the totality of the relevant facts, we conclude that the record fails to support an inference that the prosecutor excused G.B. on the basis of race.

 Defendant argues, however, that because the trial court had found a prima facie showing in an earlier *Wheeler* motion responding to the prosecutor's use of a peremptory challenge to Prospective Juror V.J., he was not required to make a prima facie showing in a subsequent motion objecting to the prosecutor's use of a peremptory challenge to Prospective Juror G.B. We disagree. A prima facie showing at one point in the proceedings does not require a statement of reasons for excusal of all subsequent members of the same cognizable group. (*Alvarez, supra,* 14 Cal.4th at pp. 198–199.) In any case, as discussed, the record does not support an inference of discriminatory purpose.

### 5. *Excusal of Prospective Jurors A.R. and R.P.*

The prosecutor also exercised peremptory challenges against Prospective Jurors A.R. and R.P. Defendant contends the prosecutor improperly excused these individuals, both Hispanic, solely on the ground of group bias, and that the trial court erred in failing to rule on his *Wheeler* motion pertaining to them.

No one objected on *Wheeler* grounds to the prosecutor's use of peremptory challenges against A.R. and R.P. During the hearing on the *Wheeler* motion as to Prospective Juror G.B., however, counsel for defendant noted that A.R., a death penalty advocate, had been excused, and that there was "some question" about R.P. but that he indicated he could be fair and follow the law. He argued that G.B. exhibited no biases and concluded: "Given the circumstances, I believe that a *Wheeler* motion is present and that a new jury should be impaneled."

Defendant argues the above statements about A.R. and R.P. constituted a timely *Wheeler* motion objectioning to their excusal, and that the trial court erred in failing to address it. We disagree. Defense counsel's brief comments regarding their excusal came in the context of arguing that G.B. had been improperly excused based on group bias, and we do not construe counsel's comments as a *Wheeler* objection regarding the excusal of A.R. and R.P. Accordingly, he failed to preserve this claim for appeal. (See, e.g., *People v. Stankewitz* (1990) 51 Cal.3d 72, 105 [270 Cal.Rptr. 817, 793 P.2d 23].)

### D. *Use of Peremptory Challenges to Eliminate Those Who Did Not Strongly Support the Death Penalty*

Defendant contends that the prosecutor's use of peremptory challenges to eliminate four prospective jurors who did not wholeheartedly support the death penalty violated the principles set forth in *Witherspoon v. Illinois, supra,* 391 U.S. 510, and his federal constitutional rights to due process under the Fifth and Fourteenth Amendments, a fundamentally fair trial by an impartial jury under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment.

During voir dire, the prosecutor peremptorily challenged Prospective Jurors N.L., C.R., J.E., and S.H. Counsel for Richard Avila objected to each challenge on *Wheeler* grounds, noting that these prospective jurors were Hispanic. Defendant joined in counsel's motions as to J.E. and S.H. but not as to N.L. or C.R. The court denied the motions.

Defendant did not object below to the prosecutor's use of peremptory challenges to N.L. and C.R. And, as to J.E. and S.H., defendant objected on

the ground of *Wheeler* only. Accordingly, defendant has failed to preserve the issue for appeal. (See *People v. Box, supra,* 23 Cal.4th at p. 1187.) The issue is without merit in any event.

In *Witherspoon v. Illinois, supra,* 391 U.S. at page 522, the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Defendant acknowledges that the high court has since held that a prospective juror may be excluded for cause because of his or her views on capital punishment if those views would prevent or substantially impair the performance of his or her duties as a juror (see *Wainwright v. Witt, supra,* 469 U.S. at p. 424), but maintains that the rationale of *Witherspoon* is sound and should be extended to situations where venirepersons are peremptorily challenged because of their views on the death penalty. In support, he cites a federal district court case that held it was unconstitutional for prosecutors to use peremptory challenges consistently to exclude potential jurors who express reservations about the death penalty. (See *Brown v. Rice* (W.D.N.C. 1988) 693 F.Supp. 381, 393.) But as defendant acknowledges, *Brown v. Rice* was reversed on this point on appeal. (See *Brown v. Dixon* (4th Cir. 1989) 891 F.2d 490, 498, fn. 15 [declining to hold that *Witherspoon* was "a command liberally to examine the exercise of the peremptory challenge"].) We decline to extend *Witherspoon* in this manner.

■ Moreover, in *People v. Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306], we held, inter alia, that there was no "constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty." We have consistently adhered to this view. (See, e.g., *People v. Brown* (2004) 33 Cal.4th 382, 403 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Burgener, supra,* 29 Cal.4th at p. 864; *People v. Cox* (1991) 53 Cal.3d 618, 648–649 [280 Cal.Rptr. 692, 809 P.2d 351].) Defendant argues that we should reexamine *Turner.* He does not persuade us to do so.

Alternatively, defendant argues *Turner* is inapplicable because that case "expressly relied on the presumption that each side had an equal number of challenges, so the final result would still be fair." But defendant's argument here is not that he had an unequal number of peremptory challenges. Rather, he argues that, because the majority of the jury panel called to service in his case consisted of those who strongly favored the death penalty, exercising an equal number of peremptory challenges in his case resulted in a jury heavily favoring the death penalty. But as we said in *Turner*: "We recognize that a

jury shorn of significant community viewpoints on an issue in the case is not ideally suited to the 'purpose and functioning of a jury in a criminal trial.' [Citation.] That, however, is a result inherent in the parties' historic and important right to exclude a limited number of jurors for fear of bias." (*People v. Turner, supra,* 37 Cal.3d at p. 315.) Defendant's objection to the use of peremptory challenges to prospective jurors who did not wholeheartedly support the death penalty must fail.

### E. *Individual Death-qualification Voir Dire*

Defendant contends that the trial court erred in failing to conduct individual death-qualification voir dire, thereby violating his federal constitutional rights to a fair trial by an impartial jury, to due process, and to a reliable judgment under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], we stated that, to minimize the potentially prejudicial effects of voir dire conducted in open court, in future capital cases, the portion of the voir dire of each prospective juror involving death qualification should be done individually and in sequestration. Our holding in *Hovey* has been abrogated by Code of Civil Procedure section 223, as added in 1990 by Proposition 115. (*People v. Vieira* (2005) 35 Cal.4th 264, 288 [25 Cal.Rptr.3d 337, 106 P.3d 990].) Code of Civil Procedure section 223 provides, in pertinent part: "Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." Because defendant's trial occurred after section 223 of the Code of Civil Procedure was enacted, that section governs here.

Notwithstanding Code of Civil Procedure section 223, defendant contends that the trial court's failure to hold individual voir dire as set forth in *Hovey* violated his federal constitutional rights. We disagree. We adopted the rule in *Hovey* pursuant to our supervisory authority over California criminal procedure and not under constitutional compulsion. (*People v. Anderson, supra,* 43 Cal.3d at p. 1135; accord, *People v. Vieira, supra,* 35 Cal.4th at p. 287.) Code of Civil Procedure section 223 was intended to overrule *Hovey*'s holding that individual sequestered voir dire is required during death qualification (*People v. Vieira, supra,* 35 Cal.4th at p. 288; *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46]), and defendant cites no authority in support of his argument that sequestered voir dire is constitutionally compelled.

In the alternative, defendant contends the trial court abused its discretion in conducting group death-qualification voir dire. We disagree. Although the

court denied defense requests to conduct the entire death-qualification voir dire individually, it allowed for "some private sequestered voir dire as to some jurors because of some information they have about the case or for some other reason." The court clearly recognized its obligation to comply with section 223 of the Code of Civil Procedure. Defendant fails to convince us that the court's procedure on this matter constituted an abuse of discretion or violated the federal Constitution.

## III. GUILT PHASE ISSUES

### A. Asserted Trial Court Errors Involving Accomplice Testimony and Related Instructions

#### 1. Richard Avila

Defendant contends the trial court erred in refusing to instruct the jury that the testimony of codefendant Richard Avila required corroboration under section 1111[40] and should be viewed with caution, and further erred in forbidding counsel to refer to Richard as an accomplice during argument. He claims these errors violated his federal constitutional rights to a fair trial, to due process, and to present a defense, as protected by the Fifth, Sixth, and Fourteenth Amendments, and to a reliable judgment under the Eighth and Fourteenth Amendments.

During a conference on jury instructions, defendant questioned whether, by virtue of Richard's status as a codefendant, his testimony could be considered independent evidence to corroborate other accomplices' testimony. He argued the court should instruct the jury to determine whether Richard was an accomplice, and the court agreed.

When defendant requested that Richard's name be inserted into the instruction on whether a witness is an accomplice (CALJIC No. 3.19), Richard objected. The prosecutor suggested a separate instruction be formulated so as

---

[40] Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

not to confuse the jury about the burden of proof necessary to find Richard guilty. Defendant agreed, and the court asked him to draft the instruction.[41]

Richard objected, arguing that a cautionary instruction telling the jury to view his testimony with distrust would be highly prejudicial to him. The trial court wondered whether, if an accomplice instruction identifying a testifying codefendant were not given, the other two codefendants (defendant and Spradlin) nevertheless would get the benefit of a general accomplice instruction that precluded the prosecution from obtaining a conviction based on the uncorroborated testimony of a testifying codefendant. The prosecutor responded that Richard's testimony should be viewed like that of any other witness as against himself, but by the rules of accomplice testimony as against his codefendants. After further discussion, the court concluded that the law precluded an accomplice instruction in this case, and that Richard's credibility should be judged by the same standards as that of any other witness.

Shortly before the start of closing arguments, the trial court instructed all counsel to refrain from referring to Richard Avila as an accomplice, but permitted counsel to refer to Richard's involvement in the crimes based on the evidence. It concluded: "So I'm instructing all counsel not to refer to Richard Avila as an accomplice and not to make any argument which infers or argues that his testimony because he is an accomplice must be corroborated under the law, because I have ruled that it does not have to be corroborated."

We have discussed in several cases the issue of how the jury should be instructed to view the testimony of an accomplice who is also one of multiple defendants in a single criminal trial. In *People v. Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908], where a confessing codefendant was an accomplice as a matter of law, we held the trial court did not err in leaving to the jury the determination of his role as an accomplice, thus avoiding imputations of guilt of the other two codefendants which might have flowed from the court's direction that the confessing codefendant was an accomplice as a matter of law. (*Id.* at p. 556.) In *People v. Terry* (1970) 2

---

[41] Accordingly, defendant proffered the following instruction:

"The defendant, Richard Avila, has testified as a witness in this trial.

"You now must decide whether or not Richard Avila is an accomplice witness. This decision must be made only by a preponderance of the evidence.

"Your decision shall in no way be utilized by you in determining the guilt or innocence of Richard Avila, but it is to be solely utilized to determine his status as a witness in this trial, that is whether, Richard Avila, is an accomplice witness or is he not an accomplice witness.

"Your determination as to Richard Avila's guilt as to the crimes charged within the information, must still be made by using the beyond a reasonable doubt standard as I have instructed."

Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961] (*Terry*), overruled on another point in *People v. Carpenter* (1997) 15 Cal.4th 312, 381–382 [63 Cal.Rptr.2d 1, 935 P.2d 708], we held that, generally, instructions on accomplice testimony must be given on the court's own motion only when the accomplice witness is called by the prosecution or when a defendant, in testifying, implicates his codefendant while confessing his own guilt. But "where a defendant testifies in his own behalf and denies guilt while incriminating a codefendant, it is at most for the discretion of the trial judge whether to give accomplice testimony instructions on his own motion." (*Terry,* at p. 399.)

After the trial in this case, we decided *Alvarez, supra,* 14 Cal.4th 155. There, we held the trial court did not err in giving accomplice instructions, where two codefendants each testified in his or her own behalf, denied guilt, and incriminated the other to some extent. We explained that the testimony of an accomplice who testifies against a defendant deserves "close scrutiny" because "he has the motive, opportunity, and means to attempt to help himself at the other's expense," and that this rationale "remains true when the accomplice who testifies against a defendant is himself a defendant." (*Id.* at p. 218.)

Similarly, in *People v. Box, supra,* 23 Cal.4th 1153 (*Box*), we held the trial court should have instructed the jury that codefendant Flores's testimony should be viewed with care and caution to the extent it tended to incriminate the defendant. Just as in the case of an accomplice who testifies for the prosecution, Flores's testimony in his own defense was subject to the taint of an improper motive—promoting his own interest by inculpating the defendant. Accordingly, we held there was no persuasive reason not to require an instruction that an accomplice's testimony should be viewed with care and caution when requested by a defendant in a case where the codefendant testified. (*Id.* at p. 1209.)

Thus, decisional law existing at the time of trial recognized it was within the trial court's discretion not to give accomplice instructions with respect to Richard's testimony. But *Alvarez* and *Box* make clear that a trial court should instruct the jury that, to the extent a codefendant's testimony tends to incriminate a defendant, it should be viewed with care and caution and is subject to the corroboration requirement. We need not decide, however, whether the court erred because any error in this regard was nonprejudicial.

A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is "sufficient corroborating evidence in the record." (*People v. Lewis* (2001) 26 Cal.4th 334, 370 [110 Cal.Rptr.2d 272, 28 P.3d 34].) To corroborate the testimony of an accomplice, the prosecution must present "independent evidence," that is, evidence that "tends to connect the

defendant with the crime charged" without aid or assistance from the accomplice's testimony. (*People v. Perry* (1972) 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129].) Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. (*Ibid.*; accord, *People v. Lewis, supra,* 26 Cal.4th at p. 370.) " '[T]he corroborative evidence may be slight and entitled to little consideration when standing alone.' [Citation.]" (*People v. Perry, supra,* 7 Cal.3d at p. 769.)

Here, Richard Avila's testimony was sufficiently corroborated by independent evidence. When defendant was interviewed after his arrest, he initially denied being at a party, denied knowing anyone living on North Hayes, denied knowing Medina or Jeffrey Spradlin, and claimed he had not seen his cousin, Richard Avila, in years. Defendant's initial attempt to conceal from the police his involvement in the activities culminating in the murders implied consciousness of guilt constituting corroborating evidence. (See *People v. Perry, supra,* 7 Cal.3d at p. 772 [attempts of an accused to conceal his identity or his whereabouts may warrant an inference of consciousness of guilt and may corroborate an accomplice's testimony]; see also, e.g., *People v. Garrison* (1989) 47 Cal.3d 746, 773 [254 Cal.Rptr. 257, 765 P.2d 419] ["evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission which may properly be considered as corroborative of an accomplice's testimony"].) Defendant eventually admitted he brought Medina and Sanchez to the party. He also admitted that he might have been inside the car in which the victims were taken to their deaths and that his saliva might be found on Sanchez. Michael Ramirez also implied that defendant was present during the discussion of what was to be done with Medina and Sanchez shortly before they were taken away from the property.[42] (See, e.g., *People v. Hathcock* (1973) 8 Cal.3d 599, 618 [105 Cal.Rptr. 540, 504 P.2d 476] [corroborating evidence included testimony that defendant was in the presence of the two victims shortly before their deaths].) In sum, the evidence adduced at trial sufficiently corroborated Richard's testimony.

---

[42] Ramirez testified on direct examination that he was in the main trailer when he heard an argument, and that when he went outside, he saw Richard and Rojas arguing about what was to be done with Medina and Sanchez. On cross-examination by the prosecutor, Ramirez testified that defendant did not get involved in this argument. He further testified that Rodriguez was present during this argument and told Rojas that killing the girls was "crazy." Rojas asked Rodriguez, "What are you going to do? Snitch?" Rodriguez did not reply. When the prosecutor next asked, "What, if anything [did defendant] say to Frank Rodriguez?" Ramirez answered, "He [did not] say anything to him." Thus, the form of the prosecutor's questions and Ramirez's answers appear to assume that defendant was present.

### 2. Frank Rodriguez and Michael Rojas

During a conference outside the presence of the jury on the applicability of accomplice instructions, defendant argued that Ray Juarez, Frank Rodriguez, and Michael Rojas were all accomplices as a matter of law. The prosecutor argued that only Juarez was an accomplice as a matter of law. The trial court ruled that Juarez was an accomplice as a matter of law but that the jury should determine whether Rodriguez and Rojas were accomplices. The court gave the following instructions relevant to accomplice testimony: CALJIC No. 3.10 (accomplice defined); CALJIC No. 3.11 (testimony of accomplice must be corroborated); CALJIC No. 3.12 (sufficiency of evidence to corroborate an accomplice); CALJIC No. 3.13 (one accomplice may not corroborate another); CALJIC No. 3.14 (criminal intent necessary to make one an accomplice); CALJIC No. 3.18 (testimony of accomplice to be viewed with distrust); and CALJIC No. 3.19 (burden to prove corroborating witness is an accomplice).

Defendant contends the trial court erred in not ruling that Rodriguez and Rojas were accomplices as a matter of law and in failing to so instruct the jury, in violation of section 1111 and his federal constitutional rights to a fair trial, to due process, and to present a defense protected by the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth and Fourteenth Amendments.

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) To be so chargeable, the witness must be a principal under section 31. That section defines principals as "[a]ll persons concerned in the commission of a crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission . . . ." (§ 31.) An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. Like a conspirator, an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271, fns. 19 & 20 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

Whether a person is an accomplice within the meaning of section 1111 is a factual question for the jury to determine in all cases unless " 'there is no dispute as to either the facts or the inferences to be drawn therefrom.' [Citation.]" (*People v. Hayes, supra,* 21 Cal.4th at p. 1271.) Thus, a trial court can determine "as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 679 [66 Cal.Rptr.2d 573, 941 P.2d 752].)

As we explain below, the trial court correctly declined to instruct the jury that Rodriguez and Rojas were accomplices.

There was no evidence that Rodriguez actually shot and killed either Medina or Sanchez. And although it was undisputed that he rode in the car with the victims to the canal bank, there was evidence he did not do so voluntarily.[43] Thus, Rodriguez's status as an accomplice turns on whether, as a conspirator or an aider or abettor, he was aware that Medina and Sanchez were to be killed or was engaged in any other crime the foreseeable result of which might be murder. (See, e.g., *People v. Hayes, supra,* 21 Cal.4th at p. 1271.)

Circumstantial evidence showed that Rodriguez was an accomplice to the murders. For example, as stated, Juarez testified that Rodriguez was armed when he got in the car with Medina and Sanchez. And Rodriguez himself testified that he thought the women might be killed. Such evidence, however, does not compel the conclusion that he was an accomplice. Because the record does not dictate the conclusion that Rodriguez aided defendant and Spradlin knowing their homicidal intent, the court did not err in determining that he was not an accomplice as a matter of law.

For the first time on appeal, defendant argues Rodriguez was an accomplice in the murders because he was engaged, as a conspirator or an aider and abettor, in kidnapping Medina and Sanchez, and the foreseeable result of the kidnapping was murder. The prosecution, however, did not contend that Medina and Sanchez were kidnapped, much less that the foreseeable result of the kidnapping was murder.[44] In any event, given the evidence that Rodriguez

---

[43] Rojas testified that defendant told Rodriguez to go, and that unidentified individuals pushed him into the car. Juarez, however, testified that it was Rojas who pressed Rodriguez, who he testified was armed with an Uzi, to get in the car.

[44] Alternatively, defendant argues that Rodriguez was an accomplice to murder as a matter of law under a felony-murder theory, with kidnap as the predicate felony. But the prosecution did not present such a theory with respect to any of the defendants on trial. Rodriguez thus was not liable to prosecution for murder on this theory. (§ 1111.)

did not have the intent to encourage or facilitate the commission of any particular offense when he got in the car with Medina and Sanchez, the record does not compel such a conclusion.

As for Michael Rojas, strong circumstantial evidence suggested he was an accomplice to both Medina's rape and the murders. Juarez, Rodriguez, and Ramirez all testified they saw Rojas assault Medina while she was being gang raped in the Wilderness trailer and later overheard him say that Medina and Sanchez must be "taken care of" or killed because they knew too much. Richard also testified that he saw Rojas assault Medina in the Wilderness trailer and saw him in the car that took Medina and Sanchez away from the North Hayes property to their deaths.

Rojas himself, however, denied any involvement in Medina's rape and in the murders. Defendant claims Rojas was an accomplice as a matter of law because his testimony contradicted that of prosecution and defense witnesses and was "inherently unbelievable." In particular, defendant notes Rojas denied raping Spring, contrary to other witnesses' testimony. Arguing it would be impossible to believe that someone who took a leading role in Spring's rape did not likewise take such a role in a similar rape of Medina, defendant contends Rojas must have lied about his involvement in Spring's rape (for which he was given immunity from prosecution on the condition that he testify truthfully in the present case) so that he could deny involvement in Medina's rape (for which he was not given immunity from prosecution). But such a contention is speculative.

Further, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738], defendant concludes that the trial court erred in ruling that Rojas's accomplice status was a jury question because his self-serving testimony did not amount to evidence that was reasonable, credible, or of solid value. But we have found no case that has applied the reasoning of *Johnson*, which involved the standard of review of a claim of sufficiency of the evidence to support a conviction, to a case involving asserted trial court error in failing to declare a witness an accomplice as a matter of law. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10 [17 Cal.Rptr.3d 302, 95 P.3d 523].)

Thus, although circumstantial evidence indicated Rojas was an accomplice in Medina's rape and in the murders, such evidence did not compel a conclusion that he was an accomplice, in light of his denial of involvement in

those crimes. Accordingly, the trial court did not err in ruling that Rojas's accomplice status was a jury question.

### 3. *Instructional Errors*

Assuming that the accomplice status of Frank Rodriguez and Michael Rojas was for the jury, defendant contends the instructions on this issue were incomplete. Specifically, defendant contends that the trial court should have instructed the jury, sua sponte, that Rodriguez could be considered an accomplice to murder if it found he aided and abetted a kidnapping, based on the natural and probable consequences doctrine, and that Rojas likewise could be considered an accomplice if it found he aided and abetted a rape, also based on that doctrine. Defendant contends the court's errors lightened the prosecution's burden of proof in violation of his federal constitutional rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment.

■ A trial court "must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial." (*People v. Ervin, supra,* 22 Cal.4th at p. 90.) ■ When the evidence at trial would warrant the jury's concluding that a particular witness was a defendant's accomplice in the crime or crimes for which the defendant is on trial, the court must instruct the jury to determine whether the witness was an accomplice. (*People v. Hayes, supra,* 21 Cal.4th at pp. 1270–1271.)

■ At common law, a person who encouraged or facilitated the commission of a crime could be held criminally liable for the crime he encouraged or facilitated, as well as for "any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 260 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) The natural and probable consequences doctrine is based on the recognition that those who aid and abet should be responsible for the harm they have naturally, probably, and foreseeably put in motion. (*Ibid.*) When the prosecution relies on the natural and probable consequences doctrine to hold a defendant liable as an aider and abettor, the trial court has a sua sponte duty to identify and describe any potential target offense or offenses allegedly aided and abetted by the defendant, because such instructions are " 'general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' " (*Id.* at p. 264.)

Although the holding in *People v. Prettyman, supra,* 14 Cal.4th 248, was limited to reliance on the natural and probable consequences doctrine to hold a *defendant* liable as an aider and abettor, its reasoning actually applies with greater force here. In this case, the prosecution did not charge defendant with kidnapping, and neither the prosecution nor the defense claimed at trial that any of the defendants or potential accomplices were involved in a kidnapping. Under these circumstances, Rodriguez's potential liability for murder for aiding and abetting a kidnapping based on the natural and probable consequences doctrine was not a general principle of law that was closely or openly connected with the facts presented at trial, on which the court had a sua sponte duty to instruct, for there was no "risk that the jury, generally unversed in the intricacies of criminal law, [would] 'indulge in unguided speculation' [citation] when it applie[d] the law to the evidence adduced at trial." (*Id.* at p. 267.) To hold otherwise would be tantamount to requiring the trial court " 'to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly.' " (*Id.* at p. 269.)

Similarly, although the prosecution argued that the defendants on trial could be liable for murder under a theory of felony-murder rape, neither the prosecution nor the defense argued that any one of the potential accomplices were liable for murder, under the natural and probable consequences doctrine, because he aided and abetted a rape. Under these circumstances, Rojas's potential liability for murder on such a theory was not a general principle of law that was closely or openly connected with the facts presented at trial, on which the court had a sua sponte duty to instruct.

In any event, the lack of an instruction on the natural and probable consequences doctrine as it might relate to Rodriguez and Rojas did not prejudice defendant in any way because their testimony, like the testimony of Richard, was sufficiently corroborated by independent evidence of defendant's guilt. As stated, defendant initially attempted to conceal from the police his involvement in the activities culminating in the murders, implying a consciousness of guilt. But he eventually admitted that he brought Medina and Sanchez to the party and might have been inside the car in which the victims were taken to their deaths. Michael Ramirez's testimony that defendant was present during the discussion of what was to be done with Medina and Sanchez also corroborated Rodriguez's and Rojas's testimony that defendant participated in that discussion. (See *ante,* pt. III.A.1.) Physical evidence also corroborated this evidence of defendant's guilt: evidence that the victims were shot by a .25-caliber gun and that .25-caliber shell casings were found on the ground near them corroborated Rojas's testimony that he

saw defendant with a .25-caliber gun, and evidence at the scene indicating that Sanchez attempted to flee up the embankment corroborated Rodriguez's testimony that at the canal he saw a woman attempting to crawl away from defendant.

### 4. *Insufficiency of the Evidence to Corroborate the Testimony of Accomplices*

Defendant contends that his conviction must be reversed because (1) there was insufficient independent evidence to corroborate the testimony of Juarez, Rodriguez, and Rojas, (2) whether the jury found Rodriguez and Rojas to be accomplices is uncertain, and (3) if the jury found them to be accomplices, it might have relied on evidence that could not properly be used to corroborate their testimony. He further contends that insufficient evidence to corroborate the testimony of the accomplices in this case contributed to the violation of his federal constitutional rights to a fair trial, to due process, and to present a defense protected by the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth and Fourteenth Amendments.

Assuming arguendo that Rodriguez and Rojas were accomplices, sufficient independent evidence corroborated their testimony, as discussed earlier. (*Ante*, pt. III.A.3.) Likewise, there was sufficient independent evidence corroborating Juarez's testimony. For example, both Ramirez and Juarez testified that defendant was present during the discussion of what was to be done with Medina and Sanchez. Moreover, .25-caliber and nine-millimeter bullet fragments recovered from the victims and bullet casings found at the scene of the crime corroborated Juarez's testimony that he saw defendant with .25-caliber and nine-millimeter guns on the night in question. Accordingly, we reject defendant's related claim that the trial court should have granted his motion for acquittal under section 1118.1[45] on the murder counts for insufficiency of the evidence of corroboration.

---

[45] Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

### 5. *Sufficiency of the Evidence of Corroboration to Support the Witness-killing Special-circumstance Finding and Related Instructional Error*

Defendant contends that the witness-killing special-circumstance finding, like the murder conviction, must be reversed because it was based on insufficient evidence of corroboration of the accomplices in this case, namely Juarez, Rodriguez, Rojas, and codefendant Richard Avila. But because we have concluded that there is sufficient independent evidence to corroborate the testimony of Juarez, Rodriguez, Rojas, and Richard, assuming they were all accomplices, defendant's argument that the witness-killing special circumstance must be reversed on this issue fails at the threshold.

Alternatively, defendant contends that the witness-killing special-circumstance finding must be reversed nevertheless because the trial court failed to instruct the jury sua sponte that the witness-killing special circumstance could not be based on the testimony of an accomplice unless it was corroborated by evidence tending to connect defendant with that special circumstance.

Defendant's contention is without merit. When a special circumstance requires proof of a crime other than the charged murder, that crime cannot be proved by the uncorroborated testimony of an accomplice. But when it requires "only proof of the motive for the murder for which [the] defendant has already been convicted, the corroboration requirement of section 1111 does not apply." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1177 [259 Cal.Rptr. 701, 774 P.2d 730]; see also *People v. Noguera* (1992) 4 Cal.4th 599, 632, fn. 9 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Here, the trial court informed the jury that it must determine the truth of any charged special circumstance *only if* it found that defendant was guilty of first degree murder. (See CALJIC No. 8.80.1 (1993 rev.) (5th ed. 1988).) Further, the witness-killing special circumstance did not require proof of a crime other than the charged murder; rather, it required that "[t]he victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal . . . proceeding . . . ." (§ 190.2, subd. (a)(10).) Accordingly, the requirement of section 1111 did not apply to the witness-killing special circumstance, and no instructional error occurred.

### 6. *Cumulative Error Involving Accomplice Testimony and Related Instructions*

Defendant contends the cumulative error involving accomplice testimony and related instructions deprived him of his federal constitutional rights to due process under the Fifth and Fourteenth Amendments, a fair trial under the Sixth and Fourteenth Amendments, a meaningful defense under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth Amendment.

We disagree. We have assumed the trial court erred in only one instance—in failing to instruct the jury on accomplice liability as to Richard Avila—and we concluded the error was harmless.

### B. *Mistrial and Severance Motions Related to a Statement Made by Rodriguez*

Defendant contends the trial court erred in denying his mistrial motion or, in the alternative, in denying his severance motion, based on Rodriguez's testimony that, shortly after the murders, Richard Avila told him to keep cool and do nothing because defendant had recently gotten out of prison, was crazy, and would kill him.

### 1. *Relevant Proceedings*

Before trial, Richard filed a motion to sever his trial from that of Spradlin and defendant. Defendant filed a similar motion to sever his trial from that of his codefendants and joined in Richard's motion. Following a hearing, the trial court denied the motions.[46]

Before Rodriguez testified for the prosecution, the trial court admonished him not to make references to several topics, including the parole status and criminal convictions of any of the defendants. Thereafter, Rodriguez testified to the events of July 31 and August 1, 1991, as set forth in the statement of facts. During direct examination, the prosecutor asked Rodriguez if anyone said anything to him just before he left the North Hayes property on the morning of August 1, 1991, after Medina and Sanchez had been killed. When

---

[46] The court later granted defendant's and codefendants' motions to sever their penalty phases.

he said, "Yes," the prosecutor asked, "And tell me how that occurred. Where are you when this occurred?" Rodriguez answered that he and Margarito Herrera were in the car preparing to leave when Richard approached and said, "Keep cool. Keep—kick back, because—don't do nothin', 'cause Johnny barely got out of prison. And he's crazy. He'll kill you."

Defendant moved for a mistrial based on Rodriguez's reference to defendant having been in prison. He then clarified that he objected to the entirety of Rodriguez's statement. He argued that the prosecutor had a duty to prevent Rodriguez from testifying about improper matters, that the statement was prejudicial, and that the only remedy was to declare a mistrial. Spradlin joined in the motion, adding as an additional ground the decisions in *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*).[47]

The trial court found Rodriguez's entire statement was inadmissible as to defendant under *Aranda/Bruton*, and that the reference to prison violated the spirit of its earlier order not to mention parole and conviction status. But the court found that the reference did not prejudice defendants. With respect to the portion of Rodriguez's statement that Richard said defendant was crazy and would kill Rodriguez, the court noted that defendants had known before trial that Rodriguez had made such a statement but failed to object to its admission until after Rodriguez testified. In any event, the court believed the state of the evidence against defendant was strong, and that striking the statement and admonishing the jury not to consider it in any way would remedy the problem.

In response to the trial court's finding, Richard argued Rodriguez's statement should be admitted as to him so he could argue to the jury that he attempted to help Rodriguez by warning him about defendant. He suggested the court could grant defendant's and Spradlin's motions for a mistrial, thereby effectively severing his trial from theirs, and admit Rodriguez's statement as to his case alone. He further argued that if the court denied the motions for a mistrial and to strike Rodriguez's statement, he would be denied his Sixth Amendment rights to confrontation, cross-examination, and due process because he would be unable to present a defense. Accordingly, if the court intended to strike the statement altogether, Richard asked that a mistrial be granted.

The trial court denied the severance and mistrial motions, finding the statement, minus the reference to prison, inadmissible against defendant but

---

[47] Defendant does not raise an *Aranda/Bruton* claim on appeal.

admissible to explain Richard's state of mind. The court said it would strike the reference to prison and tell the jury not to consider it for any purpose, and would tell the jury that the remaining statement, "And he's crazy. He'll kill you," could be considered for the limited purpose of explaining Richard's state of mind.

Defendant objected, arguing that admonishing the jury would not cure the taint and that allowing Richard to explore this area would only inflame the jury against him. He asked the court to reconsider the mistrial motion and again asked for severance. He also objected to the jury being "given any further information about this by the court in terms of the cautionary instruction, admonishment, or otherwise." The court replied that, having denied the motion for a mistrial, it had to give a limiting instruction to make sure that the jury did not consider Rodriguez's statement for the truth of the matter asserted.

In the presence of the jury, the trial court identified Rodriguez's statement and struck the "reference to Johnny barely getting out of prison." The court told the jury to "disregard that testimony and treat it as though you had never heard it. You shall not consider it for any purpose. In your deliberations you may not discuss or consider it." The court told the jury that the remainder of the statement, "And he's crazy. He'll kill you," could be considered "for a very limited purpose, and that is to explain the state of mind of Richard Avila," and that the jury "[could] not consider those statements for their truth or as against any other defendant in this case."

### 2. *Mistrial Motion*

Defendant contends the trial court abused its discretion in denying his mistrial motion, thereby violating his federal constitutional rights to a fair trial, to due process of law, to confront and cross-examine witnesses, to present a meaningful defense, and to reliable factfinding under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

■ A trial court should grant a motion for mistrial "only when ' "a party's chances of receiving a fair trial have been irreparably damaged" ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [96 Cal.Rptr.2d 682, 1 P.3d 3]), that is, if it is "apprised of prejudice that it judges incurable by admonition or instruction" (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776]). "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*Ibid.*) Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion. (See *People v. Valdez* (2004) 32 Cal.4th 73, 128 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

Applying these standards, we conclude the trial court did not abuse its discretion in denying the mistrial motion. As for the portion of Rodriguez's testimony referring to defendant recently having been in prison, the court admonished the jury not to consider it for any purpose. As for the statement that defendant was crazy and would kill Rodriguez, the court admitted the evidence against Richard only, and admonished the jury to consider it for the limited purpose of explaining Richard's state of mind and not for the truth of the matter stated. We presume the jury followed the court's instructions. (*People v. Boyette, supra,* 29 Cal.4th at p. 436.)

Defendant also complains that the court compounded the prejudice because, in admonishing the jury, it repeated Rodriguez's objectionable testimony. We disagree. The court did not immediately rule on the mistrial motion. Until it did so, Rodriguez continued to testify for the prosecution. Thus, when the court eventually admonished the jury, to avoid confusion, it acted properly in clarifying the statement to which its admonition referred. No error occurred.

### 3. *Severance Motion*

Before trial, all three defendants moved to sever their respective trials (guilt and penalty phases), or, alternatively, only their respective penalty phase trials from the others. The trial court denied the motions.

After the trial court denied defendant's midtrial motion for a mistrial based on Rodriguez's testimony that Richard told him defendant had recently been freed from prison, was crazy, and would kill him, defendant renewed his mistrial and severance motions. Defendant claims that the court erred in denying his renewed severance motion.[48] As with his earlier claim regarding the mistrial motion, defendant contends the court's ruling violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." Our Legislature has thus "expressed a preference for joint trials." (*People v. Boyde* (1988) 46 Cal.3d 212, 231 [250 Cal.Rptr. 83, 758 P.2d 25].) But the court may, in its discretion, order separate trials "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating

---

[48] Defendant argues only that his trial should have been severed from Richard's. Thus, we do not discuss whether the court should have severed his trial from Spradlin's. Defendant does not challenge the denial of his *pretrial* severance motion.

testimony." (*People v. Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869], fns. omitted; see also § 1098.)

We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. (*People v. Hardy* (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796, 825 P.2d 781].) If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder " 'resulted in "gross unfairness" amounting to a denial of due process.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 162 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Even if the court abused its discretion in refusing to sever, reversal is unwarranted unless, to a reasonable probability, defendant would have received a more favorable result in a separate trial. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 41.)

Defendant argues that several factors dictated severance of his trial from Richard's: the introduction of Richard's extrajudicial statement about defendant; prejudicial association with Richard, who had numerous weapons on his property; likely confusion resulting from the fact that defendant, but not Richard, was accused of shooting the victims; and the antagonistic nature of Richard's defense. As will appear, the trial court did not abuse its discretion in denying defendant's severance motion.

This was a classic case for a joint trial: all defendants faced equivalent charges, most of the evidence was cross-admissible, and there was strong evidence against each defendant. Moreover, contrary to defendant's argument, the factors supporting severance were weak. For example, assuming Richard's extrajudicial statement about defendant incriminated defendant, it did not prejudice defendant because the court admonished the jury not to consider it for any purpose against defendant, and we presume the jury followed the instruction. (*People v. Boyette, supra*, 29 Cal.4th at p. 436.) Undoubtedly, the evidence showed defendant was associated with Richard. That association, however, did not dictate severance, considering that the evidence also showed defendant, not Richard, actually shot the victims and was more culpable than Richard.

We also reject defendant's argument that severance was necessary because Richard claimed innocence while implicating defendant. " ' "Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis.*" [Citation.] . . .' '[A]lthough it appears no California case has discussed at length what constitutes an "antagonistic defense" [that might compel severance,] the federal courts have almost uniformly construed that doctrine very narrowly.

Thus, "[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other." [Citation.] "Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' [Citations.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance. [Citation.]" (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 42.)

Here, the prosecution presented abundant independent evidence establishing defendant's guilt. Such evidence showed that defendant had a gun; defendant expressed fear that the women would identify him to authorities if they were released; defendant rode in the car with the women; and defendant shot at least one woman and admitted doing so when he returned to the North Hayes property. Based on the foregoing evidence, the nature of defendant's and Richard's defenses did not compel severance.

In sum, we find no abuse of discretion or federal constitutional error in the denial of the midtrial severance motion.

### C. *Spring J. Rape Evidence*

Before and separately from the trial involving the Medina and Sanchez murders, seven individuals, including defendant, Richard Avila, and Ray Juarez, were charged with the rape of Spring J. Juarez pleaded guilty to the rape in exchange for dismissal of the murder charges and his truthful testimony in this case. Richard was convicted of the lesser included offense of unlawful sexual intercourse with a minor (§ 261.5), and defendant's case ended in a mistrial.[49]

At a pretrial hearing in this case, Richard asked the trial court to exclude any evidence of his involvement in the Spring J. incident. Although the prosecutor stated he did not intend to "rehash who did what," defendant argued that he wanted to call Spring as a witness to demonstrate that Rojas and Juarez were present during the rape, which, in turn, would be relevant to their credibility, character, and motives as prosecution witnesses. The court prohibited the prosecution from introducing evidence during the guilt phase that Richard was convicted of unlawful intercourse or that he raped, or aided and abetted another in the rape of, Spring J.

---

[49] The retrial of the Spring J. rape case against defendant trailed the instant case and was eventually dismissed.

At trial, Rojas testified for the prosecution. The prosecutor asked him: "While you were in the group of men that were there that evening, did you hear any member of the group make any plans with respect to what might be done to Spring J[.]?" Defendant objected on the ground that the question assumed a fact not in evidence. Following a discussion outside the presence of the jury, the court sustained the objection. It also precluded further questioning about the Spring J. incident pending future hearings on the matter.

Defendant now contends that the trial court made several errors in admitting and excluding certain evidence regarding the Spring J. incident.

### 1. *Rojas's Involvement*

Out of the presence of the jury, the parties and the trial court discussed the evidence that would be admitted about the Spring J. incident. Defendant stated that he planned to cross-examine Rojas extensively about that incident to show that Rojas was most likely the murderer or one of the murderers, and thus raise a reasonable doubt about defendant's guilt. Defendant argued that, because Rojas was involved in Spring's rape, which was executed in a manner similar to Medina's rape, and because the earlier incident occurred close in time and place to the incident for which he was currently on trial, Rojas must be guilty of Medina's rape and the murders.

The court ruled the evidence that Rojas had raped and threatened Spring, as well as the evidence that he knew, when he signed a contract with the prosecution, that she had identified him as one of the men who had raped her, was admissible to impeach Rojas's credibility. Finding insufficient connection between Rojas's involvement in Spring's rape and the charged crimes, however, it ruled the evidence inadmissible to show Rojas's guilt of Medina's rape and the murders. (Evid. Code, §§ 250, 352.) The court also excluded generally any evidence on the Spring J. incident unless it was offered to rebut evidence admitted for limited purposes.

Defendant now contends that the trial court erred in excluding evidence of Rojas's involvement in the Spring J. incident on grounds that it was insufficient to support defendant's third party culpability theory, and was more prejudicial than probative.

 Any relevant evidence that raises a reasonable doubt as to a defendant's guilt, "including evidence tending to show that a party other than the defendant committed the offense charged," is admissible. (*People v. Hall* (1986) 41 Cal.3d 826, 829 [226 Cal.Rptr. 112, 718 P.2d 99]; see also *People v. Lewis, supra,* 26 Cal.4th at p. 372; Evid. Code, §§ 210, 350, 351.) But

"evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall, supra*, 41 Cal.3d at p. 833.) Relevant evidence may be excluded under Evidence Code section 352 if it creates a substantial danger of undue consumption of time or of prejudicing, confusing, or misleading the jury. (*Hall*, at p. 829.)

We review for abuse of discretion a trial court's rulings on relevance and the exclusion of evidence under Evidence Code section 352. (*People v. Cole, supra*, 33 Cal.4th at p. 1195.)

The trial court did not abuse its discretion. Evidence that Rojas raped Spring on the same night and in the same location where Medina was later raped might have shown Rojas had the motive or opportunity to rape Medina, but it was insufficient to raise a reasonable doubt about defendant's guilt inasmuch as the evidence in this case showed that more than one individual was responsible for the rape and murders. Moreover, defendant's argument that Rojas's involvement in the earlier rape of Spring raised an inference that he (Rojas) killed Medina and Sanchez is too speculative to raise a reasonable doubt about defendant's guilt of the murders.

### 2. Defendant's Involvement

Before Juarez testified, the trial court admonished him not to "discuss or mention the names of Jeffrey Spradlin or Richard Avila or Johnny Avila in connection with the rape or assault of Spring J[.]" Later, on cross-examination by defendant, Juarez testified that he saw Rojas in the Wilderness trailer with a belt around Spring's neck and a gun pointed to her head, that Rojas told her he would kill her if she did not shut up, and that he did not see defendant there. He also testified that, when he was smoking KJ with Spring, defendant was not present. The prosecutor requested a sidebar and expressed concern that defendant was opening the door to prior inconsistent statements by Juarez that defendant was, indeed, involved in Spring's rape. Defendant stated he did not "have a problem with that." Although the court reiterated that there should be no questions inquiring whether defendant, or the other two codefendants for that matter, were inside the trailer while Spring was being raped, it did not strike the testimony defendant elicited from Juarez on cross-examination.

Later, the prosecution questioned Detective Jose Flores on direct examination about any interviews he might have had with Juarez about Spring J.'s rape. Although defendant objected on the ground of relevance, citing the court's earlier ruling, he acknowledged that the evidence would be admissible

as a prior inconsistent statement of Juarez to Flores. The court overruled the objection. Detective Flores then testified that, on August 2, 1991, he had interviewed Juarez and questioned him about Spring J.'s rape. At that interview, Juarez said that while Spring was being raped, defendant put a .357-caliber gun to her head and told her to shut up because they were not "finished" with her yet.

Before Spring testified for defendant's case-in-chief, the trial court also admonished her not to mention the names of those who were in the trailer while she was being raped, other than Juarez, Rojas, and De Anda.

Defendant now contends that the trial court erred in precluding him from presenting evidence by Spring that defendant was *not* present during Spring's rape, and compounded the error by allowing the prosecution to present evidence by Detective Flores that defendant *was* involved in that rape. Defendant also contends the prosecutor improperly invited the jury to speculate about his possible involvement in the Spring J. incident.

The trial court did not abuse its discretion in excluding the evidence by Spring. Defendant was not on trial in this case for Spring's rape, and his presence at or absence from that rape was not relevant to prove or disprove his involvement in the crimes against Medina and Sanchez. Moreover, defendant's involvement in Spring's rape, if any, had no bearing on his motive to kill Medina and Sanchez.

The trial court also did not abuse its discretion by admitting Juarez's prior inconsistent statement to Detective Flores. Evidence Code sections 770 and 1235 except from the general rule against hearsay a witness's prior statement that is inconsistent with the witness's testimony in the present hearing, provided the witness is given the opportunity to explain or deny the statement or the witness has not been excused from giving further testimony in the action. (See *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 78; see also Evid. Code, §§ 770, 1235.)[50] Here, Juarez's prior statement that he saw defendant put a gun to Spring's head while she was being raped was inconsistent with his trial testimony that he did not see defendant there. Moreover, when Detective Flores testified about Juarez's prior statement,

---

[50] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Evidence Code section 770, in turn, provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

Juarez had been excused but was subject to recall. Accordingly, Juarez's prior statement was properly admitted under Evidence Code sections 770 and 1235.

Defendant does not acknowledge the applicability of Evidence Code sections 770 and 1235. Rather, he simply argues that the jury was left with a misleading and unfavorable picture of defendant's involvement in the Spring J. incident because the trial court admitted prosecution evidence by Detective Flores that defendant was present during and involved in Spring's rape, but excluded defense evidence by Spring that defendant was not present. We disagree, for Juarez's trial testimony that defendant was not present during Spring's rape remained on the record and constituted evidence that the jury could consider. It was precisely because Juarez's trial testimony remained on the record that the prosecution had the right to rebut it with Juarez's prior inconsistent statement to Detective Flores under Evidence Code sections 770 and 1235.

In a related argument, defendant contends the trial court erred when it sustained the prosecutor's objection to his closing argument to the jury that defendant was not present during Spring's rape, and that the prosecutor compounded the error by improperly inviting speculation, during his own closing argument, that defendant was involved. Because we conclude the court did not abuse its discretion in excluding evidence of defendant's involvement in Spring's rape, we conclude the court did not err in sustaining the prosecutor's objection to defendant's argument to the jury. And, as will appear, the prosecutor's argument did not invite speculation about defendant's involvement in Spring's rape.

During his closing argument, defense counsel noted that Rojas testified he never saw defendant go inside the Wilderness trailer when Spring was on the property. He also argued that "[n]ot one person has put [defendant] in either Richard Avila's Wilderness trailer or . . . any other trailer on [the North Hayes] property. That's because [defendant] was never there." Following defendant's closing argument, out of the presence of the jury, the prosecutor observed that on two occasions during his argument defense counsel had asserted there had been no evidence connecting defendant to Spring's rape. The court agreed that defense counsel had violated the spirit of its earlier ruling by suggesting defendant's noninvolvement in the Spring J. incident. The prosecutor suggested an admonition to the jury might be a possible remedy, but ultimately withdrew the suggestion. Later, during rebuttal, the prosecutor argued: "No witness was asked and no information was offered for the truth of the matter one way or another as to any contact between Spring J[.] and [defendant]. Either eventuality is irrelevant to this case."

It appears the prosecutor did not correctly summarize the state of the evidence on this matter, for Juarez testified that defendant was not present at Spring's rape, and Detective Flores testified that Juarez told him that defendant was not only present but involved in that rape. But neither did the prosecutor's argument invite the jury to speculate, in violation of either state law or the federal Constitution, that defendant was present during the Spring J. incident. (See *People v. Benavides* (2005) 35 Cal.4th 69, 108 [24 Cal.Rptr.3d 507, 105 P.3d 1099] [a prosecutor's conduct violates California law if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury" ' "]; *People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11] [a prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution "when it infects the trial with such unfairness as to make the conviction a denial of due process"].) Moreover, the prosecutor properly argued that defendant's involvement or noninvolvement in the Spring J. incident was irrelevant to the murders of Medina and Sanchez. We find that, by any applicable standard, the prosecutor committed no prejudicial misconduct.

### 3. *Juarez's Involvement*

As stated, at various points throughout the trial, the court indicated that evidence of the Spring J. incident was irrelevant to the current case except on limited issues, such as the credibility of certain prosecution witnesses. Juarez testified on cross-examination by defendant that he had pleaded guilty to raping Spring J. in exchange for his truthful testimony in this case and dismissal of charges that he had murdered Medina and Sanchez. He nevertheless maintained at trial that he had consensual sex with Spring. Later, Spring testified on behalf of defendant that Juarez was one of the men who raped her in the Wilderness trailer.

Defendant now contends the trial court erred in precluding counsel from eliciting testimony from Spring about the details of Juarez's involvement in her rape to further impeach his credibility. For the same reason, defendant contends the court erred in precluding counsel from eliciting testimony that, while Juarez and De Anda were driving Spring home, Juarez asked her if she had seen him do anything wrong while she was being raped. Defendant argues such evidence showed Juarez's consciousness of guilt.

We see no abuse of discretion. As discussed previously, with the exception of certain evidence involving Rojas in the Spring J. incident, the trial court excluded evidence regarding that incident under Evidence Code section 352 unless it was offered to rebut the evidence admitted for limited purposes. Detailed evidence by Spring about Juarez's involvement in her rape would, as the court concluded, have created a substantial danger of undue consumption

of time or of confusing the issues. Likewise, evidence that Juarez asked Spring, after she was raped, whether she saw him do anything inappropriate to her in the Wilderness trailer, was properly excluded as irrelevant to the current case. Even if relevant, it was properly excluded under Evidence Code section 352.

### 4. *Rodriguez's Involvement*

Defendant contends the trial court erred in excluding evidence that Rodriguez was involved in the rape of Spring J. Specifically, he contends that the court erroneously precluded Detective Ybarra from testifying to a prior statement by Juarez that Rodriguez had raped Spring, and counsel from questioning Spring about Rodriguez.

Defendant's contention flows from his claim that the trial court erred in limiting evidence of the Spring J. incident. As discussed above (*ante*, pt. III.C.1.3.), the court did not abuse its discretion in limiting this evidence. In particular, the court did not abuse its discretion in precluding evidence tending to connect Rodriguez to Spring's rape. Any evidence linking Rodriguez to a crime for which the three defendants were not on trial would have been collateral in nature, and would have created a substantial danger of confusing the issues.

As for the contention that the trial court erroneously precluded him from questioning Spring about Rodriguez, we note that Spradlin, not defendant, sought permission to engage in that line of questioning. Defendant thus has forfeited his claim. But even assuming defendant impliedly joined in Spradlin's request, the court did not abuse its discretion in limiting examination of Spring on this issue. Again, testimony in this case about Rodriguez's involvement in Spring's rape would have been collateral to defendant's guilt.

### 5. *Spring J.'s Statement to Michael De Anda*

As stated, Michael De Anda testified for codefendant Spradlin. On cross-examination, the prosecutor asked De Anda: "During the ride home from 1604 North Hayes to the trailer park, did Spring . . . tell you in so many words that she had stripped and willingly engaged in a sexual act with multiple participants at the party?" Defendant objected the question lacked foundation and assumed a fact not in evidence. The trial court overruled the objection, and De Anda answered: "I stated that while I was taking her home she was mumbling about—something about she—this was like the other night and something to that effect that her friend Crissell or Jissell or something, they were at a party and they were doing that." The prosecutor next asked: "Did she say something to the effect, sir, she said it was like the other night

and some guys had paid her to strip or something, more than one person?" De Anda answered: "That's basically what I said, without the part about payment. She never told me anything about payment, I don't believe." When the prosecutor attempted to continue this line of questioning, Richard objected on grounds of hearsay and relevance.

Out of the presence of the jury, the parties and the trial court discussed at length the relevance of this testimony. Also out of the presence of the jury, the parties questioned De Anda on Spring's exact statement to him. The court found the prosecutor's line of questioning relevant to De Anda's credibility and ultimately overruled Richard's objection.[51]

In the presence of the jury, the prosecutor asked De Anda: "[D]id Spring . . . basically tell you that tonight she had stripped for money and willingly engaged in group sex?" De Anda replied: "Yes." Later, testifying for defendant, Spring denied making such a statement.

Defendant now contends the trial court abused its discretion in admitting De Anda's testimony that Spring told him she had stripped for money and willingly engaged in group sex. He argues such testimony was collateral in nature, distorted De Anda's original testimony on the issue, and unfairly depicted De Anda as "absurd" for insinuating that Spring was not raped. We see no abuse of discretion, for De Anda's testimony on this subject was relevant to his credibility.

### 6. *Rojas's Involvement in a Separate Assault on Defendant's Niece*

Rojas testified, inter alia, that: (1) he remembered taking a trip to Santa Cruz with some women; (2) he did not recall bringing a firearm to North Hayes and did not have a habit of carrying a .357-caliber magnum; and (3) he had smoked KJ once, a week or two before the gathering at North Hayes, and did not like it.

After the prosecution rested its case, out of the presence of the jury, defense counsel told the court he had given the prosecutor a report involving Melissa Bonillas and Jessica Trujillo, two potential witnesses for defendant. These individuals would testify that, on July 7, 1991, approximately three weeks before the gathering at North Hayes, Rojas was in Santa Cruz and assaulted Bonillas, defendant's niece. Bonillas would also testify that she saw Rojas with a firearm and saw him smoke KJ. Defendant wanted to present

---

[51] Although the court indicated it would instruct the jury that any statement De Anda attributed to Spring was not to be received for the truth of the matter stated, no such instruction appears to have been given to the jury.

this testimony to show he would not have offered to kill Medina and Sanchez at Rojas's request and to impeach Rojas's testimony about his usage of KJ and handling of firearms.

The trial court ruled that, to the extent the evidence was being offered to show that Rojas had a bias against defendant, it was an "extremely tenuous" connection. Accordingly, the court excluded the evidence under Evidence Code section 352. The court also precluded counsel from eliciting testimony that Bonillas saw Rojas with a gun and saw him smoking KJ, ruling they were "collateral, insignificant matters" under Evidence Code section 352.

Defendant now contends that the trial court abused its discretion in excluding evidence that Rojas assaulted his niece three weeks before the events at issue here. Defendant concedes such evidence was unrelated to the Spring J. incident, but argues the court's ruling was inconsistent with its ruling on the admissibility of De Anda's testimony about Spring's statement to him (*ante*, pt. III.C.5.). Defendant further contends that the court's error in excluding the evidence that Rojas assaulted his niece violated his rights to a fair jury, to due process of law, to a reliable guilt verdict, and to confrontation and cross-examination, under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

We see no abuse of discretion. Evidence that Rojas assaulted Bonillas weeks before Medina and Sanchez were killed was irrelevant to the current crimes. To the extent it could be considered evidence of bias on the part of Rojas against defendant, it was, at best, weak. Any bias would stem from the fact that Bonillas was related to defendant. But defendant did not proffer evidence that defendant knew Rojas had previously assaulted his niece, or that Rojas knew that Bonillas was his niece. Accordingly, the probative value of Rojas's prior assault on Bonillas, if any, was substantially outweighed by the probability that its admission would necessitate undue consumption of time or create substantial danger of undue prejudice or of confusing the issues, as the court below noted.[52]

We similarly see no abuse of discretion or federal constitutional error in the exclusion of evidence that Bonillas saw Rojas smoke KJ or saw him with a weapon on a previous occasion. The court reasonably concluded such evidence was insignificant and collateral.

---

[52] In a related argument, defendant argues summarily that the prosecutor engaged in misconduct in arguing that there were "no grudges, . . . serious animosity[,] or historical family feuds" between Rojas and defendant. As discussed, defendant's argument that Rojas was biased against him because Rojas had previously assaulted his niece is based largely on speculation. Accordingly, we find no misconduct.

Defendant argues that, even assuming that the evidence of a prior assault by Rojas on Bonillas was collateral, the trial court nevertheless abused its discretion in excluding it, in light of its admission of similarly collateral evidence—a purported statement by Spring that she had stripped for money—to attack De Anda's credibility. We reject the notion that the admission of collateral evidence in one instance necessitates admission of similarly collateral evidence in another instance.

### 7. *Cumulative Error*

Defendant contends that the asserted errors involving the exclusion or admission of certain evidence involving the Spring J. incident and exclusion of evidence involving Rojas's assault on Bonillas, considered separately or cumulatively, impaired his ability to present a defense and to confront and cross-examine witnesses against him. Defendant additionally invokes his federal constitutional rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and to a reliable judgment under the Eighth and Fourteenth Amendments. We reject the claim of cumulative error.

### D. *Evidence Impeaching Rojas*

The trial court conducted hearings on the admissibility of evidence of prior crimes committed by Rojas and evidence of other incidents bearing on his credibility. Richard identified for the court the prior crimes and other incidents bearing on Rojas's credibility that he intended to present for impeachment and to show a common plan or scheme under Evidence Code section 1101, subdivision (b). Defendant and Spradlin joined in Richard's motion. The court and the parties discussed the issue generally at length on several occasions and then counsel for Richard specifically addressed each particular incident of other crimes committed by Rojas. In addressing the incidents individually, counsel for Richard did not consistently argue that the incidents were admissible for impeachment *and* to show a common plan or scheme, and the court likewise did not consistently address both possible grounds for admission of such evidence. In the end, the court ruled that two prior incidents involving Rojas were admissible on the issue of Rojas's credibility, that is, as evidence that Rojas had a "morally lax character from which the jury could reasonably infer a readiness to lie." (*People v. Mickle* (1991) 54 Cal.3d 140, 168 [284 Cal.Rptr. 511, 814 P.2d 290].)

### 1. *Other Crimes Evidence Presented at Trial*

The prosecution presented evidence that Rojas had been convicted of assault with a deadly weapon (§ 245) in 1982 and armed robbery (§ 211) in 1988. Richard presented evidence of the facts underlying these convictions:

Ronald Tate testified that Rojas approached him, asked him questions about a fight Tate had just witnessed, and then pulled out a knife and stabbed him multiple times. An investigator for Richard testified that he interviewed Ruben Arrechiga, Jr., an inmate witness. Arrechiga told the investigator that Rojas told him that as he was fleeing from a convenience store that he had just robbed, he saw two young girls from the neighborhood and shot at them because they could identify him as the perpetrator.

Defendant now contends that by limiting the admissibility of Rojas's other crimes to the issue of Rojas's credibility, and by further limiting evidence detailing the facts of those other crimes, the trial court erred under state law and violated his federal constitutional rights to due process, confrontation and cross-examination, and presentation of a defense under the Fifth, Sixth, and Fourteenth Amendments, and to a reliable judgment under the Eighth and Fourteenth Amendments. Although counsel for Richard did not expressly argue that *each* incident of other crimes committed by Rojas was admissible as a common plan or scheme to intimidate a witness under Evidence Code section 1101, subdivision (b), she did argue generally that the other crimes were admissible on this ground. Because defendant joined in Richard's motion when it was first identified for the trial court, we conclude that he has preserved the claim under Evidence Code section 1101, subdivision (b). But, as discussed below, his claim is without merit.

Defendant acknowledges that the facts underlying Rojas's two prior felony convictions were admitted for impeachment. But he contends that this evidence also should have been admitted to show Rojas's common plan or scheme to intimidate or eliminate witnesses, as relevant to the possibility Rojas killed Medina and Sanchez. In this vein, defendant also contends the court erred in precluding additional evidence about the Tate incident, namely that Rojas knew Tate because they had attended the same school years before the stabbing incident.

█ Evidence Code section 1101, subdivision (a), generally prohibits the admission of evidence of a person's character or a trait of his or her character when offered to prove his or her conduct on a specified occasion. Evidence Code section 1101, subdivision (b), however, provides that evidence of a person's prior criminal act is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . .) other than his or her disposition to commit such an act." To establish the existence of a common plan or scheme, "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Moreover, to be admissible, such evidence " ' "must not contravene other policies limiting admission, such as

those contained in Evidence Code section 352." ' " (*People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (See *People v. Ewoldt, supra,* 7 Cal.4th at p. 404; Evid. Code, § 352.)

The evidence of the 1982 Tate incident was weak on the issue of whether Rojas had a plan to intimidate a witness. There was no evidence that Rojas was involved in any way in the fight that Tate had witnessed. Absent such evidence, there was no motive for Rojas to stab Tate. Accordingly, the court did not err in limiting the admission of evidence of the Tate incident to impeach Rojas.

Admittedly, the evidence of the 1988 armed robbery was stronger than the evidence of the Tate incident on the issue of Rojas's purported plan to intimidate witnesses because, arguably, Rojas shot at the girls while fleeing from the scene of the robbery because they could have identified him as the perpetrator of the robbery. But evidence of this shooting incident was weak in substance, considering that there was no offer of proof that Rojas was convicted of shooting at the girls, and considering that the testimony that Rojas shot at the girls was suspect because it was given by a convicted felon. Accordingly, the court did not err in limiting the admission of evidence of the armed robbery to impeach Rojas.

### 2. *Evidence Excluded at Trial*

Richard also proffered evidence that Rojas ordered the killings of Armando and Mario Vellez in 1982, that he stabbed Jovito Rodriguez, also in 1982, that he was an "enforcer" or "shot-caller" for a Mexican prison gang, and that he has an antisocial personality disorder and is a pathological liar. Defendant joined in Richard's initial offer of proof to the trial court. The court excluded evidence of the Vellez and Rodriguez incidents under Evidence Code section 352, excluded evidence that Rojas was an "enforcer" as irrelevant, and excluded expert testimony evidence that he is a pathological liar as invading the province of the jury (see Evid. Code, § 801), pending further foundational hearing if necessary.

Defendant now contends that the trial court should have admitted this evidence to impeach Rojas further. He also contends that, with the exception of the evidence of antisocial personality disorder, all of this evidence should have been admitted to show a common plan or scheme to eliminate those who saw him commit crimes or order others to do so.

As defendant himself notes, Rojas was impeached heavily at trial. In addition to evidence that he stabbed Ronald Tate, which resulted in his conviction for assault with a deadly weapon in 1982, and evidence that he shot at two girls while fleeing from an armed robbery for which he was convicted in 1988, there was evidence that Rojas raped Spring only hours before Medina and Sanchez were killed. He acknowledged lying to police after his arrest. A correctional sergeant with the California Department of Corrections who knew Rojas opined that he was an untruthful person. Rojas's credibility as a witness thus was highly questionable. Moreover, the relevance of Rojas's other crimes was tenuous at best and would have necessitated undue consumption of time and created a substantial danger of confusing the issues. The court did not abuse its discretion in excluding the additional evidence of Rojas's other crimes.

The evidence that Rojas was a pathological liar was properly excluded, as the jury was capable of determining the witness's credibility without expert opinion. The defense could have requested a further hearing, in which it could have shown the need to present expert testimony about the antisocial personality disorder, but did not do so.

Defendant contends that, even if the trial court did not abuse its discretion in excluding each additional instance of other crimes by Rojas, the cumulative impact of the exclusion of such evidence requires reversal. We disagree. As noted, Rojas's credibility was thoroughly impeached. Further, his involvement in the murders was extensively explored: Juarez, Ramirez, and Richard Avila testified that Rojas was concerned that Medina and Sanchez could identify their attackers; Juarez and Ramirez further testified that Rojas expressed the desire to get rid of the two women; and Richard testified that Rojas participated in placing the women in the car that eventually took them to the canal bank where they were killed.

### E. *Juarez Evidence*

Defendant contends that the trial court erred in failing to hold a hearing on Juarez's competency to testify at trial. Further, assuming that Juarez was competent to testify, defendant contends the court abused its discretion in precluding evidence that Juarez suffered from psychiatric disabilities and hallucinations that affected his ability to perceive and report events accurately. Defendant asserts these errors violated his federal constitutional rights to due process, fundamental fairness, cross-examination and confrontation of witnesses under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth and Fourteenth Amendments. We discuss the contentions in turn.

### 1. *Competency*

During Juarez's testimony, out of the presence of the jury, defendant argued that Juarez was "clearly having some problem with the ability to understand his obligation to tell the truth" and that his testimony thus far provided a foundation for allowing an expert to testify before the jury that Juarez was a sociopath who was incapable of telling the truth. Spradlin argued that Juarez's inability to tell the truth was obvious and moved to strike his entire testimony, and Richard joined in the motion "[b]ased on incompetence as a witness." The trial court ruled: "Request is denied. I think that is entirely within the province and responsibility of the jury."

Defendant failed at trial to request a hearing on Juarez's competency to be a witness. His request, rather, was for an expert to be allowed to testify before the jury about sociopaths and their inability to tell the truth. And in context, the trial court's ruling was a response both to defendant's request for an expert witness and to Spradlin's and Richard's requests to strike Juarez's testimony. Accordingly, defendant has forfeited his claim. (See *People v. Lewis, supra,* 26 Cal.4th at p. 360.)

 Were we to interpret the above exchange as an objection to Juarez's competence, we would find no substantial basis for the trial court to determine that Juarez was incompetent to testify. A person is disqualified to be a witness if he or she is "[i]ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him" (Evid. Code, § 701, subd. (a)(1)) or "[i]ncapable of understanding the duty of a witness to tell the truth" (Evid. Code, § 701, subd. (a)(2)). " '[T]he burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. [Citations.]' [Citations.] The challenging party must establish a witness's incompetency by a preponderance of the evidence. [Citations.] Unlike a witness's personal knowledge, a witness's competency to testify is determined exclusively by the court. [Citations.]" (*People v. Lewis, supra,* 26 Cal.4th at p. 360; see also *People v. Anderson* (2001) 25 Cal.4th 543, 572–574 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

 The record does not support the contention that Juarez was incapable of communicating so as to be understood or of understanding his duty to tell the truth. Juarez's testimony was, indeed, difficult to comprehend—largely because his statements were so contradictory from one moment to the next. But contradictory testimony does not suffice to show incapacity to understand the duty of truth, or to express oneself coherently. To the extent defendant contends Juarez's responses were incompetent because he was lying, this

was, of course, an issue of credibility for the jury and not relevant to the issue of his competency. (See, e.g., *People v. Lewis, supra,* 26 Cal.4th at p. 361.) " ' "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]" ' [Citation.]" (*Ibid.*)

### 2. Credibility

Assuming Juarez was competent to testify, defendant contends the trial court erred in excluding, under Evidence Code section 352, evidence of his mental deficiencies as it bore on his credibility.

In a pretrial hearing, counsel for Richard Avila sought to admit Juarez's statements to a member of the psychiatric staff in jail following his arrest in 1991 that he was hearing voices telling him to kill, that he had an unspecified injury when he was seven years old, that he could not control his anger, and that he had a bad memory. Counsel for Richard also sought to admit Juarez's prior inconsistent statements regarding drug use. Although defendant did not expressly join in Richard's motion, he made arguments in support of Richard's position. The court ruled it would admit evidence Juarez had a bad memory, but would otherwise exclude evidence of his mental deficiencies under Evidence Code section 352. Juarez later testified that, during an interview with police, he indicated he had a history of mental problems and a bad memory. Detective Ybarra testified similarly. Juarez also testified he had a learning disability, had difficulty remembering what people told him, and was confused at times.

We conclude defendant's argument in support of Richard's position was sufficient to preserve the claim for appeal, but the claim lacks merit. The trial court acted within its discretion in ruling that the probative value of the evidence of Juarez's additional mental deficiencies was substantially outweighed by undue consumption of time. Moreover, defendant was able to cross-examine Juarez about his memory and learning disability, and the jury did learn that Juarez acknowledged a history of mental problems. A reasonable jury would not have received a significantly different impression of Juarez's credibility had the excluded evidence been admitted. (See, e.g., *People v. Anderson, supra,* 25 Cal.4th at p. 579; see also *id.* at p. 609 (conc. opn. of Kennard, J.).)

### F. Tape Recordings of Statements by Michael Rojas

At trial, Rojas testified he lied to police on August 8, 1991, when he denied being present at the North Hayes property on the night of the murders and

denied knowing defendant, Richard, or Spradlin. He continued to lie to police when he was arrested on August 27, 1991, for the rape of Spring J. It was not until he was formally interviewed by police on August 28 that he finally admitted being on the property on the night of the murders.

Defendant cross-examined Rojas at length about his prior interviews with police. Although Rojas testified that he did not remember his prior interviews in detail, he consistently testified that he had lied to the police. On at least two occasions, out of the presence of the jury, the prosecutor expressed concern that detailed cross-examination about the numerous lies Rojas told to police during his interviews was consuming an undue amount of time. Defendant countered that all of the questions were relevant to credibility. He also moved to introduce Rojas's August 8 and 27 taped interviews with police under Evidence Code section 1237,[53] the exception to the rule against hearsay for past recollection recorded.[54] Citing Evidence Code sections 352 and 765,[55] the trial court indicated it would not allow lengthy cross-examination on every untrue statement that Rojas made during his interviews with police, in light of his candid admission that he had lied to them.

Later, Richard moved to play certain portions of the August 28 police interview for the jury to refresh Rojas's memory, to show Rojas's state of mind, or as prior inconsistent statements—all in an effort to impeach Rojas. Although defendant did not expressly join in Richard's motion, he did argue that all or a portion of the police interviews with Rojas should be admitted as prior inconsistent statements. The trial court allowed counsel to impeach Rojas using the transcript of the police interviews, but it refused to permit counsel to impeach Rojas by simply playing a recording of the interviews. The court, however, also indicated that it would reconsider the motion if

---

[53] Evidence Code section 1237 provides: "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement. [¶] (b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party."

[54] Evidence Code section 1237 did not apply to the admission of the taped police interviews of Rojas because Rojas did not testify that his statements to the police were true. (Evid. Code, § 1237, subd. (a)(3).)

[55] Evidence Code section 765, subdivision (a), provides: "The court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment."

counsel attempted to impeach Rojas using a transcript of the interviews and Rojas denied making a particular statement, or the prosecution argued that the transcription of the interviews was inaccurate.

Defendant now contends the trial court abused its discretion in precluding the defense from playing for the jury the August 8 and 27, 1991, taped police interviews of Rojas, and that the court's ruling violated his federal constitutional rights to due process, fundamental fairness, cross-examination and confrontation of witnesses under the Fifth, Sixth, and Fourteenth Amendments, and to a reliable judgment under the Eighth and Fourteenth Amendments.

It was uncontested at trial that Rojas lied to police during his interviews on August 8 and 27. Indeed, defendant emphasized this point several times during cross-examination. Although defendant admits that Rojas was effectively impeached, he contends that the jury should have been allowed to listen to the recording of the police interviews because it was the clearest evidence of Rojas's skill at lying and thus should have been considered in determining his credibility. Although hearing Rojas's manner of speaking in the police interviews might have assisted the jury in determining credibility, the trial court acted well within its discretion in precluding the defense from playing the taped interviews, considering that the point defendant wanted to make by playing the tape—that Rojas was a liar—had already been established. (See *People v. Pride* (1992) 3 Cal.4th 195, 235 [10 Cal.Rptr.2d 636, 833 P.2d 643]; Evid. Code, § 352.)

Although defendant relies on *People v. Degner* (1982) 131 Cal.App.3d 1049 [184 Cal.Rptr. 179], he concedes it is not on point. There, the Court of Appeal held that the trial court did not abuse its discretion in permitting the defendant's taped confession to be played for the jury because he raised issues of drug and alcohol use and its effect, and *Miranda* waiver, and the jury was better able to determine these issues when it had before it the words uttered and the manner of delivery. (*Id.* at pp. 1052–1053.) Unlike in *Degner*, here only Rojas's credibility was at issue, and because Rojas admitted he lied to police, his manner of speaking was of limited probative value.

For the first time on appeal, defendant contends the trial court should have permitted the taped interviews of Rodriguez and Juarez to be played for the jury. Defendant concedes he made no such requests below, but argues that such requests would have been fruitless given the court's ruling on playing Rojas's taped interviews. Assuming arguendo that defendant's request to play the taped interviews of Rojas extended to those of Rodriguez and Juarez such that the contention has been adequately preserved, it would fail. In essence, defendant argues the jury should have heard for itself the lies Rodriguez and

Juarez told police during their interviews. But, as with Rojas, the credibility of Rodriguez and Juarez was extensively explored at trial. For example, Rodriguez testified his memory of the night of the murders was impaired because he had been drinking. He also admitted that he had, in the past, lied to police. As for Juarez, his testimony at trial was inconsistent, almost to the point of being incomprehensible, and, as Detective Ybarra testified, he gave a different story almost every time she spoke to him. Moreover, both entered into contracts with the prosecution not to be prosecuted for the murders in exchange for their testimony at trial, and thus under these circumstances, playing for the jury their taped police interviews would not have made a measurable difference for purposes of impeachment. Thus, we necessarily reject defendant's claim of constitutional error.

### G. *Contract Not to Prosecute*

Defendant contends the trial court erred in receiving the testimony of Michael Rojas and Frank Rodriguez, with whom the prosecution had entered into contracts not to prosecute, because the contracts were conditioned on giving specific testimony, in violation of his federal constitutional rights to due process, fundamental fairness, and cross-examination and confrontation of witnesses under the Fifth, Sixth, and Fourteenth Amendments, and to a reliable judgment under the Eighth and Fourteenth Amendments.

Under the terms of Rojas's agreement, in exchange for his "full coopera-tion and truthful testimony" about the Spring J. incident, the rape and murder of Medina, and the murder of Sanchez, the prosecution agreed to: (1) Dismiss the pending rape charges against him for the rape of Spring J., (2) secure his release from confinement on his parole hold, and (3) recommend to the parole board that he not serve any time on any alleged parole violation arising out of the allegations involving Spring. Rojas's contract was specifically condi-tioned on his taking and passing a polygraph examination indicating that he did not participate in the offenses involving Spring, Medina and Sanchez and on his truthful testimony in the murder case.

Similarly, under the terms of Rodriguez's agreement, in exchange for his "full cooperation and truthful testimony" about the Spring J. incident, the rape and murder of Medina, and the murder of Sanchez, the prosecution agreed to dismiss the pending murder charges. Rodriguez's contract contained two conditions, one of which was that he testify truthfully in the murder case.[56]

---

[56] One paragraph of Rodriguez's contract, which dealt with the other condition, was blacked out before it was admitted at trial. Accordingly, we do not know its contents. The record indicates, however, that the condition involved a "polygraph reference." Defendant surmises

Defendant now argues that the condition of the contract requiring Rojas and Rodriguez to take and pass a polygraph examination with respect to their noninvolvement in the rape and murder of Medina and the murder of Sanchez effectively compelled them to deny in their testimony that they were perpetrators or accomplices, in violation of *People v. Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133] (*Medina*).

Preliminarily, defendant failed to object below to Rojas and Rodriguez's testimony based on a purported *Medina* violation. He thus has forfeited the claim. (See, e.g., *People v. Sully* (1991) 53 Cal.3d 1195, 1216 [283 Cal.Rptr. 144, 812 P.2d 163] (*Sully*).) Acknowledging his failure to object at trial, defendant contends trial counsel provided ineffective assistance. But counsel was not prejudicially deficient for failing to object, considering that *Sully*, as discussed below, had already rejected the identical "polygraph" claim argued here. Alternatively, defendant urges us to reconsider and disapprove *Sully*, and that, if we do so, we should excuse his failure to object at trial because counsel could not have foreseen this change of law. But we decline to reconsider *Sully* here.

Even assuming defendant had preserved his contention for appellate purposes, he fails to show that the contract condition involving the polygraph examination was impermissibly coercive.

In *Medina*, the Court of Appeal held that "a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." (*Medina, supra*, 41 Cal.App.3d at p. 455.) We have since observed that when an "accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial." (*People v. Allen* (1986) 42 Cal.3d 1222, 1251–1252 [232 Cal.Rptr. 849, 729 P.2d 115].) But "an agreement requiring only that the witness testify fully and truthfully is valid." (*Id.* at p. 1252.)

As noted above, *Sully, supra*, 53 Cal.3d 1195, is directly on point. In *Sully*, the defendant argued that the trial court violated *Medina* in admitting the testimony of an accomplice, with whom the prosecution had entered into a plea agreement. Under the terms of that agreement, the accomplice was

---

that this reference was identical to the requirement of taking and passing a polygraph examination contained in Rojas's contract. We assume this is so for purposes of this discussion.

permitted to plead to lesser charges in exchange for her " 'truthful and complete' statements" and truthful and complete testimony in all criminal proceedings. (*Id.* at p. 1216.) The accomplice was also required to submit to and pass a polygraph examination stating that she had no involvement in the deaths of the victims. On appeal, the defendant argued the plea condition requiring the accomplice to "pass a polygraph examination with respect to her noninvolvement in the murders effectively compelled her to deny in her testimony that she was the perpetrator or an accomplice in any of the murders in violation of *Medina*." (*Ibid.*) We found no *Medina* violation because the polygraph condition did not "dictate" the accomplice's testimony; she remained free to testify as she wished "without having to subscribe to any particular version of events." (*Id.* at p. 1217.) We also noted that the accomplice's testimony was amply corroborated, and that the defense "had a full and fair opportunity, with full knowledge of the terms of the plea agreement, to impeach [the accomplice's] testimony and to argue her credibility to the jury." (*Id.* at p. 1218.)

Here, the condition requiring Rojas to pass a polygraph examination did not dictate his testimony. He remained free to testify as he desired, "without having to subscribe to any particular version of events." (*Sully, supra,* 53 Cal.3d at p. 1217.) Although Rojas might have been under some pressure to adhere to his statements that he was not involved in the murder and rape of Medina or in the murder of Sanchez, he nonetheless was required to testify truthfully and completely at trial to avoid breaching the contract. No more was required to satisfy *Medina.* (*Ibid.*) The same analysis applies to Rodriguez's contractual obligation to testify truthfully and completely at trial. Moreover, defendant had a full and fair opportunity, with full knowledge of the terms of the contracts, to impeach Rojas's and Rodriguez's testimony and argue their credibility to the jury.

Following the close of evidence, the jury was instructed to decide whether the three main prosecution witnesses—Rojas, Rodriguez, and Juarez— testified truthfully.[57] Defendant contends this instruction diluted the burden of proof by essentially encouraging the jury to convict the three defendants if it found the witnesses were truthful, and that the error violated his federal constitutional rights to due process and proof of guilt beyond a reasonable

---

[57] "You have heard testimony that witnesses Michael Rojas, Raymond Juarez and Frank Rodriguez have entered into contracts with the District Attorney's Office and that the contracts include, as a condition of receiving the benefits conferred, a requirement that the witnesses must testify 'truthfully.'

"Whether these witnesses have testified truthfully is for you alone to decide based on all the evidence received in this trial.

"It would be improper for you to judge the credibility of Mr. Rojas, Mr. Juarez or Mr. Rodriguez based on any matter not in evidence in this trial. For example, you may not

doubt under the Fifth and Fourteenth Amendments, confrontation and cross-examination under the Sixth and Fourteenth Amendments, and a reliable judgment under the Eighth and Fourteenth Amendments.

On this theme, defendant first argues that the last paragraph of the instruction was an incorrect statement of law because "for the purposes of determining whether an immunity agreement has been breached, it is the court that determines whether a witness has testified truthfully." But the instruction did not instruct the jury to determine whether any of the three main prosecution witnesses breached their respective contracts with the prosecution. Rather, it correctly instructed them to determine the witnesses' credibility.

Defendant further argues that, because the jury knew these witnesses' contracts were conditioned on truthful testimony, and because the jury was instructed to determine the truthfulness of these witnesses, the instruction effectively forced the jury to "choose between seeing the defendants found guilty and the witnesses go free, or seeing the defendants go free while the witnesses would have to stand trial." Defendant complains this circumstance turned the trial into a popularity contest among the three witnesses and the defendants rather than an individualized determination of guilt. Not so. It is true that, in light of evidence that a condition of the three witnesses' contracts with the prosecution was that they testify truthfully, it was important to instruct the jury on determining the truthfulness of a witness. To this end, the instruction expressly informed the jury that it was to determine the witnesses' credibility based on the evidence at trial, not on a belief that the prosecution had already determined they were truthful. Nothing in the language of the instruction misled the jury to determine the defendants' guilt on anything less than proof beyond a reasonable doubt. Because we find no instructional error, defendant's claim of federal constitutional error must fail.

## H. *Stipulation*

In the presence of the jury, counsel for Richard said that all parties stipulated "that two questions were asked of Mr. Rojas and that he gave two responses in the August 28th, 1991, interview" with police. Counsel then read a portion of the transcript of that interview: " 'Question: Did [Medina and Sanchez] have to be kind of, like carried or dragged into the car?' [¶] Answer by Mr. Rojas: 'Yes.' [¶] 'Question: Johnny and who was putting them into the

judge the credibility of these witnesses based in whole or in part on a belief that the District Attorney has determined that these witnesses, or any of them, are credible witnesses, or any of them, have testified truthfully.

"You, the jury, are the only judges of whether in fact these witnesses, or any of them, have testified truthfully in this trial."

car?' [¶] Answer by Mr. Rojas: 'I'm not sure. Jeff [Spradlin] was helping them, I think, and telling them that they were giving them a ride home.' " When counsel asked the trial court to accept the stipulation, the court replied: "Yes, that is a stipulation and the jury must accept that as an established fact."

Defendant contends the jury "would have necessarily interpreted" the court's reply to mean they must accept Rojas's answers as truth of the matters asserted. Defendant further contends that the court's instruction violated his federal constitutional rights to due process, confrontation and cross-examination, and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and to a reliable judgment under the Eighth and Fourteenth Amendments.

The claim is without merit. In context, the court directed the jury to accept that the questions were asked of, and answers given by, Rojas. The stipulation nowhere asserted that Rojas answered the questions truthfully, and no reasonable jury would have so understood them. We presume the jury followed the court's directions. (See *People v. Welch* (1999) 20 Cal.4th 701, 773 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

## I. *Defendant's Absence During Readback of Testimony*

Defendant contends he was denied his rights to be present during trial and to be assisted by counsel during a critical stage of the trial when the trial court allowed rereading of certain testimony in his absence and without obtaining a waiver of his presence. In so doing, he asserts, the trial court violated sections 977[58] and 1043,[59] article I, section 15 of the California Constitution, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

During deliberations, the jury asked to hear the testimony of Mary Joseph, an identification technician for the Fresno County Sheriff's Department, regarding fingerprints found on the burned car (the Pontiac Bonneville that Ray Juarez and Jeffrey Spradlin had stolen) and on Richard Avila's 1964 Chevrolet Impala. After a discussion between the court and all parties, the

---

[58] Section 977 provides in pertinent part: "In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . ." (§ 977, subd. (b)(1).)

[59] Section 1043, subdivision (a), provides: "Except as otherwise provided . . . , the defendant in a felony case shall be personally present at the trial." Subdivision (d) states that the provisions in subdivision (a) "shall not limit the right of a defendant to waive his right to be present in accordance with Section 977."

court proposed to go to the jury room with the court reporter and tell the jury that there was no testimony in reference to fingerprints on the burned car, and that the court reporter would read the testimony from Mary Joseph in reference to fingerprints on the Impala. Defendant did not object to this proposal.

Shortly thereafter, in the jury room, in the presence of the court reporter, the court told the jury the following:

"You asked for two things. You asked for Mary Joseph's testimony in reference to fingerprints on the burned car. There is no such testimony.

"The second thing you asked for was Mary Joseph's testimony in reference to the fingerprints on the '64 Impala. That testimony has been pulled and our court reporter will be reading that back to you as soon as I leave.

"While she is reading to you, you may not deliberate or discuss the case in her presence. You need to wait until she finishes and has left the room, and then you may resume your deliberations."

 Defendant's absence from the readback of Mary Joseph's testimony violated section 977, subdivision (b)(1), because defendant did not execute in open court a written waiver of his right to be personally present. But the error was "statutory only and thus 'is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error.' [Citation.]" (*People v. Moon* (2005) 37 Cal.4th 1, 21 [32 Cal.Rptr.3d 894, 117 P.3d 591].) Because defendant provides no basis on which we could conclude the result of his trial would have been different had he been present at the readback (see *People v. Horton* (1995) 11 Cal.4th 1068, 1121 [47 Cal.Rptr.2d 516, 906 P.2d 478]), we find the violation of section 977 was harmless. For the same reason, his absence at the readback did not offend his constitutional rights to due process or a fair and reliable trial.

### J. Verdict Inconsistencies

Defendant contends that his murder convictions and all special circumstance findings must be set aside because inconsistencies in the guilt verdicts and special circumstance findings demonstrate that the jury was confused and misapplied the law to the facts in violation of his federal constitutional rights to fair trial, due process, and reliable factfinding under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

#### 1. Relevant Proceedings

The trial court instructed the jury that it must decide separately each special circumstance alleged in the case as to each of the defendants, and

that, to find a special circumstance alleged to be true, it must agree unanimously. (CALJIC No. 8.80.1.) The court then instructed the jury, without objection, on the three special circumstances alleged in the case: multiple-murder (§ 190.2, subd. (a)(3)), murder of a witness to a crime (§ 190.2, subd. (a)(10)),[60] and murder while engaged in the commission of a rape (§ 190.2, subd. (a)(17)).[61] In particular, as instructed, the witness-killing and rape-murder special-circumstance allegations were mutually exclusive,[62] as the prosecutor so argued to the jury.

The jury found all three defendants guilty of two counts of first degree murder. As to each of the defendants, the jury further found true all three special circumstances alleged. Moreover, the jury found Spradlin guilty of rape while acting in concert (§§ 261, subd. (a)(2), 264.1) but found defendant and Richard not guilty of that offense.

Out of the presence of the jury, the trial court and all parties discussed the jury verdicts at length. Richard eventually moved for a mistrial, and defendant joined in the motion. Defendant also argued that the jury was confused, there was no factual basis for its findings, and that to allow the special

---

[60] Section 190.2, subdivision (a)(10) requires the victim of the murder to have been "a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal or juvenile proceeding, and the killing was not committed during the commission or attempted commission, of the crime to which he or she was a witness."

[61] Section 190.2, subdivision (a)(17), requires that the murder be committed while the defendant was "engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" rape in violation of section 261. Section 261, subdivision (a)(2), in turn, defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator" accomplished against the person's will "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

[62] The trial court gave the jury the standard instruction on the witness-killing special circumstance as follows: "To find that the special circumstance, referred to in these instructions as murder of a witness to a crime, is true, each of the following facts must be proved: [¶] 1. The person killed was a witness to a crime, *prior to, and separate from the killing*; [¶] 2. The killing was intentional; and [¶] 3. The purpose of the killing was to prevent the witness from giving testimony in a criminal proceeding. [¶] *The crime witnessed is not prior to and separate from the killing of the witness when both are part of one continuous transaction or the same continuous criminal transaction.*" (CALJIC No. 8.81.10 (1991 rev.) (5th ed. 1988), italics added.)

The trial court modified the standard jury instruction on rape-murder special circumstance. The instruction as given instructed the jury as follows: "To find that the special circumstance, referred to in these instructions as murder in the commission of rape, is true, it must be proved: [¶] 1. The murder was committed while the defendant was *engaged in* the commission of a rape; and [¶] The murder was committed in order to carry out or advance the commission of the crime of rape or to facilitate the escape therefrom or to avoid detection. *In other words, the special circumstance referred to in these instructions is not established if the rape was merely incidental to the commission of the murder.*" (CALJIC No. 8.81.17 (1991 rev.) (5th ed. 1988), italics added.)

circumstances to stand under these circumstances violated his rights to due process under the Fourteenth Amendment and to be free from cruel and unusual punishment under the Eighth Amendment. He asked the court to strike all of the special circumstances or declare a mistrial.

The trial court denied the motions for a mistrial and to strike all of the special circumstances. The court, however, struck the rape-murder special circumstance as to both murders and the multiple-murder special circumstance as to the Sanchez murder.

On appeal, defendant identifies two purported inconsistencies in the verdicts against him. He asserts the jury found true the rape-murder special circumstance but found him not guilty of the crime of rape. He also asserts that the true finding on the rape-murder special circumstance, which required the murder to have been committed *during* the commission of rape (§ 190.2, subd. (a)(17)), was inconsistent with the true finding on the witness-killing special circumstance, which required the murder to have been committed after the commission of rape (§ 190.2, subd. (a)(10)).

## 2. *Discussion*

As a general rule, inherently inconsistent verdicts are allowed to stand. (*United States v. Powell* (1984) 469 U.S. 57, 64–69 [83 L.Ed.2d 461, 105 S.Ct. 471] (*Powell*); *People v. Lewis, supra*, 25 Cal.4th at p. 656.) For example, "if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911 [35 Cal.Rptr.2d 624, 884 P.2d 81].) Although " 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred" in such situations, "it is unclear whose ox has been gored." (*Powell, supra*, 469 U.S. at p. 65.) It is possible that the jury arrived at an inconsistent conclusion through "mistake, compromise, or lenity." (*Ibid.*) Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, "it is neither irrational nor illogical" to require him to accept the burden of conviction on the count on which the jury convicted. (*Id.* at p. 69.)

Applying the high court's rationale in *Powell*, defendant is not entitled to a reversal of his murder convictions on the basis that his acquittal on the rape count was inconsistent with the true finding on the rape-murder special circumstance. Defendant was given the benefit of the acquittal on the rape count, and, in any event, the trial court struck the rape-murder special circumstance, and thus there was no "error that worked against [him]." (*Powell, supra*, 469 U.S. at p. 66.)

Although *Powell* does not expressly address the situation, like the one here, where a true finding of one special circumstance is inconsistent with a true finding of another special circumstance, resulting in an inconsistency more severe than either legally permissible alternative (e.g., not-true finding as to both special circumstance or true finding as to one special circumstance only), defendant nevertheless is not entitled to a reversal of his murder convictions on this basis. The inconsistency here in the true findings of the rape-murder and witness-killing special circumstances was harmless because the trial court struck the rape-murder special circumstance, and thus there was no practical error that worked against him.

In any event, a "criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. . . . [No] further safeguards against jury irrationality are necessary." (*Powell, supra,* 469 U.S. at p. 67.) And as we have already concluded, there was sufficient evidence to uphold defendant's convictions for murder. Similarly, there was sufficient independent evidence that defendant intentionally killed Medina and Sanchez because he was afraid they could identify him and link him to the unlawful activities that occurred on the North Hayes property. For these reasons, we necessarily reject defendant's claim of federal constitutional error.

### K. *Trial Court Errors Relating to Alleged Juror Misconduct*

Defendant contends the trial court erred in failing to provide him with identifying information about a juror so that he could investigate a claim of juror misconduct. Alternatively, he contends the court erred in failing to hold a posttrial evidentiary hearing where the juror could be compelled to testify on a showing that the juror engaged in misconduct. The error, he contends, violated his federal constitutional rights to a fair trial by an impartial jury and due process under the Fifth, Sixth, and Fourteenth Amendments, and a reliable judgment under the Eighth and Fourteenth Amendments.

#### 1. *Relevant Proceedings*

On January 17, 1995, the jury returned a verdict of death.

After discharging the jury, the trial court distributed a questionnaire inquiring whether any jurors consented to the release of personal identifying information. All jurors except Juror No. 12 objected to the release of such information. On February 10, 1995, defendant petitioned for access to juror information.

The trial court held a hearing on defendant's petition on February 16, 1995. Several jurors, including B.S., Juror No. 6, were present. Juror No. 6 reiterated his objection to release of his personal information. The court denied the petition.

Defendant also filed a motion for an evidentiary hearing on alleged misconduct by Juror No. 6, supported by declarations by a Kenneth Cavin and two investigators for defendant.

Kenneth Cavin declared that a friend, Timothy Fleming, came to his house during the week of January 16, 1995, and that during one conversation, Fleming—who drank two beers—said that one of his employees was a juror on a three-defendant murder trial. According to Cavin, Fleming said that his employee, who worked for a couple of hours in the mornings before going to court each day, expressed opinions regarding the judicial system and the attorneys and judge in the case he was sitting on. Fleming's employee believed the judge was "not too bright;" the defense attorneys were "milking the system by repeating in redundant detail the testimony and cross-examination in the case;" the attorneys' "disputes about evidence were ridiculous [because] they were fighting about evidence that had already been seen by the jury;" the case could have been tried in less time; and the attorneys were just driving up their fees at public expense. The employee did not discuss the facts of the case. Cavin contacted Skip Masters, an investigator for defendant, and related the conversation. When Cavin told Fleming that someone would contact him about possible jury misconduct, Fleming became extremely upset.

Howard Masters, an investigator for defendant, spoke to Cavin, who essentially related the information contained in his declaration. Cavin also told Masters that Fleming's employee commented he felt the prosecutor was "okay" but that the defense attorneys argued redundantly and were "milking the case" for more money. Fleming's employee also complained about the time the case had taken from his family and job earnings. Masters also contacted Fleming, who was "annoyed" and "guarded." But Fleming confirmed that one of his employees had been a juror on defendant's trial. Although Fleming could not recall his employee making comments about the facts in the case or defendants during the course of the guilt or penalty phases, he recalled the employee "being critical and making disparaging comments about the court, judicial system, defense counsel, and particularly the earnings and quality of life" that the case had taken away from him, especially over the holiday season. Fleming could not recall the exact time period during which his employee made these comments.

Another investigator for defendant, Clifford Garoupa, also spoke to Fleming. Fleming told him that B.S., an employee of his, had commented while he

was a juror that the "system kind of stinks" and that it "takes too long to get these things resolved." Fleming "figured out what jury . . . [B.S.] was on only after the break between the guilt and penalty phase of this trial" by hearing news reports of the penalty phase. Fleming told Garoupa that his conversation with Cavin should be considered in context, that is, on an occasion when Fleming drank beer and after Cavin had taken three Vicodin pills for a headache. Fleming also stated that B.S. had related many things after the trial but refused to say what they were. Garoupa also spoke to B.S., who declined to discuss his jury service.

On February 24, 1995, the trial court addressed defendant's motion for an evidentiary hearing to investigate allegations of juror misconduct. Defendant argued, based on the three declarations, that Juror No. 6, who had been the foreman, had prejudged the case before the matter had been submitted to the jury. The court denied the motion and noted that Cavin's declaration was defective because it was undated. And, notwithstanding the hearsay nature of the declarations and assuming that the statements attributed to Juror No. 6 were true, the court found insufficient showing had been made that the statements rose to the level of "prejudicial misconduct."

In March 1995, defendant moved for a new trial or modification of the verdict on grounds of insufficiency of the evidence, prosecutorial misconduct, and jury misconduct. He again requested an evidentiary hearing where Juror No. 6 could be called to testify. Defendant also moved to continue his sentencing hearing and requested that the sheriff's department be ordered to serve Juror No. 6 with a subpoena. The court refused to order the sheriff's department to serve Juror No. 6 and denied the continuance motion, stating it was based on speculation that Juror No. 6 *might* provide a basis for a new trial. After summarizing at length the evidence adduced at the guilt and penalty phases, the court denied the motion for a new trial and declined to modify the sentence.

### 2. *Discussion*

Preliminarily, we note that, in a footnote in his opening brief, defendant states that Juror No. 6's "discussion with his employer about the defense attorneys was clearly misconduct." In his reply brief, however, he clarifies that his claim is only that the trial court should have held a hearing or disclosed identifying information about the juror, not that the juror's statement constituted prejudicial misconduct. Accordingly, we do not reach the question whether prejudicial juror misconduct, in fact, occurred.

Defendant first faults the trial court for failing to provide him with Juror No. 6's home address, so that he was unable to obtain a statement from the

juror. We conclude no error occurred. At the time defendant petitioned for access to identifying juror information in February 1995, Code of Civil Procedure section 237 provided that any person petitioning the court for access to juror identifying information may receive it if, after a hearing on the petition, there was an absence of an express finding of a continuing "compelling [governmental] interest" in keeping such information confidential. (Code Civ. Proc., § 237, amended by Stats. 1993, ch. 632, § 2, pp. 3722–3723.)[63] Here, after balancing "the privacy, safety and other considerations, the juror's refusal to discuss the deliberations or verdict, as against the rights of any of the parties to obtain that information based on a showing of need," the court made an express finding of a compelling governmental interest with respect to the identifying information of most of the trial jurors, including Juror No. 6. Under these circumstances, we conclude the court acted within its broad discretion in denying defendant access to Juror No. 6's home address. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096 [86 Cal.Rptr.2d 602, 979 P.2d 963].)

■■■ Defendant next faults the trial court for refusing to hold a posttrial evidentiary hearing on the issue of juror misconduct, and refusing to compel the juror to testify at such a hearing. The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260].) Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is "necessary to resolve material, disputed issues of fact." (*Id.* at p. 415.) "The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*Id.* at p. 419; see also *People v. Schmeck* (2005) 37 Cal.4th 240, 295 [33 Cal.Rptr.3d 397, 118 P.3d 451].)

"We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct." (*People v. Carter* (2003) 30 Cal.4th 1166, 1216 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

---

[63] Code of Civil Procedure section 237 currently provides that any petition for access to identifying juror information must be supported by "a declaration that includes facts sufficient to establish good cause for the release [of such information]." (*Id.*, subd. (b).)

■ Applying these rules here, we conclude the trial court did not abuse its discretion in declining to hold a hearing on potential jury misconduct. Defendant's showing on this issue consisted of a declaration by Cavin, who had spoken to Fleming, who, in turn, had spoken to Juror No. 6, and declarations by two defense investigators generally recounting statements by Cavin and Fleming. At the least, the declarations consisted of double hearsay. "Normally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct." (*People v. Hayes, supra,* 21 Cal.4th at p. 1256.) Aside from the hearsay problem, none of the declarations indicates when during defendant's trial the purported misconduct occurred. Cavin's declaration itself was defective because it was undated. And, as one of the defense investigators declared, Juror No. 6 declined to talk about his jury service. Accordingly, defendant failed to come forward with sufficient evidence demonstrating a strong possibility that prejudicial misconduct had occurred.

Assuming without deciding that Juror No. 6 did make statements disparaging defense counsel, the trial court, and the criminal justice system, in violation of the court's admonition not to discuss any subject connected with the trial, whether Juror No. 6 made such statements was not a material issue in the case, for the statements had no bearing on the matter pending before the jury, that is, defendant's guilt or innocence. (See *In re Hamilton* (1999) 20 Cal.4th 273, 306 [84 Cal.Rptr.2d 403, 975 P.2d 600].) Accordingly, evidence of any such statements by Juror No. 6 did not create a strong possibility of prejudicial misconduct, and the court did not abuse its discretion in refusing defendant's request for an evidentiary hearing or to compel Juror No. 6 to testify at such a hearing.

## L. *Sealed Records*

### 1. *Rojas's Parole and Juvenile Records*

On two occasions before Rojas testified, the trial court conducted in camera proceedings in response to defendants' requests for access to Rojas's parole and juvenile records. The court granted the defense access to some records and denied access to others. Defendant contends that his inability on appeal to review all the existing parole and juvenile records pertaining to Rojas that the court had reviewed in camera to determine whether the court's ruling was correct violated his federal constitutional rights to due process under the Fifth and Fourteenth Amendments, a reliable judgment under the Eighth Amendment, effective assistance of counsel and confrontation and cross-examination under the Sixth Amendment. Accordingly, defendant contends that we should independently review the court's rulings concerning access to various records of Rojas.

Before filing his opening brief, defendant filed, in this court, a motion asking this court to review Rojas's parole and juvenile records, as well as all other sealed records in this case to which he did not have access, and to determine whether to unseal them or otherwise provide him with copies thereof.[64] Accordingly, we reviewed all of the sealed documents in the case and, on December 10, 2003, after defendant filed his opening brief but over six months before he filed his reply brief, we granted the motion in part, ordering that all the sealed records, with a few exceptions, be unsealed or otherwise provided to counsel for defendant.

In his reply brief, defendant acknowledges that we granted his motion in part but does not otherwise amend his claim. Defendant's argument (that he cannot adequately request review of records to which he does not have access) is without merit with respect to the records that have now been unsealed and those that remain sealed but of which defendant has been given a copy. As to all of these records, defendant fails to argue a continuing need for independent review. Accordingly, we decline to provide it.

■ The trial court's in camera rulings withholding certain parole and juvenile records pertaining to Rojas, records that remain sealed and to which defendant does not have access, require further discussion. "Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable 'must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record.' [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 493 [3 Cal.Rptr.2d 106, 821 P.2d 610].) We have done so and, as will appear, see no prejudicial error.

■ " '[T]he right of an accused to obtain discovery is not absolute.' [Citation.] '[The] court retains wide discretion to protect against the disclosure of information which might unduly hamper the prosecution or violate some other legitimate governmental interest.' [Citation.] This may be particularly true when the information sought is not directly related to the issue of a defendant's guilt or innocence. [Citation.]" (*People v. Luttenberger* (1990) 50 Cal.3d 1, 21 [265 Cal.Rptr. 690, 784 P.2d 633].)

For example, with certain exceptions not applicable here, juvenile case files are confidential by operation of law, and inspection thereof is limited to certain enumerated individuals and/or agencies. (See Welf. & Inst. Code, §§ 827, 828; Cal. Rules of Court, rule 1423(a), (b).) Neither defendant nor his counsel fall into any category of individuals and/or agencies authorized to

---

[64] As originally transmitted to us from the trial court, the sealed records in this case consisted of over 12 volumes of transcripts.

inspect Rojas's juvenile case files without prior authorization to inspect them ordered by the juvenile court presiding judge or a judicial officer designated by the juvenile court presiding judge. (Cal. Rules of Court, rule 1423(b).) Notwithstanding the fact that the trial court in this case released to counsel two juvenile petitions involving Rojas, the court did not abuse its discretion in withholding the remainder of Rojas's juvenile records because counsel did not obtain prior authorization by the juvenile court presiding judge, or a judicial officer designated by the juvenile court presiding judge, to inspect them.

 As to the parole records of Rojas that remain sealed, the trial court apparently withheld them on grounds that preserving the confidential information contained therein outweighed the necessity for their disclosure in the interest of justice. (Evid. Code, § 1040, subd. (b)(2) [a public entity has a privilege to refuse to disclose information acquired in confidence by a public employee in the course of his or her duty if such disclosure "is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice"].) Having independently reviewed the records in question, we are persuaded that the trial court did not abuse its discretion in reaching this conclusion.

In any event, defendant cannot establish prejudice of constitutional dimension. Denial of discovery of certain juvenile and parole records of Rojas did not prevent defendant from challenging Rojas's credibility and suggesting his involvement in the murders.

### 2. *Other Sealed Records*

Defendant also contends that we should independently review the trial court's other in camera proceedings and records relating to codefendants that have been transmitted to us from the trial court under seal. Defendant's claim, in substance, is that because he cannot review the portions of the record on appeal that have been transmitted to us from the court under seal, he cannot determine whether error occurred, and because he cannot determine whether error occurred, we should conclude he has been deprived of various federal constitutional rights or, in the alternative, independently review all of the sealed records ourselves to determine whether error occurred.

As stated, most of the records related to codefendants to which he claims he does not have access have been unsealed or otherwise provided to him. As to the records that have been provided to him, we decline to provide independent review.

Some sealed records related to codefendants, however, require further discussion. Of the originally sealed records pertaining to codefendants that

defendant identifies in his opening brief, records pertaining to attorney fees for Richard and Spradlin, and records related to a motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] by Richard, remain sealed by operation of law with no exception applicable here. (See § 987.9; Cal. Rules of Court, rule 31.2(a).) These records do not involve defendant, and we reject defendant's argument that being denied access to them infringed any of his federal constitutional rights.

### M. *Cumulative Error in Guilt Phase*

Defendant contends that, even if the errors alleged *ante* are not in themselves reversible, they are reversible cumulatively. We disagree. Our rejection of each of defendant's specific claims necessarily forecloses his claim of cumulative error.

## IV. PENALTY PHASE ISSUES

### A. *Asserted Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in misconduct during his cross-examination of Dr. Charles Pine, a defense clinical psychologist, by asking whether Dr. Pine believed defendant would kill again in prison. Defendant urges that the misconduct violated state law and his federal constitutional rights to a fair trial, due process, and confrontation and cross-examination under the Fifth, Sixth, and Fourteenth Amendments, as well as his rights to presentation of witnesses, fair consideration of mitigating evidence, and reliability of his penalty verdict under the Eighth and Fourteenth Amendments.

### 1. *Relevant Proceedings*

Dr. Pine conducted a psychological evaluation of defendant and concluded defendant suffered from multiple neuropsychological deficiencies, which, combined with past alcohol or PCP use, affected his ability to function.

On direct examination, Dr. Pine predicted that because defendant acted withdrawn and was noninteractive when under the influence of PCP in the past, defendant would behave in a similar fashion if he used PCP in the future. On cross-examination, the prosecutor asked Dr. Pine: "[W]ould you expect [defendant] to be more likely to kill again based on the fact that he's killed before?" Defendant objected to the question as irrelevant and beyond the scope of direct examination. The court stated that it believed the question was "a fair rebuttal cross-examination question because much of the direct examination directly and indirectly has elicited opinions from which it could

be argued that [defendant] does not have the mental wherewithal to commit the crime for which he's convicted." It overruled defendant's objection and then permitted the prosecutor to rephrase his question.

The prosecutor told Dr. Pine he would ask a hypothetical question based on the following assumptions: "[T]hat [defendant] was in fact the killer or one of the killers . . . of the two alleged victims in this case," "that you [Dr. Pine] previously testified and found to be fact that [defendant] has difficulty in controlling himself," "that [defendant has] a reactive personality," and "that [defendant] is faced with a significant stress factor or a danger factor to himself." The prosecutor next asked: "[B]ased on those hypothetical factors, would the . . . assumed fact that he has killed before make it more likely for this hypothetical man to kill again?" Defendant made an unspecified objection. Out of the presence of the jury, the prosecutor stated he would withdraw the question and drop this line of questioning, but defendant nevertheless moved for a mistrial. The court denied the mistrial motion, concluding the hypothetical was proper cross-examination. Defendant requested an immediate cautionary instruction. The court denied the request, stating that the standard cautionary instruction to be given at the conclusion of the trial (see CALJIC No. 1.02) would be sufficient.

In the presence of the jury, the prosecutor continued his cross-examination of Dr. Pine. There was no further mention of the prosecutor's previous hypothetical question.

Following the close of evidence, the jury was instructed, inter alia, "If an objection was sustained to a question, do not guess what the answer might have been. Do not speculate as to the reason for the objection. [¶] Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it enables you to understand the answer." (See CALJIC No. 1.02.)

### 2. *Discussion*

■■■ Defendant did not make a specific objection on the ground of misconduct to the prosecutor's cross-examination question posed to Dr. Pine. Accordingly, he failed to preserve the issue for appeal. Generally, " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Gray* (2005) 37 Cal.4th 168, 215 [33 Cal.Rptr.3d 451, 118 P.3d 496].) Even had defendant preserved the claim, we would find no misconduct.

A prosecutor's misconduct violates California law if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Farnam, supra,* 28 Cal.4th at p. 167.) A prosecutor's misconduct further violates the Fourteenth Amendment to the United States Constitution if it "infects the trial with such unfairness as to make the conviction a denial of due process" (*People v. Morales, supra,* 25 Cal.4th at p. 44; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868]), or is of "sufficient significance to result in the denial of the defendant's right to a fair trial" (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392]).

"[E]xpert testimony that a capital defendant will pose a danger in the future if his life is spared is inadmissible." (*People v. Boyette, supra,* 29 Cal.4th at p. 446.) A prosecutor can, however, "properly explore on cross-examination the basis for an expert's prediction that a capital defendant will pose no future danger if sentenced to life without parole." (*People v. Earp* (1999) 20 Cal.4th 826, 894 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

Defendant contends that the prosecutor engaged in misconduct in asking Dr. Pine whether defendant would be more likely to kill again because the defense did not elicit, on direct examination, any testimony that defendant would pose no future danger if sentenced to life without parole.

We need not resolve the question whether the prosecutor's cross-examination question of Dr. Pine was proper because we conclude that, under any standard of prejudice, the question did not affect the outcome of the penalty phase. (See, e.g., *People v. Earp, supra,* 20 Cal.4th at p. 894.) Dr. Pine did not answer either the prosecutor's original question—whether he expected defendant to be more likely to kill again based on the fact that he had killed before—or the subsequent hypothetical question on the same subject matter. The jury was instructed not to guess what the answer might have been if an objection was sustained to a question, speculate as to the reason for the objection, or assume to be true any insinuation suggested by a question. We presume the jury followed the court's instructions, and defendant's argument to the contrary is speculation. Thus, we necessarily reject defendant's claim of federal constitutional error.

### B. *Refusal to Permit Evidence of the Lack of Punishment for Accomplices*

The prosecution moved the trial court to preclude the defense from presenting evidence or argument on the lack of punishment for accom-

plices—Rojas, Juarez, and Rodriguez—in this case. Over defendant's objection, the court granted the motion. Defendant now contends this was error. He acknowledges we have rejected this claim in the past (see, e.g., *People v. Brown* (2003) 31 Cal.4th 518, 562–563 [3 Cal.Rptr.3d 145, 73 P.3d 1137]) but urges us to reconsider. He presents no persuasive reason to do so.

Defendant claims the federal Constitution requires consideration of an accomplice's punishment, or lack thereof, because the federal death penalty statute lists, as a factor to consider in determining whether a sentence of death is to be imposed on a defendant under federal law, "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." (18 U.S.C. § 3592(a)(4).) The federal statute is inapposite. First, it is limited to evidence of sentences for codefendants. Second, that the federal death penalty law allows for consideration of such a factor does not imply that it is constitutionally required. (*United States v. Sampson* (D.Mass. 2004) 335 F.Supp.2d 166, 194 [" 'What 18 U.S.C.A. § 3592 allows is substantially broader than what the Supreme Court has declared to be the minimal requirements under the Constitution' "].) We conclude that the court did not err in granting the prosecution's request to preclude such evidence.

## C. *Sufficiency of Evidence*

Defendant asserts that, even if the evidence in this case—which he complains is largely based on the testimony of three key prosecution witnesses who were biased and unreliable—is substantial enough to support his conviction, upholding his death sentence on such evidence contravenes the need for heightened reliability in the factfinding process in a capital case. We disagree. As we have noted multiple times throughout this opinion, there was substantial evidence of defendant's guilt, and defendant fails to persuade us that the state of the evidence at the guilt phase calls the penalty phase verdict into doubt.

## D. *Response to Jury Question*

Defendant contends the trial court violated his right to the effective assistance of counsel under the Sixth Amendment to the federal Constitution when it communicated with the deliberating jury without notice to and in the absence of his counsel. He also claims a violation of due process under the Fifth, Sixth, and Fourteenth Amendments, and denial of a reliable judgment under the Eighth and Fourteenth Amendments.

### 1. *Relevant Proceedings*

Jurors began deliberating at 3:30 p.m. on Tuesday, January 10, 1995, and the court excused them for the day at 4:50 p.m. The next day, the jury sent a note to the court asking, "In the event we are not all in agreement concerning the penalty, what happens?" After a discussion with counsel, the court answered the jury as follows: "That is not for the jury to consider or to concern itself with. You must make every effort to reach a unanimous decision if you can."

Later that same day, the jury sent another note to the court stating, "We have discussed and voted three times and we cannot agree on which punishment for [defendant]." The court informed counsel that it was inclined to ask the jury for the numerical split and that, depending on the answer, it might ask each juror individually whether he or she felt that there was a possibility that further deliberations might be fruitful. Defendant asked that each juror be polled outside the presence of the rest of the jurors. The court denied the request as unnecessary. The court asked the jury foreman "how the jurors are divided numerically," and the foreman stated that the division was seven to five. The court informed the jury that it would adjourn for the day but was ordering the jury back the next day to resume deliberations. It stated: "I'm not suggesting or encouraging any of you to change your minds or your votes tomorrow. However, it's just my view that given the length of this case and the decision that you have to make that less than one day of deliberation is not so lengthy that I'm prepared to give up hope that you might be able to reach a verdict."

At 2:45 p.m. on Friday, the fourth day of deliberations, the jury sent a note to the court stating, "We cannot reach a unanimous agreement and would like the weekend to consider the case before another vote is taken." The court excused the jury for the weekend and ordered them back at 9:00 a.m. on the following Tuesday, January 17.

After the court excused the jury, it notified counsel about the note by telephone. Thereafter, counsel for defendant requested, via facsimile, that the court convene the jury on Tuesday at 9:00 a.m. and poll them before they engage in further deliberations.

On Tuesday, the court was involved in other matters until approximately 9:45 a.m. About this time, it received word that the jury had reached a verdict. Shortly thereafter, the court convened without the jury. Defendant argued that the jury's note on Friday indicated it was at an impasse, and that,

at that point, the court should have informed counsel to discuss the matter instead of dismissing the jury for the day. He also argued the court should have precluded the jury from deliberating that morning until court and counsel could discuss the matter. The court replied that the last jury's note was not an indication that they had reached an impasse or that they were deadlocked. It further stated: "In fact, their request was that they wanted to come back and continue to confer about this matter. On that basis, I saw no reason to reconvene them, I saw no reason to instruct them, I saw no reason to give them further guidance."

The substance of defendant's claim is that the trial court improperly dismissed the jury for a three-day weekend, without contacting and soliciting counsel's views in response to an indication the jury was deadlocked. Defendant contends he should have been given the opportunity to persuade the court to poll the jury or otherwise give a cautionary instruction reminding the jury of its responsibility not to surrender conscientiously held beliefs in order to reach a verdict.

### 2. *Discussion*

"[I]t has long been the rule that the trial court should not entertain communications from the jury except in open court, with prior notification to counsel. '[A]ll communications should be made in open court. . . . Ordinary procedure would require that the trial judge afford the parties an opportunity to be apprised of any such communication and to have the opportunity to make timely objection to any action by the court or jury which might be deemed irregular.' [Citations.]" (*People v. Hogan* (1982) 31 Cal.3d 815, 848–849 [183 Cal.Rptr. 817, 647 P.2d 93], disapproved on another point in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].)

The trial court did not err. The jury's note did not state that it was hopelessly deadlocked. Rather, their question was whether they could adjourn for the weekend before deliberating further. It is true that "the preferable practice is to notify counsel of all mid-deliberation jury inquiries" (*People v. Mickle, supra,* 54 Cal.3d at p. 174), but the inquiry here essentially involved an administrative issue—the time of adjournment—not testimony or any point of law. "A statutory or constitutional violation occurs only where the court actually provides the jury with instructions or evidence during deliberations without first consulting counsel." (*Ibid.*)

*People v. Dagnino* (1978) 80 Cal.App.3d 981 [146 Cal.Rptr. 129], on which defendant relies, is inapposite. In *Dagnino,* the Court of Appeal held

that the trial court prejudicially erred when it provided to the deliberating jury, pursuant to its requests but without notification to counsel, additional instructions on the difference between first and second degree burglary and the definition of accessory and also a written copy of previously read instructions. (*Id.* at pp. 989–990.) In contrast, the jury in defendant's case made no inquiry about the law or the facts of the case, and the court did not give any directions to the jury.

Defendant's reliance on *People v. Horton, supra,* 11 Cal.4th at pages 1136–1137, is likewise unhelpful to him. There, this court held that instructing a deadlocked jury, without notification to counsel, to deliberate further constituted a denial of assistance of counsel where the trial court had been prepared to declare a mistrial but did not do so because counsel for codefendant had urged it to allow the jury to continue deliberating. (*Ibid.*) Unlike the jury in *Horton,* the jury in defendant's case did not indicate it was deadlocked or ask for further direction.

E. *Challenges to the Death Penalty Law*

Defendant challenges various aspects of California's death penalty law (§ 190 et seq.) as violating the United States Constitution. We have previously considered and rejected these challenges, and defendant offers no persuasive reason to reconsider them here. A summary of our pertinent holdings follows.

California law adequately narrows the class of persons eligible for the death penalty. (*People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568]; *People v. Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Section 190.3, factor (a) is not unconstitutionally vague and has not been used in ways so "arbitrary and contradictory" as to violate the federal Constitution. (*People v. Morrison, supra,* 34 Cal.4th at p. 729.) The jury need not make written findings, achieve unanimity as to specific aggravating circumstances, find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), find that aggravating circumstances outweigh mitigating circumstances, or find that death is the appropriate penalty. (*People v. Morrison, supra,* 34 Cal.4th at pp. 730–731; *People v. Prieto* (2003) 30 Cal.4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) Use in the sentencing factors of such adjectives as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (*id.,* factor (g)) does not act as a barrier to the consideration of mitigating evidence in violation of the federal

Constitution. (*People v. Morrison, supra,* 34 Cal.4th at pp. 729–730.) The jury need not be specifically instructed that lingering doubt is a factor to consider, as that concept is encompassed in factor (k). (*People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Intercase proportionality review is not constitutionally required. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Anderson, supra,* 25 Cal.4th at p. 602.) To the extent defendant requests intracase proportionality review, it would not aid him. Given the nature of these murders, defendant's conduct and comments thereafter, and his previous criminal activity, his sentence is not grossly disproportionate to his personal culpability. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 511.)

California law is not constitutionally deficient because the prosecution retains discretion whether to seek the death penalty (*People v. Monterroso* (2004) 34 Cal.4th 743, 796 [22 Cal.Rptr.3d 1, 101 P.3d 956]) or because it does not provide for a presumption in favor of life (*People v. Maury, supra,* 30 Cal.4th at p. 440; *People v. Samayoa* (1997) 15 Cal.4th 795, 852–853 [64 Cal.Rptr.2d 400, 938 P.2d 2]). The delay in appointing counsel and hearing his appeal, and execution after such a delay, are not unconstitutional. (*People v. Snow* (2003) 30 Cal.4th 43, 127 [132 Cal.Rptr.2d 271, 65 P.3d 749].) This court's review process is not impermissibly influenced by political considerations. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1140–1141 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

F. *International Law*

Defendant contends that the various violations of state and federal law that he has asserted also constitute violations of international law. He cites articles 6 and 14 of the International Covenant on Civil and Political Rights, as well as articles 1, 2, and 6 of the American Declaration of the Rights and Duties of Man. But "[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse, supra,* 27 Cal.4th at p. 511.) Because we find no state or federal bars to the imposition of the death penalty on defendant, we necessarily reject his claim that his sentence violates international law.

G. *Cumulative Error*

Defendant contends the cumulative effect of the asserted errors in the guilt phase and any error in the penalty phase requires reversal of his death sentence. We disagree. We have either rejected his claims or concluded any assumed error to be nonprejudicial on an individual basis. The assumed errors are no more compelling when considered together.

## V. CONCLUSION

For the reasons stated, we affirm the judgment.

George, C. J., Kennard, J., Werdegar, J., Moreno, J., Corrigan, J., and Gaut, J.,[*] concurred.

Appellant's petition for a rehearing was denied August 2, 2006. George, C. J., did not participate therein.

---

[*]Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.